Stanley J. Silverstone
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
445 Hamilton Avenue, Suite 1204
White Plains, New York 10601
(914) 997-1346
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELTA PILOTS ASSOCIATION,<br>    a labor organization<br>    incorporated in Florida<br>                      Plaintiff<br>v.<br><br>JOHN DOE,<br>    an individual<br>                      Defendant. | Civil Action No.: 1:14-cv-00225-AKH |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR LEAVE TO TAKE IMMEDIATE DISCOVERY

### I)      SUMMARY.

Plaintiff, the Delta Pilots Association ("DPA"), seeks leave of the Court to serve limited but immediate discovery on all third-parties such as Internet web-hosting companies, Internet Service Providers ("ISP"), telephone companies, and others, who are believed to have information that will determine, or assist in determining, the true identity of the "John Doe" Defendant.  DPA has had to bring this action and motion because of the "hacking" of its web site in November 2013 and ongoing interference with it, which constitutes multiple violations of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq*. The timing of this motion is driven by the fact that the digital information sought will be lost with the passage of time. (Because Plaintiff does not currently know the identity of any of the Defendants, Plaintiff cannot ascertain any of the Defendants' positions on this Motion).

## II)      FACTS.

As alleged in the complaint (Doc. No. 1, hereinafter Cmplt.), Delta Air Lines, Inc. is one of the nation's largest commercial air carriers and employs nearly 12,000 commercial pilots. (Cmplt. ¶ 12). Under the federal law, covered employees, including pilots, have a right to choose whether to be represented by a union and, if so, by what union. (Cmplt. ¶ 13).

The Air Line Pilots Association ("ALPA") is a labor union that currently represents the pilots employed by Delta. (Cmplt. ¶ 14-16).

In May of 2010, DPA was founded out of dissatisfaction with ALPA's representation of Delta pilots and with the specific goal of replacing ALPA as the union representing Delta pilots. (Cmplt. ¶ 18). Tim Caplinger is the founder of DPA, a member of its Board of Directors, and its Interim President. (Cmplt. ¶ 19).

In 2010, the DPA began a campaign to collect authorization cards ("cards") signed by individual Delta pilots in order to demonstrate that a majority of them desire to be represented by DPA. (Cmplt. ¶ 20). This campaign was for the purpose of securing and winning a representation election conducted by the National Mediation Board ("NMB"), pursuant to the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, and ultimately to have DPA certified by the NMB as the new and exclusive representative of Delta pilots. (*Id.*). By early November 2013, DPA had collected cards from more than 50% of all Delta pilots but had not yet filed an application for a representation dispute with the NMB. (Cmplt. ¶ 21).

DPA's primary means of conducting its business, including communicating with Delta pilots, raising donations, and campaigning, is through its web site. (Cmplt. ¶ 22). DPA's web site can be located, or "surfed" to, on the Internet, or "web," at the uniform resource locator ("URL"), or web address, of http://delta-pilots.org. (Cmplt. ¶ 23).

The DPA website displays a running count of the number of cards signed by Delta pilots in DPA's campaign to seek an election to replace ALPA. (Cmplt. ¶ 25).

SquareSpace, Inc. is a New York company that "hosts" DPA's web site. (Cmplt. ¶ 26). Tim Caplinger had personal access to DPA's SquareSpace account on behalf of DPA at all relevant times. (Cmplt. ¶ 28).

Starting on or about November 8, 2013, and continuing thereafter, the integrity of DPA's web site was dramatically and visibly disrupted when it was "hacked" into. (Cmplt. ¶ 32).

As a direct and immediate consequence of this attack, DPA's web site ceased to function as intended (Cmplt. ¶ 33), the ability of the site to accept monetary donations from members and/or supporters ceased to function properly when links to a secure third-party credit card web site were severed (Cmplt. ¶ 34), the ability of the web site to display video messages and important updates was severely disrupted (Cmplt. ¶ 35), the private portion of the web site became inaccessible (Cmplt. ¶ 36), and visitors to DPA's web site were involuntarily redirected away from it to sites not of DPA's making, nor owned, nor controlled by DPA. (Cmplt. ¶ 37).  In the early stages of the attack, viewers attempting to access DPA's web site were involuntarily redirected to a web page that falsely claimed DPA had abandoned its card collection campaign and now urged support for ALPA ("work together").  This page also contained a link to an ALPA web site. (Cmplt. ¶ 38).  In the later stages of the attack, viewers were redirected to yet another web site, "deltapilot.org," which mimicked DPA's web site, effectively a malicious "clone" of it.  (Cmplt. ¶ 39).

