UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELTA PILOTS ASSOCIATION, | ) |
| Plaintiff | ) ) ) ) |
| v. | ) No. 1:14-cv-00225-AKH ) |
| JOHN DOE, | ) ) ) |
| Defendant. | ) ) |

## OPPOSITION OF NON-PARTY AIR LINE PILOTS ASSOCIATION, INTERNATIONAL (INCLUDING NON-PARTY DELTA MASTER EXECUTIVE COUNCIL) TO PLAINTIFF'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS *DUCES TECUM*

## FACTS

### A. The Parties and Non-Party ALPA

Plaintiff Delta Pilots Association ("DPA") was founded in May 2010 with the "specific goal of replacing [the Air Line Pilots Association, International ("ALPA")] as the union representing Delta pilots." Compl. ¶ 18.[1] Defendant "John Doe," according to DPA, is an unidentified person who, DPA alleges, hacked into its website on November 8, 2013. *Id.* ¶ 4, 32. Non-party ALPA is the certified collective bargaining representative of the Delta pilots. *Id.* ¶¶ 14-16. Non-party Delta Master Executive Council is ALPA's highest local coordinating body at Delta Air Lines, Inc. ("Delta"). Hanson Dec. ¶ 1.

---

[1] DPA likes to discuss its claim as to receiving cards from Delta pilots to authorize a representation election, but it has admitted that its drive to replace ALPA as the certified collective bargaining representative for the Delta pilots has stalled, stating on June 23: "We are currently in an apparent holding pattern with expiring cards being replaced by renewals and a few new members joining us every day. It's going to take a significant boost by acting in unison if we are going to exit this holding pattern." Declaration of Michael Hanson ("Hanson Dec.") ¶ 3 & Exs. 1 (at 1), 2 (at 1) (March 26)); Compl ¶ 25.

## B. The Alleged "Hacking" and DPA's Response

DPA's unverified Complaint asserts that, on or about November 8, 2013, its website "was dramatically and visibly disrupted when it was 'hacked' into" by an unidentified "John Doe." Compl. ¶¶ 4, 32. DPA alleges that, as a result, it lost the ability to accept monetary donations and that the ability of the website to display video messages and updates was disrupted. *Id.* ¶¶ 34-35. *But see* Hanson Dec. ¶¶ 4, 5 & Exs. 2 (at 3) (claiming more than $150,000 in total donations received as of November 19, 2013), 3 (at 2) (claiming $140,000 in total donations received as of October 12, 2013).

The day after the alleged "hack," DPA emailed to its email address list the following "DPA ALERT" with the headline "**ALPA Hacks DPA!**" There, DPA asserted that ALPA not only hacked the website but also "cloned" it, and DPA urged its mailing list to "reward . . . appropriately" the ALPA members (the "Special Committee") who were engaged in the Delta pilots' efforts to remain in ALPA:

> **ALERT! ALPA has hacked part of the DPA website.**
>
> When users search for Delta Pilots Association and try to go to the link provided, you are redirected to an ALPA produced page that indicates DPA has quit our campaign (not true, of course). The content of our site has not been hacked, only where the address takes you.
>
> DPA recommends that you do not attempt to visit the DPA site until we let you know it is restored. ALPA has cloned the site and is operating what appears to be the DPA site at <u>deltapilot.org.</u> This site could be harmful!
>
> DPA will work hard to restore our site, but do we really need it? DPA is not just a website, it is 5675 Delta Pilots! ALPA cannot "hack" your mind nor "hijack" your determination. Help them see that they have made a grave error in judgment. The ALPA "Special Committee" is clearly responsible for this so reward them appropriately.
>
> Perhaps now is the time to consider removing yourself from ALPA dues check-off. Contact DAL Pilot Payroll to revoke automatic dues withdrawal.

* * * * *

> With our website down, word-of-mouth, and therefore the [DPA] *GO TEAM*, just got more important. Let ALPA's actions motivate you to join the *GO TEAM* and let's swamp the bases with Delta Pilots who will no longer tolerate ALPA.
>
> **CLICK HERE** to join the *GO TEAM.*
>
> Carry **AUTHORIZATION CARDS** with you right now and have a fellow Delta Pilot join us or renew their Card right now.

