UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

DELTA PILOTS ASSOCIATION,

Plaintiff,

v.

RUSSELL C. MELVIN,

Defendant.

Civil Action No. 1:14-cv-00225-AKH

## <u>REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE AMENDED COMPLAINT</u>

Levy Ratner, P.C.
80 Eighth Avenue, Floor 8
New York, NY 10011-5126
(212) 627-8100
(212) 627-8182 (fax)

On the Brief:    Dana E. Lossia
                 Alek L. Felstiner

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 1

   I.  DPA's CLAIM AGAINST MELVIN WAS NOT BROUGHT UNTIL MORE THAN
       THREE YEARS AFTER THE ALLEGED "HACK" ......................................... 1

     a)  Moving for Leave to Amend Did Not Toll the Statute of Limitations Because
         Defendant Melvin Had No Notice Within the Limitations Period ................................. 1

     b)  The FAC Does Not Relate Back under Rule 15(c) Because There Was No "Mistake"
         and Melvin Did Not Receive the Requisite Notice ........................................................... 5

  II.  DPA'S SECOND AMENDED COMPLAINT STILL FAILS TO STATE A CLAIM
       UNDER CFAA ........................................................................................................ 8

     a)  DPA Still Fails to Plead a Cognizable "Loss" Under CFAA ......................................... 9

         i.   DPA Concedes that Lost Goodwill and Investigatory Expenses are Not
             Cognizable………………………………………………………..…………9

         ii.   The SAC Reveals that DPA Incurred No Actual Costs, and the Alleged Man-
             Hours Are Not Cognizable…………………………………………….......9

         iii.  The Alleged $11,000 in Lost Contributions Is Too Speculative to Qualify as a
             CFAA "Loss"……………………………………………………………13

     b)  The Additional Allegations in the SAC Conflict with Supporting Documents and
         Transform DPA's Claim From Vague to Incoherent ................................................... 15

  III. LEAVE TO AMEND IS NOT IN THE INTERESTS OF JUSTICE WHERE DPA HAS
       ALREADY FALLEN SHORT THREE TIMES ............................................................. 18

# TABLE OF AUTHORITIES

**Cases**

*A.V. v. iParadigms, LLC*,
  562 F.3d 630 (4th Cir. 2009) ................................................................................ 11

*Aquent LLC v. Stapleton*,
  65 F. Supp. 3d 1339 (M.D. Fla. 2014) .................................................................. 10

*Archibald, v. City of Hartford*,
  274 F.R.D. 371 (D. Conn. 2011) ............................................................................ 6

*Barrow v. Wethersfield Police Dept.*,
  66 F.3d 466 (2d Cir. 1995) .................................................................................... 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................. 14

*Bender v. City of New York,*
  No. 14-cv-4386, 2015 U.S. Dist. LEXIS 16002, at *10 (S.D.N.Y. Feb. 10, 2015) ................... 6

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) .................................................................................... 14

*Debrosse v. City of New York*,
  No. 13-cv-3822, 2016 U.S. Dist. LEXIS 69507, at *9 (E.D.N.Y. May 25, 2016) ................... 6

*Dominguez v. City of New York*,
  No. 10-cv-2620, 2010 U.S. Dist. LEXIS 88818, at *6 (S.D.N.Y. Aug. 27, 2010) ................... 6

*Durstenberg v. Electrolux Home Prods.*,
  No. 15-cv-9277, 2016 U.S. Dist. LEXIS 23968 (S.D.N.Y. Feb. 23, 2016) .............................. 4

*Girau v. Europower, Inc.*,
  317 F.R.D. 414 (S.D.N.Y. 2016) ............................................................................ 7

*Gomez v. City of New York*,
  No. 13-cv-1822, 2016 U.S. Dist. LEXIS 71182, at *12 (S.D.N.Y. May 31, 2016) ................... 6

*Higgins v. NYP Holdings, Inc.*,
  836 F. Supp. 2d 182 (S.D.N.Y. 2011) .................................................................... 3

*Hogan v. Fischer*,
  738 F.3d 509 (2d Cir. 2013) .................................................................................... 6

*Johnson v. U.S. Dept. of Homeland Security*,
    No. 3:09-cv-975, 2010 U.S. Dist. LEXIS 37048, at *3 (N.D.N.Y. Apr. 13, 2010).................. 3

*Krupski v. Costa Crociere S.p.A.*,
    560 U.S. 538 (2010)......................................................................................................... 6

*Moore v. Indiana*,
    999 F.2d 1125 (7th Cir. 1993) ...................................................................................... 2, 3

*Morel v. Daimler-Chrysler AG*,
    565 F.3d 20 (1st Cir. 2009) .............................................................................................. 8

*Newton v. City of New York*,
    No. 07-cv.-6211, 2009 U.S. Dist. LEXIS 55195 (S.D.N.Y. June 26, 2009) ........................... 3

*Newton v. City of New York*,
    No. 07-cv-6211, 2009 U.S. Dist. LEXIS 95346, at *52 (S.D.N.Y. Oct. 13, 2009).................. 3

