Lucas K. Middlebrook
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
199 Main Street, Seventh Floor
White Plains, NY 1060
(914) 997-1346
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELTA PILOTS ASSOCIATION,<br>  a labor organization<br>  incorporated in Florida<br><br>                              Plaintiff<br><br>     v.<br><br>RUSSELL C. MELVIN,<br><br>     an individual<br>                              Defendant. | Civil Action No.: 1:14-cv-00225-AKH<br><br>**<u>SECOND</u>**<br>**AMENDED COMPLAINT**<br>**FOR DECLARATORY JUDGMENT,**<br>**INJUNCTIVE RELIEF AND,**<br>**MONETARY DAMAGES**<br>(Jury Trial Demanded) |

COMES NOW plaintiff, the Delta Pilots Association ("DPA"), by and through its attorneys Seham, Seham, Meltz & Petersen, LLP, and for their Second Amended Complaint, now against defendant Russell C. Melvin, and states as follows:

### NATURE OF THE CASE

1. This is an action for declaratory judgment, injunctive relief, and monetary damages stemming from the "hacking" of plaintiff's web site beginning in November of 2013 and continuing. It centers on the knowing transmission of computer code and/or commands into a protected computer without authorization and with intent to cause damage, the intentional accessing of a protected computer without authorization that recklessly caused damage, and the intentional accessing of a protected computer without authorization, that caused damage and loss. These acts are a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*.

## PARTIES

2.     Plaintiff, the Delta Pilots Association ("DPA" or "plaintiff"), is an association recognized by the IRS as a 501(c)(5) labor organization, which is incorporated in the State of Florida.  DPA seeks to organize and exclusively represent the craft and class of pilots at Delta Airlines, Inc. ("Delta").

3.     DPA maintains a home office in Tampa, Florida.

4.     Defendant Russell C. Melvin ("Melvin" or "defendant") is an individual who is responsible alone – or with others individuals or entities acting as accomplices – for "hacking" into DPA's web site by unauthorized access that was intended to, and did, cause damage and loss.

## JURISDICTION AND VENUE

5.     Defendant Melvin is subject to personal jurisdiction in this district, the United States District Court for the Southern District of New York, and in the state of New York. Defendant committed illegal acts within this district and within this state.  Defendant did this by purposefully contacting and using Internet and computer communications to access, without authorization, DPA's web site through or on computers used in interstate commerce, which are owned, controlled, or maintained by SquareSpace, Inc. ("SquareSpace") that has its principal business offices in New York, and are located within this district and within this state.  Defendant Melvin thereby caused injury within this district and within this state.

6.     This Court has subject matter jurisdiction because federal question jurisdiction pursuant to 28 U.S.C. §1331 arises under the federal Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq*.  In particular, Section 1030(g) of CFAA provides that, "[A]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief."

7. In addition, plaintiff's claim is brought under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2210 & 2202.

8. Venue is proper within this district, the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to these claims occurred within this district.

## FACTS

9. Delta is a "carrier" within the definition of the Railway Labor Act ("RLA"), 45 U.S.C. § 151, First, headquartered in Atlanta, Georgia.

10. Delta is one of the nation's largest commercial air carriers and, on information and belief, maintains a fleet of approximately 700 aircraft, operates over 5,000 domestic and international flights every day, and employs nearly 13,700 commercial pilots.

11. Under the RLA, covered employees including pilots employed by Delta have a right to choose whether to be represented by a union and if so by what union.

12. The Air Line Pilots Association ("ALPA") is a labor union and "representative" within the meaning of the RLA, 45 U.S.C. § 151, Sixth.

13. ALPA represents nearly 54,000 commercial pilots at some 32 separate U.S. and Canadian airlines.

14. ALPA currently represents the pilots employed by Delta.

15. Delta is one of the last "major" airlines as opposed to the smaller "regional" airlines that ALPA represents.

16. In May of 2010, the DPA was founded out of dissatisfaction with ALPA's representation of Delta pilots and with the specific goal of replacing ALPA as the union representing Delta pilots.

17.     Tim Caplinger, who is a resident of Florida and a pilot employed by Delta, is the founder of DPA, a member of its Board of Directors, and its Interim President.