Despite DPA's efforts to mitigate damage to its web site and to restore control over it, defendant John Doe succeeded in inserting commands or code into accounts on computers relied upon by plaintiff that are necessary to the proper and safe function of DPA's web site. (Cmplt. ¶

41).  This constitutes an ongoing means to re-access and to potentially disable, disrupt, or interfere with the integrity of DPA's web site at any time.  (Cmplt. ¶ 51).  To date, DPA has not been successful in removing all of the malicious commands or code and consequently DPA's web site remains potentially vulnerable to renewed "backdoor" attacks by defendant Doe presently and in the future.  (Cmplt. ¶ 52).

On November 9, 2013, DPA published on its publicly accessible Facebook and Twitter accounts a message stating, "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice …" (Cmplt. ¶ 53).  On November 14, 2013, DPA published in its email newsletter entitled "DPA Status Report" an article that stated in part, "Hacking Update … our investigation has led us to a point we did not want to arrive at, filing a lawsuit …" (Cmplt. ¶ 54).

The very next day, November 15, 2013, Tim Caplinger received three phone calls at his residence from a person who refused to identify himself but who claimed that he was responsible for hacking into DPA's web site by means of using Caplinger's personal information. (Cmplt. ¶ 55).  The caller attempted unsuccessfully to negotiate with Caplinger to avoid being "pursued." (Cmplt. ¶ 56).  Later that same day Caplinger made a criminal complaint based on the hacking of DPA's web site.  (Cmplt. ¶ 57).

### III)   APPLICABLE LAW.

Courts, including in this circuit, routinely allow discovery to identify unknown "John Doe" defendants.  *See Munz v. Parr*, 758 F.2d 1254, 1257 (8th Cir. 1985) (error to dismiss claim merely because the defendant was unnamed; "Rather than dismissing the claim, the court should have ordered disclosure of the Officer Doe's identity"); *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (error to dismiss unnamed defendants given the possibility that identity

could be ascertained through discovery); *Valentin v. Dinkins*, 121 F.3d 72, 75-76 (2d Cir. 1997) (vacating dismissal; pro se plaintiff should have been permitted to conduct discovery to reveal identity of the defendant); *Dean v. Barber*, 951 F.2d 1210, 1215 (11th Cir. 1992) (error to deny the plaintiff's motion to join John Doe defendant where identity of John Doe could have been determined through discovery); *Maclin v. Paulson*, 627 F.2d 83, 87 (7th Cir. 1980) (where "party is ignorant of defendants' true identity … plaintiff should have been permitted to obtain their identity through limited discovery"); *Schiff v. Kennedy*, 691 F.2d 196, 197-198 (4th Cir. 1982) (holding the district court erred by dismissing the case because the Doe defendant was a real person who could be identified through discovery); *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980 (stating "where identity of alleged defendants [are not] known prior to the filing of a complaint … the plaintiff should be given an opportunity through discovery to identify the unknown defendants").

Immediate discovery (prior to a Rule 26 conference) to uncover the identity of a John Doe defendant is warranted in situations where conduct in violation of federal law has been committed entirely *online*. With the rise of the Internet has come the ability to commit certain tortious acts, such as defamation, copyright infringement, and trademark infringement, entirely on-line. The tortfeasor can act pseudonymously or anonymously and may give fictitious or incomplete identifying information. Parties who have been injured by these acts are likely to find themselves chasing the tortfeasor from Internet Service Provider (ISP) to ISP, with little or no hope of actually discovering the identity of the tortfeasor. In such cases the traditional reluctance for permitting filings against John Doe defendants or fictitious names and the traditional enforcement of strict compliance with service requirements should be tempered by the need to provide injured parties with a forum in which they may seek redress for grievances.

*Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578 (N.D. Cal. 1999).

Courts will also allow expedited discovery where the party establishes good cause, i.e, where the need for expedited discovery, in consideration of the administration of justice, outweighs prejudice to the responding party. *Semitool, Inc. v. Tokyo Electron Am., Inc.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002); *Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003); *Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 613-14 (D. Ariz. 2001).

### IV)     ARGUMENT.

**1)     Good Cause To Allow Limited, Immediate Discovery Exists Based On The Continuing Online "Hacking" Of DPA's Web Site That Is Interfering With A Union Election Campaign And DPA's Very Purpose For Existing.**

Good cause exists for the relief requested based on the following:

First, DPA demonstrates good cause because it has been and will continue to be irreparably harmed by Defendant Doe's conduct because, as alleged, the "hacking" of its web site is an online (digital) action in violation of federal law that continues to this very day and is presently interfering with DPA's primary purpose for which it was founded, and also indirectly constitutes ongoing interference with all Delta pilots' rights under federal law to choose their union representative.  The hacker appears bent on using illegal online methods to thwart DPA from collecting enough cards in order to file for an election, perhaps hoping DPA will run out of time under various statutory deadlines.  DPA's entire rationale for existing is hence threatened and it is being irreparably harmed at this time. *United Ins. Co., Ltd. v. World Wide Mgmt. of Consultants*, 2011 U.S. Dist. LEXIS 52131, at *14 (E.D.N.Y. April 27, 2011) (*citing Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004)) ("A company's loss of reputation, good will, and business opportunities can constitute 'irreparable harm…'").