Declaration of Stanley Silverstone ("Silverstone Dec.") Ex. C (ECF No. 13-3, at 5-6).[2]

The next day (November 10), DPA announced on Twitter and on its Facebook page: "The attack has been defeated! Our site is fully operational and secure. Let's focus on our advance to independence!" Hanson Dec. ¶¶ 4, 5 & Exs. 2 (at 3), 3 (at 1). In a separate "DPA ALERT" of the same day, DPA represented that its "site was not compromised internally[,]" that no "data was lost or accessed[,]" and that the "hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA and may have contained other malicious content." *Id.* ¶ 6 & Ex. 4 at 2.

C.   **ALPA Counsel's November 15, 2013 Conversation with an Individual Delta Pilot**

On the late afternoon of November 15, 2013, an individual Delta pilot (the "Delta Pilot") called the ALPA Legal Department. Shortly thereafter, ALPA attorney and Assistant Director of the Representation Department Arthur Luby and ALPA Senior Attorney Matthew Babcock had a conference call with the Delta Pilot. During that conversation, the Delta Pilot sought confidential legal advice concerning both an accusation that had been made against him by DPA President Tim Caplinger that the Delta Pilot had hacked into the DPA website and, further, Mr. Caplinger's threats of criminal and civil liability. During this conversation, the Delta Pilot

---

[2] Page references refer to the page numbers generated by the Court's ECF system.

asked if the conversation was subject to the attorney-client privilege, and Mr. Luby responded that it was. Declaration of Arthur Luby ("Luby Dec.") ¶ 3.

D.   **The Delta Pilot's Email and Statement of November 19, 2013**

In the days following that conversation, at Mr. Luby's request, the Delta Pilot prepared a statement (the "Statement") recounting his knowledge of the events concerning Mr. Caplinger's allegations, and Mr. Luby advised him concerning the issues that should be covered in the Statement as well as on certain phraseology. The Statement is attached to the Declaration of Stanley Silverstone as Exhibit C (ECF No. 13-4, at 2-6). Contrary to suggestions by DPA, there have been no redactions from the Statement. Luby Dec. ¶ 4.

The Delta Pilot provided the Statement to Mr. Luby via email on November 19, 2013. *Id.* ¶ 5. The Statement itself does not identify the Delta Pilot, but the email to which it was attached sets forth his name and email address. Mr. Luby understood the email (which also had two other attachments) to be subject to the attorney-client privilege; indeed, it states in the subject line (written by the Delta Pilot) that it is subject to the "Attorney Client Privilege" followed by the name of the Delta Pilot. In contrast, Mr. Luby understood the Statement itself was not privileged. *Id.*

While admitting that ALPA produced a copy of the Statement in response to the subpoenas, DPA (at 7-8) describes the Statement as "a confession of individual responsibility for the harm to DPA's website[.]" In fact, the Delta Pilot explicitly denied hacking into the DPA website: "At no time did I attempt to access DPA's domain name management account or their web site account, nor did I make any effort to knowingly interfere with their ability to run their website." Silverstone Dec. Ex. C (ECF No. 13-4, at 4). Instead, the Delta Pilot recounted how he had established a personal Squarespace Account that was in "trial mode." Based on Squarespace's assurance (reprinted in the Statement), the Delta Pilot believed that that material

4

on the website would not be published while his website was in trial mode. However, the Delta Pilot's personal thoughts posted on the unpublished website somehow mapped to a domain name owned and controlled by DPA. When he learned of the problem, the Delta Pilot immediately shut down his trial account by early afternoon on November 9. He subsequently contacted Mr. Caplinger in "an effort to resolve the issue and make sure all facts were on the table for everyone," but, as set forth in the Statement, Caplinger attempted to distort the conversation into a confession by the Delta Pilot – which it was not – and threatened him with civil and criminal charges. *Id.* at 2-6.