*Nexans Wires S.A. v. Sark-USA, Inc.*,
    319 F. Supp. 2d 468 (S.D.N.Y. 2004).............................................................................. 10

*NovelPoster v. Javitch Canfield Group*,
    140 F. Supp. 3d 954 (N.D. Cal. 2014) ........................................................................ 11, 12

*Patrick Patterson Custom Homes v. Bach*,
    586 F. Supp. 2d 1026 (N.D. Ill. 2008) ............................................................................ 10

*Sanders-Burns v. City of Plano*,
    594 F.3d 366 (5th Cir. 2010) ........................................................................................... 7

*Scelfo v. Aurora Concept, Inc.*,
    No. 02-cv-7835, 2006 U.S. Dist. LEXIS 5473, at *54 (S.D.N.Y. Feb. 9, 2006)..................... 3

*Scott v. Village of Spring Valley*,
    577 Fed. Appx. 81 (2d Cir. 2014) ..................................................................................... 6

*Silano v. Wheeler,*
    *No. 3:13-CV-00185,* 2015 U.S. Dist. LEXIS 13736, at *13 (D. Conn. Feb. 5, 2015)................ 3

*United States v. Fowler*,
    No. 8:10-cr-65-T-24, 2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25, 2010).......... 11

*United States v Middleton*,
    231 F3d 1207 (9th Cir. 2000) ........................................................................................ 11

*United States v. Larsen*,
   190 F. App'x 552 (9th Cir. 2006) ............................................................................. 11

*United States v. Millot*,
   433 F.3d 1057 (8th Cir. 2006) ................................................................................. 11

*United States v. Shahulhameed*,
   No. 5:12-118-KKC, 2014 U.S. Dist. LEXIS 52364, at *4 (E.D. Ky. Apr. 16, 2014) ............. 12

**Statutes**

18 U.S.C. § 1030 ................................................................................................. 1, 9, 13

**Rules**

Fed. R. Civ. Proc. 15 ........................................................................................ 4, 5, 6, 7, 8

## PRELIMINARY STATEMENT

Plaintiff DPA's Opposition to Defendant Melvin's Motion to Dismiss offered no new facts or authority to make DPA's First Amended Complaint (FAC) timely. Accordingly, the FAC should be dismissed on statute of limitations grounds. DPA's proposed Second Amended Complaint (SAC), which was apparently intended to cure the deficiencies of the FAC, still fails to state a claim under the Computer Fraud and Abuse Act (CFAA). The new assertions in the SAC actually make DPA's allegations less plausible and more inconsistent, while still falling short of the pleading standard for CFAA claims. The additional allegations also conclusively demonstrate that DPA cannot show the $5,000 in economic loss that is required for stating a CFAA claim. For these reasons the claims should be dismissed and leave to amend should not be granted.

## ARGUMENT

### I.   DPA'S CLAIM AGAINST MELVIN WAS NOT BROUGHT UNTIL MORE THAN THREE YEARS AFTER THE ALLEGED "HACK"

The alleged hack occurred on or about November 8, 2013. SAC ¶ 41. DPA did not begin its action against Melvin until almost three years after the act complained of, well outside the CFAA statute of limitations. See 18 U.S.C. §1030(g).  DPA seeks to escape the limitations period by arguing that (1) filing a motion for leave to amend the original complaint tolled the statute of limitations, and (2) the FAC relates back to the original filing. Neither argument saves DPA's untimely complaint.

#### a)   Moving for Leave to Amend Did Not Toll the Statute of Limitations Because Defendant Melvin Had No Notice Within the Limitations Period

The original complaint did not name Melvin as a defendant. After substantial expedited discovery, DPA moved to amend the complaint on January 29, 2015. (Docket # 44). DPA filed

this motion under seal and did not serve the motion or the proposed Amended Complaint on Melvin. DPA did not depose Melvin, despite the Court's suggestion that it do so, or otherwise notify him that he was the subject of the litigation. As a result, Melvin did not receive notice of the action against him until he was served with the FAC on November 3, 2016.

DPA contends that the filing of the motion should toll the statute of limitations even though the motion was not granted or the amended complaint filed or served until after the limitations period had run. The argument has a surface appeal, in that tolling may save parties from missing their window due to elements beyond their control. But DPA ignores the critical element present in every tolling case it cited in its own brief: tolling is proper when, and only when, a timely motion to amend will give the defendant notice of the proposed claim within the limitations period. That way, even if the motion is not granted, or the amendment filed, until after the limitations period has run, the statute has served its purpose by timely notifying the defendant of the claim.