18.     In 2010, the DPA began a campaign to collect authorization cards ("cards") signed by individual Delta pilots in order to demonstrate that a majority of them desire to be represented by DPA.  This campaign was for the purpose of securing and winning a representational election conducted by the National Mediation Board ("NMB"), pursuant to the RLA, and ultimately to have DPA certified by the NMB as the new and exclusive representative of Delta pilots.

19.     By early November 2013, the DPA had collected cards from more than 50% of all Delta pilots but had not yet filed an application for a representational dispute with the NMB.

20.     DPA's primary means of conducting its business, including communicating with Delta pilots, raising donations, and campaigning, is through its web site.

21.     DPA's web site can be located, or "surfed" to on the Internet, or "web," at the uniform resource locator ("URL"), or web address of, http://delta-pilots.org.

22.     DPA's web site contains publically accessible web "pages" as well as private pages requiring a login and password.

23.     On the public portion of its website, DPA displays a running count of the number of cards signed by Delta pilots in DPA's campaign to replace ALPA.

24.     SquareSpace, Inc. is a New York company that "hosts" DPA's web site.

25.     Through SquareSpace DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account.

26.     Tim Caplinger was authorized to and had personal access to DPA's SquareSpace account on behalf of DPA at all relevant times.

27.     Rick Eagan, also a pilot employed by Delta, was DPA's Web Master at all relevant

times. Eagan was authorized by Caplinger to access DPA's SquareSpace account on behalf of DPA at all relevant times.

28. DPA's web site is maintained on computer(s) used in, or that affect, interstate or foreign commerce or communication, which are owned, operated, and controlled by SquareSpace.

29. Critical files, code, and programs that constitute DPA's web site are maintained on computers located in the state of New York.

30. At all relevant times, Melvin was a Delta pilot based out of Memphis, Tennessee.

31. Melvin joined DPA on or about January 5, 2011, giving an address of 7050 Corsica Drive, Germantown, Tennessee, 38138.

32. Property records show that Melvin acquired the 7050 Corsica Drive, Germantown, Tennessee, 38138 property sometime in 2012.

33. Melvin also owns property in the Nashville area and currently resides there.

34. Melvin withdrew his membership in DPA sometime in 2012.

35. At no time was Melvin ever authorized for administrative access to DPA's web site, computer files, or computers used by DPA for its web site.

36. Subsequent to his withdrawal from DPA, Melvin became openly active in ALPA, took positions in ALPA such as a member of the Government Affairs Committee.

37. Sometime after Melvin withdrew from DPA but on, or prior to, November 8, 2013, Melvin surreptitiously and without authorization obtained the DPA administrative login and password to the Squarespace computer and files hosting DPA's web site.

38. Melvin obtained the DPA administrative login and password knowing his purpose was to gain unauthorized access to the computer and files hosting DPA's web site in order to transmit codes or commands to it that would damage or impair the functioning of the DPA's web

site and inflict loss on DPA.

39. Sometime, on or, before November 8, 2013, Melvin obtained a web hosting account at Squarespace.

40. Sometime, on or, before November 8, 2013, Melvin obtained or used an email address of "amp.chumbawamba@ausi.com"

41. Starting on or about November 8, 2013, and continuing thereafter, the integrity of DPA's web site was dramatically and visibly disrupted when Melvin "hacked" into it by unauthorized use of the DPA administrative login and password and thereafter causing damage and loss by the transmission of code or commands to cause the web site to cease functioning and to instead serve Melvin's unauthorized use.

42. On November 8, 2013, at approximately 7:18 p.m. EST, Melvin transmitted commands or code to the "master files" of Squarespace computer and files hosting DPA's web site and opened a trial account called "Tim-Caplinger.squarespace.com" for the purpose of creating a hoax or fake website on that trial account in order to redirect the DPA website to the trial account website using DPA domain administrative credentials.

43. To accomplish this unauthorized act Melvin impersonated "Tim-Caplinger" and used an email address of amp.chumbawamba@ausi.com as Squarespace computer records show.

44. At approximately 7:18 p.m. EST using the DPA domain administrative credentials Melvin transmitted commands or code to switch the primary domain name of "Tim-Caplinger.squarespace.com" to another domain name – "deltapilot.org".

45. The site "deltapilot.org." was then owned by DPA but not being used by it.

46. Melvin transmitted commands or code to the Squarespace computer and other domain files hosting DPA's web site that caused the "deltapilot.org" site to 'point to' files existing

in the Tim-Caplinger.squarespace.com trial account whose owner was concealed by "ContactPrivacy.com" – a domain privacy service which was located in Canada and which had been previously established by unknown parties who, on information and belief, conspired with Melvin.