Second, there is *limited time* that the information sought will be available because there is a very real danger that it will no longer exist. Electronic evidence may be, and usually is, destroyed by intentional but routine deletion, unintended over-writing, or by other means. The same is true for telephone records because they are typically just digital information as well. All "computer" or "digital" evidence is by its very nature subject to being permanently lost as a matter of routine course. Yet in this case if the relevant digital information held by third-parties is erased then DPA will have no ability to identify Doe, and thus will be unable to pursue its lawsuit to protect itself. Where "physical evidence may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties to the litigation," good cause for expedited discovery exists. *See Qwest Comm.*, 213 F.R.D. at 419; *Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675, 676 (D. Colo. 2002) (allowing the plaintiff expedited discovery to inspect "beans" in the defendant's possession because the beans might no longer be available for inspection if discovery proceeded in the normal course).

Third, an emergency need for preservation of evanescent evidence is present on these facts.

Fourth, discovery is necessary for the movement forward of the case. Courts regularly grant expedited discovery where such discovery will "substantially contribute to moving th[e] case forward." *Semitool*, 208 F.R.D. at 227. Here, the present lawsuit cannot proceed without the limited, immediate discovery Plaintiff seeks because there is no other information Plaintiff can obtain about Defendant without discovery from third parties.

Fifth, there is no conceivable prejudice to Defendant Doe because Plaintiff merely seeks information to identify Defendant and serve him/her.

**2)    DPA Meets The Standard For Identifying Anonymous Internet Users.**

More specifically, courts have developed the following factors to consider when granting motions for expedited discovery to identify anonymous Internet users:

(1)    Whether the plaintiff can identify the missing party with sufficient specificity such that the court can determine that defendant is a real person or entity who could be sued in federal court;

(2)    All previous steps taken by the plaintiff to identify the Doe defendant; and

(3)    Whether the plaintiff's suit could withstand a motion to dismiss.

*Columbia Ins. Co. v. Seescandy.com*, 185 F.R.D. 573, 578-80 (N.D. Cal. 1999).

Each of these factors resolve in favor of granting DPA's requested relief.

First, DPA has sufficiently identified a real person who claims to have been the hacker. (Cmplt. ¶ 55-56). Also, the circumstances alleged indicate the hacker had a motive that only a real party would have.

Second, there are no other practical measures DPA could take to identify the Doe Defendant.

Third, DPA has asserted *prima facie* claims for violations of the Computer Fraud and Abuse Act.

When outlining the above factors, the court in *Seescandy.com* noted that in cases where injured parties are likely to find themselves chasing unidentified tortfeasors from ISP to ISP, the traditional enforcement of strict compliance with service requirements should be tempered by the need to provide injured parties with a forum in which they may seek redress for grievances. 185 F.R.D. at 579. An analysis of the factors clearly demonstrates DPA's legitimate interest in identifying the name and address of the individual who has hacked into its web site.

**3)       How Discovery Will Lead To Identifying Information.**

In addition to the factors discussed above, some courts have indicated that a plaintiff requesting early discovery for the purpose of identifying unknown defendants should justify specific requests and explain how such requests "will lead to identifying information about the defendant that would make service of process possible." *See Seescandy.com*, 185 F.R.D. at 580; *see also*, *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980).  Quite simply, DPA intends to learn from third-parties the 'online tracks' of the hacker, and any telephone records 'tracks,' that will either indicate the real person or persons or provide leads to other information that will.  For example, the hacker gained access to DPA's web hosting site by some method and at some certain time.  The hacker also placed calls to DPA's founder.  In each instance the hacker, here John Doe, had to have left indications of his or her actions.  Those 'tracks' can be analyzed, by forensic experts if necessary, for telltale signs revealing Doe's true identity.

## V)       CONCLUSION.

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the Motion and enter an Order substantially in the form of the attached Proposed Order.

Respectfully submitted,

On: <u>January 17, 2014</u>    By: <u>*/s/  Stanley J. Silverstone*</u>
Stanley J. Silverstone, Esq. (*pro hac vice*)
ssilverstone@ssmplaw.com
Lucas K. Middlebrook, Esq. (*pro hac vice*)
lmiddlebrook@ssmplaw.com
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
445 Hamilton Avenue, Suite 1204
White Plains, NY 10601
Tel. (914) 997-1346
Fax (914) 997-7125

Nicholas Granath (MN Lic. 198729; *pro hac vice*)
ngranath@ssmplaw.com
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
2915 Wayzata Blvd.
Minneapolis, MN 55405
Tel. (612) 341-9080
Fax (612) 341-9079

*Attorneys for Plaintiff*