E.  **ALPA's November 21, 2013 "True Headings"**

On November 21, 2013, ALPA published to the Delta pilot group a detailed "True Headings" article concerning the alleged hack. The article denied and refuted DPA's charges that ALPA had hacked its website, explaining what DPA should have done to determine whether and how hacking had occurred. The article continued:

> However, instead of conducting an actual investigation and making available relevant information from its service provider and DNS [Domain Name Server] records, DPA immediately accused ALPA of hacking and then announced that it reported this matter to the FBI – which, DPA claimed, would conduct an investigation at some unknown date in the future. ALPA has not been contacted by the FBI or any governmental agency, but if we are contacted we will provide all information generated in our investigation and will cooperate fully. The simple fact is that any such inquiry will inevitably establish that the DPA's charges against [ALPA] are wholly without merit.
>
> Because we do not have access to the various systems in question, we cannot be sure of the source of the temporary problems experienced by DPA. IT experts have advised us that the typical source of these sorts of difficulties is not hacking conspiracies, but rather errors in managing DNS records. From the documentation we could lawfully secure, there appears to have been several instances of errors in system administration, including one occasion when the DPA DNS was redirected to another one of their websites, announcing a failure to collect enough cards. Based on a review of saved records, the web domains from that site resolve to *another*

5

> Squarespace account, with a URL displaying affiliation with DPA's leadership.
>
> We have learned that network traffic was briefly mixed with a private individual's account maintained with the same hosting provider as the DPA, in this case Squarespace. These sorts of problems simply could not have been generated by persons without administrative access to DPA's accounts.

Silverstone Dec. Ex. A (ECF No. 13-1, at 11-12). The article concluded: "Ultimately, we are in no position to know the particulars of DPA's problems without relevant documentation from its service providers. What we do know is that ALPA had no involvement in this incident and the DPA's allegations and claims against ALPA are not true." *Id.* at 12.

### F.     DPA's Complaint Against John Doe

Despite its repeated accusations (and likely not wanting to defend a counterclaim for libel), DPA did not sue ALPA over the alleged hacking. Instead, it waited two months and, on January 13, 2014, filed suit against "John Doe." DPA then sought leave from the Court to take "limited, immediate discovery" because of the possibility of loss of electronic evidence, promising that it merely sought "information to identify Defendant and serve him/her." DPA Mem. of Law in Supp. of Mot. for Leave to Take Immediate Discovery at 6-7 (filed Jan. 17, 2014) (ECF No. 4). DPA further represented to the Court:

> Quite simply, DPA intends to learn from third-parties the 'online tracks' of the hacker, and any telephone records 'tracks,' that will either indicate the real person or persons or provide leads to other persons that will. For example, the hacker gained access to DPA's web hosting site by some method and at some certain time. The hacker also placed calls to DPA's founder. In each instance the hacker, here John Doe, had to have left indications of his or her actions. Those 'tracks' can be analyzed, by forensic experts if necessary, for telltale signs revealing Doe's true identity.

*Id.* at 9.

On January 28, 2014, the Court granted DPA leave to "serve immediate discovery upon third-parties *in order to identify defendant John Doe.*" Silverstone Dec. Ex. A (ECF No. 13-1, at 11) (emphasis added). For more than four months thereafter (a total of more than 7.5 months since the alleged hacking), DPA neither subpoenaed documents from ALPA nor sued ALPA based on its earlier accusations.

On April 30, 2014, DPA represented to the Court that it had subpoenaed five telephone and internet companies, which resulted in the production of documents. DPA asserted that the documents "revealed potential defendants" but not evidence to "definitely establish[] responsibility for the hacking of DPA's website." Letter to Judge Hellerstein from Stanley S. Silverstone at 1 (ECF No. 11). DPA also alerted the Court to the possibility of "depositions of the potential defendants identified to date[,]" but it has not disclosed whether such depositions have occurred. *Id.* at 2.

### G. DPA's Subpoenas to ALPA (Including the Delta Master Executive Council)

On May 28 and June 3, 2014, DPA served subpoenas *duces tecum* on ALPA and the Delta Master Executive Council, demanding production of three categories of documents. The subpoena to ALPA had a return date of June 13, and DPA's counsel denied ALPA's request for an extension of time to respond even though DPA expected ALPA to search for responsive electronic documents from many representatives, attorneys, and employees. *See* Silverstone Dec. Ex. C (ECF No. 13-3, at 2-3). DPA relented only after ALPA objected. *See id.* Ex. D (ECF No. 13-6, at 2); *compare* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena.").