*Moore v. Indiana*, 999 F.2d 1125 (7th Cir. 1993), the leading case and primary citation in DPA's brief, illustrates precisely the importance of such notice. In that case, a plaintiff sought leave to amend his complaint to add additional defendants. The plaintiff filed the motion to amend within the limitations period, but did not attach the proposed amended complaint and did not notify the putative defendants until after the limitations period had run. The court found that the statute of limitations had run against the putative defendants and denied the motion as futile. On appeal, the Seventh Circuit acknowledged that a motion for leave to amend will normally toll the statute of limitations, but upheld the district court's decision because the plaintiff in *Moore* "did not notify either the putative defendants or the court that he intended to add those claims until his submission of a proposed amended complaint [outside the limitations period]." 999 F.2d

at 1131. The Seventh Circuit explained that "[e]ven if the court allowed the proposed amendments, the plaintiff's action against the putative defendants would not commence until that date and, as a result, would be barred by the statute of limitations." *Id.*

The Second Circuit has not spoken on this issue. Some district courts have held that where a plaintiff seeks to add claims against the *existing defendant*, a motion for leave to amend will toll the statute of limitations as long as the proposed amendment is attached to the motion such that the defendant has notice of the substance of the amendments.

Most of the cases DPA cites deal with motions to amend a plaintiff's claim, not motions to add a defendant. *See Silano v. Wheeler*, No. 3:13-CV-00185, 2015 U.S. Dist. LEXIS 13736, at *13 (D. Conn. Feb. 5, 2015) (granting leave to add new claims); *Scelfo v. Aurora Concept, Inc.*, No. 02-cv-7835, 2006 U.S. Dist. LEXIS 5473, at *54 (S.D.N.Y. Feb. 9, 2006) (same); *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 191 (S.D.N.Y. 2011) (same); *Johnson v. U.S. Dept. of Homeland Security*, No. 3:09-cv-975, 2010 U.S. Dist. LEXIS 37048, at *3 (N.D.N.Y. Apr. 13, 2010) (recognizing tolling rule but denying leave because motion to amend filed outside the limitations period).

In *Newton v. City of New York*, No. 07-cv.-6211, 2009 U.S. Dist. LEXIS 55195 (S.D.N.Y. June 26, 2009), cited by DPA, the plaintiff sought leave to add additional defendants but the court held the motion in abeyance while it ruled on a pending summary judgment motion. The motion for leave to amend was tolled while the court decided the other matter, but ultimately the court instructed the plaintiff to withdraw the motion and no timeliness argument ever arose. *See* 2009 U.S. Dist. LEXIS 55195, at *1; *Newton*, No. 07-cv-6211, 2009 U.S. Dist. LEXIS 95346, at *52 (S.D.N.Y. Oct. 13, 2009).

In *Durstenberg v. Electrolux Home Prods.*, No. 15-cv-9277, 2016 U.S. Dist. LEXIS 23968 (S.D.N.Y. Feb. 23, 2016), also cited by DPA, the plaintiff moved to join additional defendants and to remand the case to state court for lack of diversity jurisdiction. The plaintiff intended to consolidate the remanded case with an ongoing state court action in which the putative federal defendants had already been named. There was no issue of notice. *See* 2016 U.S. Dist. LEXIS 23968, at *7.

Tolling is not appropriate where, as here and in *Moore*, the defendant to be added does not receive notice of the proposed amendment until long after the limitations period has run (almost a year in Melvin's case). The importance of notice is echoed in Rule 15(c), which precludes relation back of amendments except where the defendant had notice of the action. *See* Fed. R. Civ. Proc. 15(c).

DPA admits that it had Melvin's name as of August 2014. DPA did not notify Melvin that he would, or might, be the subject of this litigation at any time prior to November 2016. Nor did DPA depose Melvin, despite the Court's suggestion to do so, or send Melvin a copy of the proposed amended complaint.

In its briefs, DPA claims that it sent Melvin a letter in August 2014. However, DPA did not include this allegation in the FAC, and it also left this allegation out of the SAC, even after Melvin had raised the issue of notice. To the extent that DPA's claim may be considered at all in the context of this Motion to Dismiss, the document does nothing to establish that Melvin received notice of litigation against him. The letter DPA claims to have mailed has no complaint attached, despite the text of the letter referring to an attachment. *See* Declaration of Nicholas Granath ("Granath Declaration") (Docket #76), Attachment 23. Even if DPA had attached a complaint, it would have been the original complaint against the Airline Pilots Association

(ALPA) and "John Doe," not any complaint against Melvin. Nothing in the letter or the complaint, if attached, would alert Melvin that he might be added to this litigation as a defendant. Moreover, DPA failed to establish (or even to allege in either the FAC or the SAC) that Melvin received the letter. DPA did not show or allege that the address on the letter was Melvin's mailing address in 2014. DPA concedes that Melvin does not currently reside at that address. *See* SAC ¶ 33. Meanwhile, the certificate of mailing, which was offered to confirm that DPA mailed the letter, has no address on it at all, and DPA submitted no delivery confirmation.

In sum, although DPA was not responsible for the time that elapsed between its motion to amend and the Court's grant of leave to amend, DPA should not be excused for its failure to notify Melvin within the statute of limitations. DPA did not request, and the Court did not grant, an order tolling the statute of limitations. Now the period has long since run, at prejudice to Melvin, as will be set forth in more detail in Melvin's Opposition to DPA's Motion for Leave to Amend. To take advantage of the tolling principle, DPA must do more than file a sealed motion with the Court and then sit back while the months pass.