47. As a direct and immediate consequence of this attack, DPA's web site ceased to function as intended and web pages containing data and information in the public portion of the web site were made inaccessible.

48. Further, the ability of DPA's web site to accept monetary donations from member and/or supporters ceased to function properly when software links to a secure third-party credit card web site were severed.

49. Further, the ability of the web site to display video messages and important updates was severely disrupted.

50. Further, the private portion of the web site became inaccessible.

51. Further, visitors to DPA's web site were involuntarily redirected away from it to sites not of DPA's making, nor owned, nor controlled by DPA.

52. In the early stages of the attack, viewers attempting to access DPA's web site were involuntarily redirected to a web page that falsely claimed DPA had abandoned its card collection campaign and now urged support for ALPA ("work together"). This false page also contained a link to an ALPA web site.

53. In the later stages of the attack viewers were redirected to yet another web site, "deltapilot.org," which mimicked DPA's web site, potentially a malicious "clone" of it.

54. The false web page and the clone site were calculated or intended to dissuade any further Delta pilots from signing cards in DPA's campaign or to otherwise abandon DPA, or its

campaign, by knowingly and intentionally making false statements of material fact about DPA and its campaign.

55. On or about November 8, 2013, and continuing thereafter, defendant, without authorization, knowingly caused or procured the transmission of a program, information, code, or commands, into a computer or computers used in interstate commerce that resulted in, and intentionally caused damage to data, files, code, and programs constituting DPA's web site.

56. This attack thereby disrupted DPA's web site and effectively "hijacked" it to another site, one intended to appear as part of DPA's web site in order to deceive viewers of it and to inhibit or cut-off donations to DPA.

57. This attack further severed software links to other computers used in interstate commerce relied upon by DPA's web site both for receiving monetary donations and for displaying videos.

58. Further, on or about November 8, 2013, and continuing thereafter, defendant intentionally accessed a computer or computers used in interstate commerce, without authorization, and as a result recklessly caused damage to data, files, code, and programs then constituting DPA's web site, on a computer or computers hosting and storing the same.

59. Further, on or about November 8, 2013, and continuing thereafter, without authorization, defendant intentionally accessed a computer or computers used in interstate commerce without authorization and as a result of such conduct caused damage and loss of data, files, code, and programs then constituting DPA's web site.

60. Plaintiff suffered loss by defendant's aforesaid wrongful acts, including costs in excess of five-thousand ($5,000), incurred to assess and discover the extent that DPA's web site was rendered inoperable, and to determine the nature of the damage to its integrity, and to restore

the integrity of its web site, to re-establish critical links to it, and to communicate for this purpose with DPA's hosting service.

61.     In attempting to assess damage and to restore the integrity of DPA's web site and restore availability of data and severed linked programs, Caplinger initially expended approximately 40 man-hours and Eagan 32 hours between discovering the damage and about December 3, 2013.

62.     At the time, as pilots, Caplinger earned about $150 an hour and Eagan $203.

63.     Some severed links were not discovered or repaired until January 2014.

64.     Consequently, the initial costs to repair the damage to the site were approximately $12,496.

65.     Further, plaintiff sustained loss through donations not received during that portion of time the DPA web site's contribution page was rendered inoperable.

66.     As a direct consequence of the severed links to the donation pages, approximately $11,000 donations to DPA were lost during November and December 2013, when the site was being repaired.

67.     Plaintiff further suffered loss by incurring costs and expenditures to identify and pursue the offender(s) in order to ensure the future security and integrity of the DPA web site.

68.     Plaintiff also suffered the consequence of lost good will.  This loss was to the extent that the hacking and redirection to web sites falsely claiming plaintiff had ceased its organizing campaign interfered with, or frustrated, DPA members and supporting pilots' lawful exercise of rights under the RLA to choose their own representative, which DPA sought and seeks to facilitate.

69.     Defendant caused and continues to cause irreparable injury to plaintiff that cannot be fully compensated by, or measured in, money-damages.

70. Despite plaintiff's efforts to mitigate damage to its web site and to restore control over it, defendant succeeded in inserting commands or code into accounts on computers relied upon by plaintiff that are necessary to the proper and safe function of DPA's web site. This constitutes an ongoing means to re-access and to potentially disable, disrupt, or interfere with the integrity of DPA's web site at any time.