DPA's subpoenas do not seek documents related to the information that it allegedly garnered from the five telephone and internet companies. They do not mention any "online

7

tracks" or "telephone records tracks" that it obtained through those subpoenas. Likewise, DPA's motion to compel does not provide any analysis of that information (expert or otherwise) or explain how the documents subpoenaed from ALPA would allow it to follow up on the discovery materials that it previously obtained.

We review below the letters exchanged between DPA and ALPA concerning the first two document requests to ALPA (including the Delta MEC); the third is not at issue here.

**Document Request No. 1.** This request seeks responsive documents that "contain, describe or reference any 'facts' learned or 'information generated' in any 'investigation' by ALPA or the ALPA Delta MEC, as stated in the" November 21, 2013 True Headings. (DPA (at 7) now expands this request to include "in no uncertain terms, that ALPA produce all responsive documents relating to the investigation that it admittedly conducted related to who was behind the DPA website attack.") On June 11, 2013, ALPA objected to Request No. 1 to the extent it sought privileged documents, stated its understanding based on an earlier email exchange with DPA's counsel that the request was "confined to documents that would identify John Doe[,]" and objected to the request if DPA did not intend to "limit the request to documents needed 'in order to identify defendant John Doe,'" because "it exceed[ed] the authority granted by the Court." Silverstone Dec. Ex. C (ECF No. 13-3, at 2- 3). ALPA further responded that its investigation "did not show that any 'hacking' of the DPA's website occurred and likewise did not reveal the identity of any such supposed 'hacker,'" and it cited two exhibits attached to the subpoenas. *Id.* at 3.

DPA rejected ALPA's understanding that its request was limited to documents needed to identify John Doe: "Undoubtedly, the court will ask you why you refuse to produce the same documents about which ALPA previously declared, 'if we are contacted we will provide all

information generated in our investigation and will cooperate fully.'" Silverstone Dec. Ex. D (ECF No. 13-6, at 3) (Doc. Req. No. 1). This statement deliberately distorted the content of the November 21, 2013 True Headings by omitting the first half of the quoted sentence, which stated in its entirety: "*ALPA has not been contacted by the FBI or any governmental agency, but if we are contacted* we will provide all information generated in our investigation and will cooperate fully." *Supra* at 5 (emphasis added).[3]

**Document Request No. 2**. This request seeks responsive documents "identify[ing] the 'private individual' referenced in" the November 21, 2013 True Headings. In pertinent part, ALPA responded:

> Attached hereto as Attachment 2 is a statement that was attached to an email of November 19, 2013, from a Delta pilot to ALPA attorney (and Assistant Director of the Representation Department) Arthur Luby. The email itself is subject to the attorney-client privilege and concerns the attached statement, DPA's allegations that someone hacked its website, and two other attached documents that are not responsive to this Request. ALPA has found no documents reflecting the identities of any other individual referenced in the November 21, 2013 True Headings.

Silverstone Dec. Ex. C (ECF No. 13-3, at 3) (Doc. Req. No. 2). ALPA also objected to "publicly identifying this individual because, as a Delta pilot within the bargaining unit, he is entitled to be protected against the risk that DPA will make untruthful public assertions about him. DPA has engaged in such conduct in the past." *Id.* at 4. ALPA did offer to provide the name of the individual if DPA was willing "to maintain the confidentiality of this individual's identity and to

---

[3] DPA continued its misinformation campaign in its motion to compel. There, DPA represented (at 7) that ALPA "has recently revised its objection to allege that the request exceeds the scope of discovery permitted by this Court's January 28, 2014 Order[.]" (citing ALPA June 25, 2014 letter (Silverstone Dec. Ex. E (ECF No. 13-7, at 2-4))). As shown above, however, ALPA's letter of June 11, 2014, explicitly objected to Request No. 1 to the extent that DPA "did not intend to limit the request to documents needed 'in order to identify defendant John Doe[.]" *Id.* Ex. C (ECF 13-3, at 3).