### b)  The FAC Does Not Relate Back under Rule 15(c) Because There Was No "Mistake" and Melvin Did Not Receive the Requisite Notice

Rule 15(c)(1)(C) permits a party to be substituted where the party to be added "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." These requirements must be satisfied within the time prescribed for service in Rule 4(m). *See* Fed. R. Civ. Proc. 15(c)(1).

The Second Circuit has consistently held that a lack of knowledge as to a defendant's identity is not a "mistake" under Rule 15. *See Barrow v. Wethersfield Police Dept.*, 66 F.3d 466, 470 (2d Cir. 1995), *modified*, 74 F.3d 1366 (2d Cir. 1996) ("Rule 15(c) does not allow an

amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities."); *Hogan v. Fischer*, 738 F.3d 509, 517-18 (2d Cir. 2013); *Scott v. Village of Spring Valley*, 577 Fed. Appx. 81, 82-83 (2d Cir. 2014).

*Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538 (2010), cited by DPA, did nothing to disrupt this rule. *Krupski* was not a John Doe case and did not deal with a situation in which the plaintiff lacked knowledge of identity. The plaintiff in *Krupski* picked one of two known parties to sue, and got it wrong. *Krupski* holds that Rule 15 covers that kind of mistake, which the Court defined as "[a]n error, misconception or misunderstanding; an erroneous belief." *Krupski*, 560 U.S. at 548.

The Second Circuit and numerous district courts have confirmed that *Krupski* had no effect on the rule set forth in *Barrow*. *See Bender v. City of New York*, No. 14-cv-4386, 2015 U.S. Dist. LEXIS 16002, at *10 (S.D.N.Y. Feb. 10, 2015) (collecting cases); *Dominguez v. City of New York*, No. 10-cv-2620, 2010 U.S. Dist. LEXIS 88818, at *6 (S.D.N.Y. Aug. 27, 2010). After *Krupski* the Second Circuit and the district courts have continued to reject relation-back in Doe cases. *See Hogan*, 738 F.3d at 517; *Scott*, 577 Fed. Appx. At 82; *Gomez v. City of New York*, No. 13-cv-1822, 2016 U.S. Dist. LEXIS 71182, at *12 (S.D.N.Y. May 31, 2016); *Debrosse v. City of New York*, No. 13-cv-3822, 2016 U.S. Dist. LEXIS 69507, at *9 (E.D.N.Y. May 25, 2016) (collecting cases).

*Archibald*, *v. City of Hartford*, 274 F.R.D. 371 (D. Conn. 2011), cited by DPA, describes a "split in the district courts" following *Krupski*. 274 F.R.D. at 377. *Archibald* was decided one year after *Krupski*. If such a "split" indeed existed, the Second Circuit resolved that split in

*Hogan* and reaffirmed its position in *Scott.* The mountain of subsequent cases faithfully applying *Barrow* confirms that *Barrow* is settled law.

Even under DPA's proposed standard for relation back – ignoring *Barrow*, presuming a "mistake," and focusing only on what Melvin "knew or should have known" – there is still no relation back. DPA bears the burden of demonstrating relation back where, as here, the amended complaint was filed outside the statute of limitations. *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010) (plaintiff "must demonstrate that the amended pleading satisfies the elements provided in Rule 15(c)(1)(B)-(C)"); *Santana-Watts v. Admiral Line (UK) Ltd.*, No. C-12-02701, 2013 U.S. Dist. LEXIS 53243, at *8 (N.D. Cal. Apr. 12, 2013) ("Plaintiff has the burden of demonstrating the elements that support application of the relation back rule"). Merely alleging knowledge is not enough to establish relation back. Actual or constructive knowledge must be proven.

Here DPA has shown no actual or constructive knowledge on Melvin's part. DPA claims that Melvin knew or should have known of the litigation against him because (1) he allegedly called Tim Caplinger in November 2013, (2) he allegedly wrote a letter to ALPA describing threats of liability made by Tim Caplinger against him, and (3) DPA allegedly sent Melvin a letter about the litigation in August 2014.

DPA confuses knowledge of the controversy with knowledge of the litigation. Rule 15 permits relation back only where the party to be added "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." The rule refers expressly to "the action," and requires a showing of knowledge within the Rule 4(m) period, *i.e.*, after the complaint is filed. Knowledge of the underlying controversy is not enough. *See Girau v. Europower, Inc.*, 317 F.R.D. 414, at *21 (S.D.N.Y. 2016) ("At a

minimum, . . . notice requires knowledge of the filing of suit, not simply knowledge of the incident giving rise to the cause of action.") (quoting *Morel v. Daimler-Chrysler AG*, 565 F.3d 20, 26 (1st Cir. 2009)).