71. To date, plaintiff has not been successful in removing all of the malicious commands or code and consequently DPA's web site remains potentially vulnerable to renewed "backdoor" attacks by defendant presently and in the future.

72. On November 9, 2013, DPA published in its publicly accessible Facebook and Twitter accounts a message stating, "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice …"

73. On or about November 13, 2013, Melvin sent an email to ALPA using the email address of "rcmelvin@mac.com" that attached a digital, unsigned letter.

74. Melvin's letter to ALPA disclosed that in the time frame of the hacking he owned a trial account at Squarespace and had shut it down.

75. Melvin's letter to ALPA also contained details about the disruption to DPA's web site that were not then publically known.

76. On November 14, 2013, DPA published in its email newsletter entitled "DPA Status Report" an article that stated in part, "Hacking Update … our investigation has led us to a point we did not want to arrive at, filing a lawsuit …"

77. The very next day, November 15, 2013, Tim Caplinger received three phone calls at his residence from a male person who refused to identify himself but who claimed he was responsible for hacking into DPA's web site by means of using Caplinger's personal information.

78. The caller was Melvin, as was later determined on August 14, 2014, after the Court granted DPA's then motion to compel compliance with a subpoena *duces tecum* served on ALPA (consequently disclosing Melvin as the author of the letter sent to ALPA by email on November 13, 2013).

79. The originating phone number used to call Caplinger on November 15 was 901 871-7877.

80. The 901 871-7877 phone number was then billed by AT&T to an account at Melvin's property of 7050 Corsica Drive, Germantown, Tennessee, 38138.

81. In addition, Melvin's correspondence to ALPA admitted he called Caplinger.

82. In his call to Caplinger, Melvin attempted unsuccessfully to negotiate with Caplinger to avoid being "pursued."

83. Later that same day Caplinger made a criminal complaint based on the hacking of DPA's web site.

84. Defendant's conduct, which severally compromised the integrity of DPA's web site, its supporting code, files, and computer programs, is and will continue.

85. Plaintiff has no adequate remedy at law for defendant's illegal and tortious acts.

86. Plaintiff is likely to prevail on the merits of its action (or, alternatively, there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and the balance of hardships tips decidedly in favor of plaintiff).

## FIRST CAUSE OF ACTION

**(Computer Fraud And Abuse Act, 18 U.S.C. § 1030(a)(5)(A))**

87. Plaintiff incorporates by reference, as if fully set forth herein, all preceding paragraphs of this Complaint.

88. After "hacking" into DPA's web site as alleged in the preceding paragraphs of this Complaint, defendant knowingly *caused the transmission* of a program, information, code, or commands, and as a result of such conduct, *intentionally caused damage* without authorization to a "protected computer" or computers as defined in 18 U.S.C. § 1030(e)(2).

89. Such action violates 18 U.S.C. § 1030(a)(5)(A) of the Computer Fraud and Abuse Act.

90. As a result of such action, plaintiff has suffered loss within a 1-year period aggregating more than $5,000 in value, as alleged in the preceding paragraphs of this Complaint.

91. Pursuant to 18 U.S.C. § 1030(g), plaintiff is entitled to injunctive and/or other equitable relief, as well as to compensatory damages.

92. Further, 28 U.S.C. § 2201 provides that "[i]n the case of actual controversy within its jurisdiction any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

93. Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that defendant's conduct constitutes a violation of 18 U.S.C. § 1030(a)(5)(A) of the Computer Fraud and Abuse Act.

94. Plaintiff is aggrieved of the violations of law alleged herein. Therefore, unless the Court issues declaratory relief as requested, plaintiff will be irreparably injured. Plaintiff has no prompt, adequate and effective remedy at law. Plaintiff will be successful on the merits of this action.

## SECOND CAUSE OF ACTION

**(Computer Fraud And Abuse Act, 18 U.S.C. § 1030(a)(5)(B))**

95.     Plaintiff incorporates by reference, as if fully set forth herein, all preceding paragraphs of this Complaint.

96.     By "hacking" into DPA's web site, as alleged in the preceding paragraphs of this Complaint, defendant *intentionally accessed* without authorization a "protected computer" as defined by 18 U.S.C. § 1030(e)(2), and as a result of defendant's conduct *recklessly caused damage*.