9

enter into an appropriate protective order, for the Court's approval, guaranteeing that confidentiality[.]" *Id.*[4]

DPA responded that ALPA "waived [its] right to claim attorney-client privilege for the email due to [its] failure to provide us with a privilege log for the e-mail." Silverstone Dec. Ex. D (ECF No. 13-6, at 3) (No. 2). In other words, DPA asked for a "log" with one entry – the one ALPA had already identified and upon which ALPA had claimed attorney-client privilege. DPA also refused to agree to a protective order, instead offering to "voluntarily refrain from publishing on its website any document that is produced in response to the subpoenas served on ALPA, unless and until such document is filed in any civil or criminal litigation and not sealed." *Id.*

## H. DPA's Efforts to Use this Motion to Compel to Revive Its Flagging Drive to Replace ALPA as the Collective Bargaining Representative of the Delta Pilots

DPA's counsel did not attempt to meet and confer with ALPA's counsel during or after their exchange of correspondence from June 11-27, 2014. Declaration of James K. Lobsenz ("Lobsenz Dec.") ¶ 3. Instead, DPA simply filed its motion to compel on July 3 and virtually simultaneously announced its July 3 motion to compel on its website in a publication designed to try to recruit new members and raise additional funds. Hanson Dec. ¶ 7 & Ex. 5.

DPA's July 3 announcement made a series of untrue statements about the course of events preceding its motion and made clear the malicious campaign awaiting the Delta Pilot who wrote the 4.5-page statement denying any involvement in the alleged "hack":

> \* DPA's False Statement: "ALPA National removed the name from the [Delta Pilot's] letter[.]" Hanson Dec. Ex. 5, at 3.

---

[4] ALPA also objected to producing multiple documents identifying the same individual (Silverstone Dec. Ex. C (ECF No. 13-3, at 3)), and DPA has not challenged that objection in its motion to compel.

> The Truth: ALPA produced the Statement in its entirety, as the identifying information is contained in the cover email, *see* Silverstone Dec. Ex. E (ECF No. 13-7, at 3) (Doc. Req. No. 2); *accord* Luby Dec. ¶ 5.

* DPA's False Statement: ALPA has refused "to provide the complete documentation including the names of the persons mentioned in the letter[.]" Hanson Dec. Ex. 5, at 3.

> The Truth: DPA only requested documents identifying the Delta Pilot, and ALPA offered to provide the identification pursuant to a protective order, Silverstone Dec. Ex. C. (ECF No. 13-3, at 4) (Doc. Req. No. 2).

* DPA's False Statement: DPA filed the motion to compel "to cause ALPA to reveal the names of the people they [sic] know have been involved since around the time the attack occurred[.]" Hanson Dec. Ex. 5, at 3.

> The Truth: ALPA questions whether an attack occurred and has advised DPA that it has no documents identifying any individuals (let alone multiple individuals) involved in any such attack, Silverstone Dec. Ex. C. (ECF No. 13-3, at 3) (Doc. Req. No. 1).

* DPA's False Statement: "ALPA chooses to conceal the identities of those involved claiming 'client-attorney' privilege[.]" Hanson Dec. Ex. 5, at 3.

> The Truth: ALPA has denied knowing the identities of anyone involved in the supposed hack and has not claimed attorney-client privilege with respect to the identity of the Delta Pilot but instead has sought a protective order in light of DPA's demonstrated history of false and malicious statements and attacks. *See* Silverstone Dec. Ex. C. (ECF No. 13-3, at 4) (Doc. Req. No. 2).

## **ARGUMENT**

DPA is using this Court's process – while ignoring this Court's rules – in a lawsuit in which it lacks a named adversary, all the while spreading lies and making false charges against ALPA, its committee members, and the very Delta Pilot who is *not* John Doe (if there was one).

ALPA has made clear that it has no documents identifying the alleged hacker, if there was one – the sole permissible purpose of discovery. ALPA's objections properly seek to: (1) limit discovery to what the Court authorized; (2) prevent the production of an email subject to the attorney-client privilege; and (3) protect the Delta Pilot – who denies any involvement in the alleged "hack" and who offered a detailed, written explanation of events in which he was

11

involved – from the inevitable DPA campaign of harassment that will occur if his name is released without a protective order. The Court should not countenance this abuse of its processes and should deny DPA's motion.