DPA's allegations concerning the phone call(s) in November 2013 are irrelevant. Even if DPA had established that Melvin made those calls, which it has not (despite the additional documents submitted alongside the SAC), the most that could be inferred from the call(s) would be Melvin's knowledge of the controversy. The "action" described in Rule 15 did not yet exist.

Similarly, even if DPA had proven that Melvin authored the unsigned letter to ALPA, which it has not, that letter to ALPA predates the action and could not establish Melvin's knowledge of anything but the controversy.

Finally, the August 2014 letter from DPA's counsel to Melvin cannot establish Melvin's knowledge under Rule 15 because, if it was sent at all, it was sent in August, eight months after initiation of the action and well outside the period for service prescribed in Rule 4(m). *See* Fed. R. Civ. Proc. 15(c)(1). Also, as noted above, DPA failed to prove that Melvin received the letter, the letter does not include a copy of the complaint, and nothing in the letter or the original complaint against "John Doe" and ALPA would have given Melvin actual or constructive knowledge that DPA meant to substitute him as a party.

For these reasons, the FAC does not relate back and should be dismissed as untimely.

## II.     DPA'S SECOND AMENDED COMPLAINT STILL FAILS TO STATE A CLAIM UNDER CFAA

DPA argues that the FAC already states a plausible claim under CFAA, and in the alternative that the SAC, if granted, would state a plausible CFAA claim. Neither of these arguments holds water. The FAC is inadequate, for reasons already set forth in Defendant's Motion to Dismiss, and the SAC still fails to state a claim, as explained in detail below.

762-000-00001: FFFC7DE6.doc

8

Without conceding that DPA has cured any of the defects in the FAC, this brief focuses on two deficiencies in the SAC that doom DPA's claim: (1) DPA's failure to plead a cognizable loss under CFAA; and (2) DPA's inability to coherently describe how Melvin's alleged actions caused an interruption of service. As both loss and causation are required elements of a CFAA claim, each of these deficiencies on its own requires dismissal.

**a) DPA Still Fails to Plead a Cognizable "Loss" Under CFAA**

    i.   <u>DPA Concedes that Lost Goodwill and Investigatory Expenses are Not Cognizable</u>

As discussed in Defendant's Motion to Dismiss, lost good will and any expenses incurred to identify and/or pursue offenders are not cognizable under CFAA. *See* Memorandum of Law in Support of Defendant's Motion to Dismiss (Docket #68), at 11. DPA does not dispute these principles, and thus they should be treated as conceded. Also, DPA did not plead any amounts or timeframes in connection with these alleged losses, so they cannot satisfy the CFAA loss threshold. *See* 18 U.S.C. § 1030(g) (incorporating requirement of "loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value").

    ii.   <u>The SAC Reveals that DPA Incurred No Actual Costs, and the Alleged Man-Hours Are Not Cognizable</u>

Costs involved in assessing damage to a protected computer, restoring the integrity of files, and communicating with vendors may be cognizable under CFAA. DPA mentions those categories of costs in both the FAC and SAC, but it fails to allege that it incurred any actual expenses in those categories. It is not enough to merely name types of costs that courts have previously recognized. A plaintiff must actually allege that it incurred such specific costs. DPA does not. Rather, the SAC makes clear that *DPA incurred no costs at all* in responding to the

alleged hack. Melvin raised this issue in the Motion to Dismiss in December 2016, and DPA has now had an opportunity to specify any actual expenditures it made.  DPA could not do so.

Although the SAC contains a laundry list of possibly covered "costs," it contains no allegation of any actual expenditures made by DPA to assess damage, restore the integrity of the site, or communicate with its web host. This distinguishes the instant case from those cited by DPA in support of its "loss" allegations. *See Patrick Patterson Custom Homes v. Bach*, 586 F. Supp. 2d 1026, 1030 (N.D. Ill. 2008) (plaintiff hired an accountant and engaged a computer forensic expert); *Aquent LLC v. Stapleton*, 65 F. Supp. 3d 1339 (M.D. Fla. 2014) (plaintiff hired a forensics firm).

The SAC's only new allegation of costs is the man-hours attributed to Tim Caplinger and Rick Eagan. DPA claims that Caplinger and Eagan spent a total of 72 man-hours responding to the alleged hack. SAC ¶ 61. DPA also alleges that Caplinger and Eagan earned $150 and $203 per hour, respectively, as airline pilots for Delta Airlines. *Id.* ¶ 62. Multiplying the number of hours by the individuals' hourly wages as pilots, DPA claims a total of $12,496, which is the only assertion of DPA's "costs to repair the damage." *Id.* ¶ 64. No costs other than the man-hours are included in this figure or the SAC.

These man-hour "costs" are not compensable under CFAA for several reasons. First, to the extent Caplinger and Eagan are seeking to claim the value to *them* of lost wages as pilots, they are not plaintiffs and any losses they allege to have suffered are irrelevant. Nor is Delta Airlines a plaintiff, so any loss to Delta of Caplinger and Eagan's services as pilots would also be irrelevant. DPA is the Plaintiff, and it must allege a cognizable loss that meets the CFAA threshold in order to have standing. *See Nexans Wires S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d

468, 471 (S.D.N.Y. 2004) ("In order to have standing, plaintiffs must have suffered a "loss" of at least $ 5,000.").