97.     Such action violates the Computer Fraud and Abuse Act of 1986, 18 U.S.C. § 1030(a)(5)(B).

98.     As a result of such action, plaintiff has suffered loss within a 1-year period aggregating more than $5,000 in value, as alleged in the preceding paragraphs of this Complaint.

99.     Pursuant to 18 U.S.C. § 1030(g), plaintiff is entitled to injunctive and/or other equitable relief, as well as to compensatory damages.

100.    Further, 28 U.S.C. § 2201 provides that "[i]n the case of actual controversy within its jurisdiction any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

101.    Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that defendant's conduct constitutes a violation of 18 U.S.C. § 1030(a)(5)(B) of the Computer Fraud and Abuse Act.

102.    Plaintiff is aggrieved of the violations of law alleged herein.  Therefore, unless the Court issues declaratory relief as requested, plaintiff will be irreparably injured.  Plaintiff has no prompt, adequate and effective remedy at law.  Plaintiff will be successful on the merits of this action.

## THIRD CAUSE OF ACTION

### (Computer Fraud And Abuse Act, 18 U.S.C. § 1030(a)(5)(C))

103. Plaintiff incorporates by reference, as if fully set forth herein, all preceding paragraphs of this Complaint.

104. By "hacking" into DPA's web site as alleged in the preceding paragraphs of this Complaint, defendant *accessed* a "protected computer" as defined by 18 U.S.C. § 1030(e)(2), without authorization and as a result of such conduct *caused damage and loss* as that term is defined by 18 U.S.C. § 1030(e)(8) and (11).

105. Such action violates 18 U.S.C. § 1030(a)(5)(C) of the Computer Fraud and Abuse Act.

106. As a result of such action, plaintiff has suffered loss within a 1-year period aggregating more than $5,000 in value, as alleged in the preceding paragraphs of this Complaint.

107. Pursuant to 18 U.S.C. § 1030(g), plaintiff is entitled to injunctive and/or other equitable relief as well as to compensatory damages.

108. Further, 28 U.S.C. § 2201 provides that "[i]n the case of actual controversy within its jurisdiction any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

109. Plaintiff seeks a declaration pursuant to 28 U.S.C. § 2201 that the defendant's conduct constitutes a violation of 18 U.S.C. § 1030(a)(5)(C) of the Computer Fraud and Abuse Act.

110. Plaintiff is aggrieved of the violations of law alleged herein. Therefore, unless the Court issues declaratory relief as requested, plaintiff will be irreparably injured. Plaintiff has no

prompt, adequate and effective remedy at law.  Plaintiff will be successful on the merits of this action.

## RELIEF DEMAND

**WHEREFORE**, cause having been shown, plaintiff prays for judgment against defendant as follows:

1. For a declaratory judgment, pursuant to 28 U.S.C. § 2201 declaring that the actions of defendant complained of herein constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*, as alleged herein;

2. For injunctive relief in the form of an order temporarily, preliminarily, and/or permanently enjoining defendant to immediately cease and desist any unauthorized access to any protected computer relied upon and used by plaintiff, and to take reasonable steps to verify compliance with such order;

3. Judgment for an award of compensatory damages;

4. Interest on the aforesaid amount;

5. For an order awarding to plaintiff the costs of this action, including payment of all expenses and all reasonable attorneys' fees, pursuant to 18 U.S.C. § 1030(g);

6. Granting such additional relief as the Court deems proper and just.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby <u>demand a trial by jury</u> as to all claims to which they are entitled.

Dated:      White Plains, New York
<u>April 10, 2016</u>

By: ***/s/ Nicholas P. Granath***
Nicholas P. Granath, Esq. *pro hac vice*
ngranath@ssmplaw.com
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
2915 Wayzata Blvd.
Minneapolis, MN  55405
Tel. (612) 341-9080;
Fax (612) 341-9079

And

Lucas K. Middlebrook, Esq.
lmiddlebrook@ssmplaw.com
<u>Lee Seham, Esq.</u>
<u>lseham@ssmplaw.com</u>
<u>George Diamantopoulos, Esq.</u>
<u>GDiaman@ssmplaw.com</u>
SEHAM, SEHAM, MELTZ & PETERSEN, LLP
199 Main Street, Seventh Floor
White Plains, NY 1060
Tel: (914) 997-1346;
Fax: (914) 997-7125

*Attorneys for Plaintiff, Delta Pilots Association*