## THE COURT SHOULD DENY DPA'S MOTION TO COMPEL

### A. DPA Violated the Court's Rules for Filing a Motion to Compel.

Rule 2.E of this Court's rules provides:

**Unless otherwise ordered by Judge Hellerstein, matters before him shall be conducted in accordance with the following practices:**

\* \* \* \* \*

> **E. Disputes.** Unless directed otherwise, counsel shall describe their disputes in a single letter, jointly composed. Separate and successive letters will be returned, unread. Strict adherence to the meet and confer rule is required and should be described in the joint submission as to time, place and duration, naming the counsel involved in the discussion. The Court will not resolve disputes not brought to its attention in conformity with this rule.

Counsel for DPA never suggested or provided to ALPA's counsel any draft letter describing the instant dispute. Likewise, DPA's motion does not show adherence to Local Rule 37.3(a), which requires counsel to meet and confer to attempt to resolve a discovery dispute. In fact, counsel for DPA never contacted ALPA's counsel to "meet and confer" during or after their exchange of correspondence from June 11-27, 2014. Lobsenz Dec. ¶ 3. Accordingly, DPA's motion must fail.

### B. DPA's First Request Exceeds the Authority Granted by the Court Because DPA Seeks Documents that Do Not Identify the Alleged John Doe.

Ignoring the limited discovery permitted by the Court and its own representations to the Court that it was seeking "online records tracks" and "telephone records tracks" to determine the identity of John Doe, DPA's first request seeks to require ALPA to produce documents that "contain, describe or reference any 'facts' learned or 'information generated' in any

'investigation' by ALPA[,]" a request that DPA now expansively broadens to include "all documents relating to the investigation that it admittedly conducted related to who was behind the DPA website attack." DPA argues (at 7) that it, and not ALPA, should "determine whether the documents would assist in identifying John Doe."

DPA's request grossly exceeds the scope of permissible discovery in this suit. Contrary to DPA's suggestion (at 7), Rule 26 does not govern the scope of permissible discovery here. Rather, this case involves severely circumscribed discovery in as-yet uncontested litigation against an unnamed defendant. DPA elsewhere admitted as much – it promised the Court that it needed only "limited immediate discovery[,]" Mem. of Law in Supp. of Mot for Leave to Take Immediate Discovery at 7 (filed Jan. 17, 2014) (ECF No. 4), and the Court accordingly and wisely permitted DPA only to serve "immediate discovery upon third-parties in order to identify defendant John Doe," Order (Jan. 28, 2014) (ECF No. 5). ALPA has made clear that it does not know the identity of John Doe, and that it has no documents identifying him or her, and likewise questions whether any "hacking" occurred. It is impossible to understand how all documents "related to ALPA's investigation," *none of which lead to the identity of the supposed John Doe*, could identify John Doe, or assist in identifying John Doe, in these circumstances.

If DPA had really thought that ALPA possessed information identifying John Doe, it would not have waited more than four months after filing suit to issue the subpoenas when it claimed that it needed "immediate discovery." Likewise, DPA would have asked for production of documents that would have allowed it to follow up on any alleged leads concerning "potential defendants" that it obtained from the five telephone and internet companies previously subpoenaed.

DPA, however, does not pretend to try to tie the subpoenas at issue here to its investigation into "online tracks" or "telephone records tracks" that it promised the Court it was undertaking. It does not offer a declaration from its "forensic expert" identifying how the discovery at issue would assist in identifying the alleged John Doe and does not show or claim that it has any such expertise itself. Instead, DPA has been using the subpoena authority granted by the Court and its motion to compel to mine ALPA's files for documents, or simply to make further accusations against ALPA, that might assist it to jump-start its ailing organizing efforts, which admittedly are stuck in a "holding pattern" and require "a significant boost[.]" *See supra* note 1. That is abuse of process, not the limited discovery authorized by this Court.