Second, unlike in the "man-hours" cases cited by DPA, Caplinger and Eagan are not DPA employees or contractors and received no monetary or other compensation for the time they spent. In the limited instances where courts have recognized man-hours as a cognizable "economic" loss under CFAA, the man-hours were spent by salaried employees of the plaintiff, or compensated contractors, and the losses were estimated based on compensation paid *by the plaintiff* to those individuals. For example, in *United States v Middleton*, 231 F.3d 1207 (9th Cir. 2000), cited by DPA, it was "permissible for the district court to compute 'loss' based on the *hourly wage of the victim bank's employees*," because "the bank would have had to *pay a similar amount* had it hired an outside contractor to repair the damage." 231 F.3d at 1214 (emphasis added). The same goes for *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 954 (N.D. Cal. 2014), the other man-hours case cited by DPA, in which the plaintiff's founders and primary employees expended ten hours per week and estimated their losses based on the hourly wage they previously received for performing "computer work." 140 F. Supp. 3d at 959.

The requirement that the claimed man-hours be expended by a compensated employee exists in every man-hours case, even if it is not explicitly stated. *See United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir. 2006) ("hours spent" by employees may qualify as a CFAA "loss"); *United States v. Larsen*, 190 F. App'x 552, 553 (9th Cir. 2006) ("loss" under CFAA "includes the time that the *victim's salaried employees* spend responding to the unauthorized intrusion") (citing *Middleton*) (emphasis added); *A.V. v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) (recognizing expenditure of employee man-hours as possibly covered by CFAA); *United States v. Fowler*, No. 8:10-cr-65-T-24 AEP, 2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25,

2010) (cognizable loss where "[victim's] *employees* spent significant time responding to and fixing the damage to the computers and reconfiguring the new firewall and that such time amounted to $7,226.60 *of their salaries and wages*") (emphasis added); *United States v. Shahulhameed*, No. 5:12-118-KKC, 2014 U.S. Dist. LEXIS 52364, at *4 (E.D. Ky. Apr. 16, 2014) ("Losses can include the cost of time spent by *a salaried employee of the victim* in responding to the damage.") (emphasis added). DPA did not pay or otherwise compensate Caplinger or Eagan for their time and cannot claim any of that time as a cognizable economic "loss" under CFAA.

Third, insofar as DPA is claiming the *un*compensated time Caplinger and Eagan spent as some kind of economic "loss" to DPA, the SAC contains no facts showing that DPA had any entitlement to those hours and no allegation concerning the value of those hours. Caplinger's and Eagan's salaries as airline pilots have no bearing on the value to DPA of the time they allegedly spent responding to the hack. *Cf. NovelPoster*, 140 F. Supp. 3d at 959 (computing loss of man-hours spent responding to a breach based on the founders' prior compensation for "computer work"). The loss to DPA, if any, was not lost piloting services. It would have to be the loss of Caplinger's and Eagan's time as Interim President and Web Master, respectively. As noted above, these are uncompensated positions, and the SAC contains no allegations regarding the value of time those individuals spent in those capacities. The SAC also contains no allegation that the time Caplinger and Eagan spent interfered with or detracted from the time they spent, or would have spent, fulfilling their roles within DPA.

DPA claims that the amount of loss is a question of fact, as determined by the courts in *Middleton* and *NovelPoster*. However, the plaintiffs in those cases had already alleged a cognizable loss under CFAA – the expenditure of employee hours by the employer-plaintiff.

Whether a plaintiff has alleged a cognizable loss is a question of law, not fact. Here, the lost hours of Caplinger and Eagan are not a cognizable loss under CFAA, so there is no need for any fact-finder to determine the number of hours they spent, the value of that time, or whether the time expended was reasonable.

      iii.    <u>The Alleged $11,000 in Lost Contributions Is Too Speculative to Qualify as a CFAA "Loss"</u>

DPA claims that "[a]s a direct consequence of the severed links to the donation pages, approximately $11,000 donations [sic] to DPA were lost during November and December 2013, when the site was being repaired." SAC ¶ 66. Lost "revenue" is not cognizable under CFAA unless it was lost "because of interruption of service." 18 U.S.C. § 1030(e)(11).

Here, hypothetical contributions are too speculative for DPA to plausibly allege that it lost $11,000, or any amount, "because of interruption of service." DPA did not allege that any particular potential donors attempted to contribute during whatever time the donation links were allegedly severed, or that any such individuals later decided *not* to donate once the links were restored.  DPA does not allege that it expected (or had any reason to expect) donations in any amount during that particular time period. DPA pleaded no facts about its annual, weekly or daily donation amounts, prior contributions to DPA over its website, or contribution patterns. DPA also failed to explain why any potential donors would not, or did not, simply donate once the links were restored.[1] All this information, if it exists, is within DPA's control, yet DPA has not presented it in any of the three complaints submitted to the Court thus far. Throwing out a hypothetical $11,000 figure does not amount to a pleading on lost revenue sufficient to "nudge[ ]

---

[1] This situation is not like the case of an online shopper who is looking to buy an item, discovers that her preferred retailer's site is down, and therefore buys the item from a different retailer, resulting in a lost sale. DPA is unique and supporters of DPA's efforts against ALPA cannot simply shop the internet for other labor organizations to whom to donate.