### C. DPA's Motion with Respect to the Second Request Improperly Seeks to Force ALPA to Produce a Privileged Email and, Further, Invites Abuse of a Delta Pilot Due to DPA's Refusal to Agree to a Reasonable Protective Order.

We show below how DPA's demands with respect to its second document request would require disclosure of an email subject to the attorney-client privilege and how the identification of the Delta Pilot (including his email address) would result in the harassment of him absent the protective order that DPA has rejected without explanation.

#### 1. The Individual Delta Pilot's November 19 Email Is Subject to the Attorney-Client Privilege.

DPA makes three arguments (at 9) to obtain the Delta Pilot's November 19 email to attorney Luby. First, it claims that the email is not privileged because, generally, "an attorney-client relationship does not form between union members and a union staff attorney." (internal quotation marks omitted). However, the cases cited by DPA concern a union attorney's handling of claims under collective bargaining agreements and/or within its duty of fair representation; indeed, in one case, the union and retirees explicitly denied the existence of an attorney-client relationship between the aggrieved retirees and the union attorney. *See Untied [sic] Steelworks*

*[sic]of Am. v. Ivaco, Inc.*, No. 1:01-CV-0426-CAP, 2002 WL 31932875, at *1, *3 (N.D. Ga. Jan. 13, 2003); *accord Arnold v. Air Midwest, Inc.*, 100 F.3d 857, 862-63 (10th Cir. 1996) (union attorney's representation of pilot in pre-termination process was not attorney-client relationship because it was within union's duty of fair representation); *Peterson v. Kennedy*, 771 F.2d 1244, 1261 (9th Cir. 1985) (union's representation of employee in grievance process did not establish attorney-client relationship with grievant); *Gwin v. Nat'l Marine Eng'rs Benef. Ass'n*, 966 F. Supp. 4, 7 (D.D.C. 1997) (same), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (table). Here, the Delta Pilot's communications with Mr. Luby did not concern a grievance, a claim under the collective bargaining agreement, or ALPA's duty of fair representation. Rather, he sought legal advice in light of his concerns regarding DPA President Caplinger's statements during their mid-November 2013 conversation concerning the alleged hacking of DPA's website. Mr. Luby provided that counsel.

Second, DPA asserts (at 9) that it does not know the subject on which advice was sought and whether there was an attorney-client relationship. However, ALPA specifically identified the subjects of the email in question – the attached Statement (which ALPA produced), DPA's allegations that someone hacked its website, and two other attached documents that are not responsive to the request, and Mr. Luby has confirmed that the email was written as part of the Delta Pilot's effort to secure legal advice from him. These are perfectly legitimate subjects for a privileged conversation, and the Delta Pilot specifically identified the email as being subject to the attorney-client privilege. If the Court harbors any doubts about the privileged nature of the email, ALPA is of course willing to produce it (and the two nonresponsive attachments, if the Court so desires) for *in camera* review.

Finally, DPA argues (at 8-9) that ALPA's claim of privilege fails because ALPA did not produce a privilege log. DPA again ignores the context of, and the rules governing, the current dispute. Rule 45(d)(1) requires DPA's counsel to "take reasonable steps to avoid imposing undue burden or expense" on ALPA in responding to the subpoena. Rule 45(d)(2)(B) permits ALPA to serve "a written objection . . . to producing electronically stored information in the form or forms requested." ALPA followed this procedure and, further, included in its objection letter the same information that would have been contained in a privilege log – the date of the email, the parties to the email, and the subject matters of the email. *See* Local Rule 26.2(a); *cf.* Comments to Local Rule 26.2 ("The Committee wishes to encourage parties to cooperate with each other in developing efficient ways to communicate the information required by Local Civil Rule 26.2 without the need for a traditional privilege log."). The only information that ALPA did not include (but offered to do so, subject to a protective order) was the identity of the Delta Pilot.[5]

### 2. Information Identifying the Delta Pilot Should Not Be Produced Absent a Protective Order Guaranteeing the Confidentiality of that Information.

DPA argues (at 10) that prevention of "embarrassment of the individual" Delta Pilot is an insufficient basis for a protective order.