[DPA's] claims across the line from conceivable to plausible. . . ." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

DPA's failure to allege sufficient facts about contributions is compounded by its failure to allege sufficient facts about the "interruption of service" itself, *i.e.* the severing of the donation links. DPA alleges that it lost $11,000 in contributions "during November and December 2013, when the site was being repaired," but it carefully sidesteps actually alleging how long the donation links were severed. DPA does not even allege the duration of the interruption of service that is the basis for its lost revenue claim. The SAC states that Caplinger and Eagan "expended" a certain number of hours between November 8 and December 3, 2013, but not that the interruption actually lasted that long. SAC ¶ 61. DPA also claims that the site "was being repaired" "during November and December 2013," SAC ¶ 66, but it does not plead anything as to how long potential donors would have been prevented from making contributions through the site.

The screenshots and chat logs from SquareSpace, incorporated by reference into the SAC,[2] indicate that the interruption likely lasted about one day, or less. All the chat logs are dated November 9 or November 10, 2013. Granath Decl. Attachments 5-7. Screenshots show that the trial account, to which Melvin allegedly redirected DPA's site, was shut down by the afternoon of November 9. *Id.* Attachment 8, pp. 2, 4. DPA alleges as much in the SAC. *See* ¶ 74. From the pleadings in the SAC and the documents incorporated by reference, it appears that the interruption at issue lasted a day, and this is consistent with a common-sense understanding of

---

[2] Documents referenced in a complaint may be considered by the Court on a motion to dismiss without converting the motion into one for summary judgment. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); SAC ¶ 43 (referring to the "Squarespace computer records" subpoenaed by DPA and attached to the Granath Declaration).

the time it would take to restore service after a "hack" of the type DPA describes. In the worst case, if DPA's domain settings were changed without authorization, DPA needed only to reset its passwords and readjust the domain settings to "point" back to the correct website files.

The convenient lack of an allegation as to the duration of the interruption, and the evidence suggesting a short duration, cast further doubt upon the plausibility of a hypothetical $11,000 in lost contributions claimed by DPA.

### b) The Additional Allegations in the SAC Conflict with Supporting Documents and Transform DPA's Claim From Vague to Incoherent

The FAC suffered from an absence of any allegations concerning what Melvin allegedly did and how that caused the alleged damage. Now, attempting to correct the problem, DPA adds various allegations to the proposed SAC. These new allegations present an incoherent and confusing version of events that is inconsistent with the FAC and with DPA's supporting documentation. Instead of curing the defects of the FAC, DPA has further muddied the waters.

DPA alleges that Melvin created a SquareSpace trial site, Tim-Caplinger.squarespace.com (hereinafter "Trial Site"), using the email address "amp.chumbawamba@ausi.com" (hereinafter the "Ausi.com Email"). SAC ¶¶ 42-43. Then, according to DPA, Melvin obtained and used DPA administrative credentials, without authorization, to switch the primary domain of the Trial Site to "deltapilot.org," an unused domain owned by DPA. SAC ¶¶ 37, 44-45. DPA also alleges that Melvin transmitted code or commands to SquareSpace and to domain files hosting DPA's web site, causing "deltapilot.org" (the unused DPA site) to point to the files in the Trial Site account. SAC ¶ 46. As a result, according to the SAC, "DPA's web site ceased to function as intended and web pages containing data and information in the public portion of the web site were made inaccessible." SAC ¶ 47.

These allegations undercut DPA's CFAA claim. First, the only interference about which DPA has provided any information is interference to a website that, by DPA's own admission, was not in use. "Deltapilot.org" is not the domain that DPA used for its website. DPA states explicitly that its web address is "http://delta-pilots.org." SAC ¶ 21. The "deltapilot.org" domain, although owned by DPA, was "not being used" by DPA at the time of the alleged hack. SAC ¶ 45. DPA fails to explain, or even allege, how the redirection of an unused domain caused an interruption to "http://delta-pilots.org." These additional allegations concerning the Trial Site and "deltapilot.org" undercut DPA's own argument and cast doubt on whether any interruption in service actually occurred, given that the interfered-with website was not in use at the time. At minimum the SAC reveals DPA's failure to connect Melvin's alleged conduct – pointing the unused domain to the Trial Site – with the interruption in service that DPA claims.