DPA ignores Federal Rule of Civil Procedure 26(c)(1), which provides: "The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Such good cause plainly exists concerning the provision of the name (and email address) of the Delta Pilot. DPA's July 3 website posting

---

[5] DPA raises a false issue (at 9-10) by asserting that the identity of the Delta Pilot is not subject to attorney-client privilege. ALPA never has asserted that his identity is privileged. Rather, ALPA offered to provide the name of the Delta Pilot pursuant to a protective order. Silverstone Dec. Ex. C (ECF No. 13-3, at 4).

accused him (without naming him) of being involved in hacking its website despite his lengthy written denial of the charge and despite the uncontested facts that: (1) he shut down his own personal, unpublished website on November 9 when he was advised that it was mapping to a domain name owned and controlled by DPA; and (2) DPA announced on November 10 that the alleged "attack" had been defeated and that the "hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA[.]" It is ludicrous to suspect that the Delta Pilot "hacked" DPA's website when he shut down his own personal, unpublished website upon learning of the mapping issue, and, further, when he contacted DPA's President to try to get the issue straightened out; facts, however, did not deter DPA from making malicious allegations in support of its political agenda.

Significantly, DPA's accusations against the Delta Pilot follow a long and sorry history of DPA making accusations about a variety of persons and entities concerning the alleged hack – from accusing ALPA and its committee members of hacking its website (while simultaneously using those accusations to further its organizing efforts), to misrepresenting the contents of ALPA publications, to falsely describing the documents undergirding its current motion, to misleading the Court about the type of discovery that it would undertake.

There can be no doubt that, absent a protective order protecting the confidentiality of the Delta Pilot, DPA will publicly excoriate him on its website and elsewhere. DPA implicitly admits as much by refusing to agree to a protective order without providing any explanation for doing so (apart from a one-line argument contradicted by Rule 26(c)(1)). To the extent that the Court allows DPA to continue with its discovery efforts, good cause exists to enter a protective order guaranteeing the confidentiality of the Delta Pilot's identity. *See Topo v. Dhir*, 210 F.R.D.

76, 78 (S.D.N.Y. 2002) ("When the potential for abuse of procedure is high, the Court can and should act within its discretion to limit the discovery process, even if relevancy is determined.").

ALPA has made clear that it has no information (and no reason to believe) that there was a "hack" of the DPA website. Rather, ALPA has explained that, from all it can determine, it appears at worst that an individual pilot suffered having his own personal website compromised by DPA traffic for a brief time through no fault of his own, and certainly not at the instigation of ALPA. DPA actively sought to convert this incident into an issue for use in its organizing drive, long before it made any effort to discover the identity of John Doe. Having immediately accused ALPA of being criminally responsible for this "hack," waiting more than two months to file suit (against John Doe instead of ALPA), and then delaying an additional four months after this Court's January 28, 2014 Order (7.5 months after its initial accusation) to subpoena ALPA, DPA is desperately trying to keep this bogus issue alive. That is not a proper use of the limited discovery permitted by this Court or of federal court litigation.

## CONCLUSION

For the foregoing reasons, the Court should deny DPA's motion to compel and should condition the disclosure of the identity and email address of the Delta Pilot on DPA's agreement to a protective order guaranteeing the confidentiality of that information, as set forth in the attached proposed Order.

Dated: July 14, 2014

Respectfully submitted,

*/s/ Michael E. Abram*
Michael E. Abram
COHEN, WEISS AND SIMON LLP
330 West 42nd Street, 25th Floor
New York, New York 10036
Telephone: (212) 356-0208
Facsimile: (212) 695-5436

*Counsel for Air Line Pilots Association, Int'l*

# CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2014, I electronically filed **Opposition of Non-Party Air Line Pilots Association, International (Including Non-Party Delta Master Executive Council) to Plaintiff's Motion to Compel Compliance With Subpoenas** *Duces Tecum* with the Clerk of the Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Stanley J. Silverstone
Lucas K. Middlebrook
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
445 Hamilton Avenue, Suite 1204
White Plains, NY 10601

Nicholas Granath
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
2915 Wayzata Blvd.
Minneapolis, MN 55405

*/s/ Michael E. Abram*
Michael E. Abram