Second, the screenshots provided with the Granath Declaration and the chat logs from SquareSpace concern not "delta-pilots.org" or "deltapilot.org" but a different domain name altogether – "deltapilotsassociation.org" – which appears nowhere in the FAC or the SAC. *See* Granath Decl., Attachment 2 (showing that one of DPA's "primary domains," "www.deltapilotsassociation.org," was not "pointing correctly to SquareSpace"); Attachments 3-4 (screenshots of "www.deltapilotsassociation.org" in trial mode); Attachments 5-7 (chat logs discussing problems with "deltapilotsassociation.org"). If, as the supporting documentation suggests, it is this other domain that experienced an outage or interruption, DPA makes no mention of it in the FAC or the SAC. More important, for purposes of this Motion, the SAC contains no allegation that Melvin's conduct caused damage to or interfered with the operation of "deltapilotsassociation.org."

Third, the Declaration submitted by DPA's counsel contains a description of the alleged hack that conflicts with the version of events set forth in the SAC. The Declaration states that the DPA website was *itself* placed in trial mode. *See* Granath Decl. ¶¶ 6-7. The screenshots attached to the Granath Declaration support that statement, at least in part (as noted above, they are shots of "www.deltapilotsassociation.org," not "delta-pilots.org"). *See* Granath Decl. Attachments 3-4. This conflicts with the SAC, which contains no allegation that DPA's own website was placed into trial mode. Rather, the SAC alleges that Melvin pointed "deltapilot.org" (its abandoned, unused web site) toward website files on the Trial Site, which caused viewers to see a "false page" containing a message about ALPA. *See* SAC ¶¶ 46, 52. In other words, the statement in the Declaration, and supporting screenshots, offer yet another version of the alleged hack that is inconsistent with the pleaded version.

Fourth, although DPA alleges that "SquareSpace computer records show" Melvin impersonating Caplinger to create the Trial Site, using the Ausi.com Email, that is pure fiction. *See* SAC ¶ 43. The "SquareSpace computer records" contain no mention of Melvin or of any account owned or controlled by him on their servers. The screenshots show only that someone with the Ausi.com Email may have used Caplinger's name to create the Trial Site. *See* Granath Decl. Attachment 8. Melvin appears nowhere.

Fifth, DPA's claims of a "link" between Melvin and the Ausi.com Email disintegrate upon casual review. DPA rests its allegation on a document showing that in 2008 an anonymous person used a similar (but not identical) email to post a fake news story about a "Russell Melvin" of Austin, Texas. *See* Granath Decl. Attachments 9-10. From this DPA concludes that the anonymous poster must have been Defendant Melvin, ignoring the difference in email addresses and confusing the (fictitious) subject of the 2008 message with the anonymous person who

posted it online. It bears noting that DPA did not connect either the Ausi.com Email or the anonymous poster's email with any of the email addresses that DPA's "computer forensics expert" unearthed in connection with Melvin. *See* Granath Decl. Attachment 8. Nor do those emails match the email addresses allegedly given to DPA by Melvin with his membership, or allegedly used by Melvin to send a letter to ALPA. *See* Granath Decl. Attachment 18; SAC ¶ 73.

Despite the inconsistencies in the SAC and the supporting documents, DPA nevertheless claims that it has pleaded enough to raise a "reasonable expectation" that further discovery will reveal a legitimate connection between Melvin and the alleged hack. DPA's invocation of *Twombly* is misplaced. What the SAC reveals is a lack of evidence connecting Melvin to the hack, not a promise of more to be found. Also, unlike DPA, the plaintiff in *Twombly* did not have the benefit of expedited discovery. DPA has already taken discovery from various parties, including its web host, and there is still nothing from SquareSpace to connect the hack to Melvin.

After three tries and substantial discovery DPA has still failed to plead a coherent or consistent description of what the alleged hack *was*, how it happened, and how Melvin was supposedly involved. The claims should be dismissed.

## III.    LEAVE TO AMEND IS NOT IN THE INTERESTS OF JUSTICE WHERE DPA HAS ALREADY FALLEN SHORT THREE TIMES

In the event the Court grants this Motion to Dismiss, DPA should not be given another opportunity to amend its complaint.[3] DPA has already had three chances and fallen short each time. DPA took discovery and has received a Motion to Dismiss identifying in detail the various defects of the FAC. DPA still failed to state a claim. There is no reason to believe that DPA can

---

[3] Melvin will address DPA's pending Motion for Leave to Amend in his forthcoming opposition brief. In short, it would be futile to grant the Motion for Leave to Amend, for the reasons given in Parts I and II of this brief. Permitting the amendment would also be prejudicial to Melvin, and inappropriate in light of DPA's undue delay.

or will fix these defects on the fourth attempt. Also, amendment would be futile because the statute of limitations has already run and there would be no relation back, as explained in Part I, above.

Dated: January 17, 2017
     New York, New York

                                LEVY RATNER, P.C.

                                /s/_____

                    By:   Dana E. Lossia
                             Attorneys for Defendant
                             80 Eighth Avenue
                             New York, NY 10011
                             (212) 627-8100
                             (212) 627-8182 (fax)
                             dlossia@levyratner.com