UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
DELTA PILOTS ASSOCIATION,

                                 Plaintiff,

                -against-             Case No. 1:14-CV-00225-AKH

RUSSELL C. MELVIN,

                            Defendant.
---------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Levy Ratner, P.C.
80 Eighth Avenue, Floor 8
New York, NY 10011-5126
(212) 627-8100
(212) 627-8182 (fax)
dlossia@levyratner.com

On the Brief:    Dana E. Lossia

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................ 2

ARGUMENT .................................................................................................................... 5

   I.   Rule 56 Standard ................................................................................................... 5

   II.  The CFAA Claims Must Be Dismissed Because The Evidence
        Does Not Show $5,000 In Cognizable Losses. ................................................... 6

         (1)   Lost earnings of Tim Caplinger and Rick Eagan ............................... 7

         (2)   Lost donations ..................................................................................... 9

         (3)   Lost good will ..................................................................................... 11

         (4)   Attorneys' fees ................................................................................... 11

         (5)   Litigation costs ................................................................................... 13

         (6)   Expert witness costs ........................................................................... 13

   CONCLUSION .................................................................................................... 17

# TABLE OF AUTHORITIES

<u>Cases</u>

*A.V. v. iParadigms, LLC,*
   562 F.3d 630 (4th Cir. 2009) ................................................................................................. 8

*Amnesty Am. v. Town of West Hartford,*
   361 F.3d 113 (2d Cir. 2004)................................................................................................... 6

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)........................................................... 5

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)........................................................... 5

*In re DoubleClick Inc. Privacy Litigation,*
   154 F.Supp.2d 497 (S.D.N.Y. 2001)..................................................................................... 15

*Int'l Chauffeured Serv., Inc. v. Fast Operating Corp.,*
   No. 11 Civ. 2662, 2012 WL 1279825 (S.D.N.Y. Apr. 16, 2012)........................................... 16

*Millennium TGA, Inc. v. Leon,*
   No. 12-CV-01360 MKB, 2013 WL 5719079 (E.D.N.Y. Oct. 18, 2013)................................. 15

*Mintel Int'l Grp., Ltd. v. Neergheen,* 08–CV–3939,
   2010 WL 145786 (N.D.Ill. Jan. 12, 2010) ............................................................................ 15

*Nexans Wires, S.A. v. Sark-USA, Inc.,*
   319 F. Supp. 2d 468 (S.D.N.Y. 2004).............................................................................. 12, 13

*NovelPoster v. Javitch Canfield Group,*
   140 F. Supp. 3d 954 (N.D. Cal. 2014) ................................................................................... 8

*Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack,*
   No. 14 CV 6498-LTS-HBP, 2018 WL 2059653 (S.D.N.Y. May 1, 2018) ....................... 12, 13

*Reis, Inc. v. Lennar Corp.,*
   No. 15 CIV. 7905 (GBD), 2016 WL 3702736 (S.D.N.Y. July 5, 2016) ................................. 16

*Reis, Inc. v. Spring11 LLC,*
   No. 15 CIV. 2836 (PGG), 2016 WL 5390896 (S.D.N.Y. Sept. 26, 2016) .............................. 15

*Scotto v. Almenas,*
   143 F.3d 105 (2d Cir. 1998).................................................................................................. 6

*SuccessFactors, Inc. v. Softscape, Inc.*,
   544 F. Supp. 2d 975 (N.D. Cal. 2008) ................................................................. 16

*Turner W. Branch, P.A. v. Osborn*,
   No. CV 13-00110 MV/WPL, 2014 WL 12593991 (D.N.M. Mar. 26, 2014) .................... 12, 13

*Tyco Int'l (US) Inc. v. John Does 1-3*,
   No. 01 CIV. 3856 RCCDF, 2003 WL 21638205 (S.D.N.Y. July 11, 2003) ...................... 15, 16

*United States v. Fowler*, No. 8:10-cr-65-T-24 AEP,
   2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25, 2010) ............................................ 9

*United States v. Larsen*,
   190 F. App'x 552 (9th Cir. 2006) ..................................................................................... 8

*United States v. Millot*,
   433 F.3d 1057 (8th Cir. 2006) ......................................................................................... 8

*United States v Middleton*,
   231 F.3d 1207 (9th Cir. 2000) .................................................................................. 8, 16

*United States v. Shahulhameed*, No. 5:12-118-KKC,
   2014 U.S. Dist. LEXIS 52364, at *4 (E.D. Ky. Apr. 16, 2014) ......................................... 10


Statutes

18 U.S.C. §1030 *et seq.* ................................................................... 1, 6, 12, 13, 14, 16


Rules

Fed.R.Civ.P. 26 ................................................................................................... 1

Fed.R.Civ.P. 34 ................................................................................................... 1

Fed.R.Civ.P. 56 ................................................................................................ 1, 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
DELTA PILOTS ASSOCIATION,

                              Plaintiff,

              -against-                        Case No. 1:14-CV-00225-AKH

RUSSELL C. MELVIN,

                              Defendant.
---------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

        Defendant Russell C. Melvin ("Melvin"), by and through his attorneys, moves pursuant to Federal Rule of Civil Procedure 56 for Summary Judgment concerning the claims of Plaintiff Delta Pilots Association ("DPA") under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §1030(a)(5)(A), (B) and (C).

## INTRODUCTION

        In a conference with the Court on May 11, 2018, counsel for both parties represented that they had exchanged initial disclosures pursuant to Rule 26(a)(1) and had produced all material in their possession, custody or control that was responsive to the Rule 34 requests for the production of documents exchanged by both sides.[1] (*See* Defendant's Rule 56.1 Statement of Material Facts (hereafter "SOF") at ¶¶ 1-3). Based upon the evidence produced, DPA cannot show that the alleged CFAA violation caused damage or resulted in losses of at least $5,000 during a 1-year period as is required under the CFAA. DPA's claims therefore must be dismissed.

---

[1] Plaintiff's counsel stated that only one piece of information – records of Plaintiff's attorneys' fees – still needed to be produced to Defendant, and that information has since been produced.

## BACKGROUND

Plaintiff DPA's website is located at http://delta-pilots.org. (SOF ¶ 6). The Second Amended Complaint makes no allegation about www.deltapilotsassociation.org (SOF ¶¶ 7-8), but discovery revealed that on Friday, November 8, 2013, DPA became aware that www.deltapilotsassociation.org was "pointing" to another website. (SOF ¶ 11).  However, deltapilotsassociation.org (without the "www") did not experience any pointing issue. (SOF ¶ 12). The next morning, Tim Caplinger, DPA's founder and interim president, called GoDaddy, the domain name provider for www.deltapilotsassociation.org, for customer support. (SOF ¶ 4, ¶¶ 28-29). GoDaddy told him to "change the www points to for square space[.]" (SOF ¶ 29). In other words, DPA needed to change where the "www." version of its domain was pointing. Later that morning, Caplinger contacted Squarespace customer support for assistance, and Squarespace likewise explained that DPA likely had "domain forwarding" turned on and needed "to disable this for your domain to display correctly with or without the www."  (SOF ¶ 20).

DPA made several domain forwarding updates to its site on the evening of November 9, 2013 and the early morning of November 10, 2013 and, with some additional customer service assistance, the allegedly "redirected" domain began pointing to the correct website.  (SOF ¶ 30).

At no time was DPA locked out of its ability to configure its domain settings or modify the contents of its websites. (SOF ¶¶ 46-47). The customer support provided by Squarespace and GoDaddy in November 2013 did not cost DPA any money. (SOF ¶¶ 49-50).

As DPA itself explained to its members, none of its website content was modified, and none of its data was accessed. (SOF ¶ 38). DPA understood this from the start. It sent out an email newsletter on November 9, 2013, just hours after noticing the pointing issue, saying "The content of our site has not been hacked, only where the address takes you." (SOF ¶ 38)

2

By November 10, 2013, DPA had announced that its website was "fully operational and secure" (SOF ¶ 37).  As DPA reinforced in an email that same day, "Again, our site was not compromised internally. No data was lost or accessed. We do not store member data on the DPA website as a side note. The hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA and may have contained other malicious content." (SOF ¶ 39). While viewers of www.deltapilotsassociation.org were temporarily directed to an apparently pro-ALPA page (SOF ¶ 14), no evidence of any "other malicious content" or "malicious commands or code" has been produced (SOF ¶ 45), nor has evidence been produced to show that the pointing of www.deltapilotsassociation.org was accomplished by an *unauthorized* user.

What emerges most clearly from the evidence supplied by Plaintiff is that DPA's leaders are technically unskilled and rely heavily on assistance from Squarespace customer support. In fact, DPA appeared to be unaware of which websites it actually owns.  In November 2013, DPA repeatedly insisted to Squarespace that it did not own www.deltapilot.org.  (SOF ¶¶ 18-19)(claiming that "Our opposition owns … deltapilot.org. They are doing the hacking/redirecting.") DPA also told its members that www.deltapilot.org was a "hostile site." (SOF ¶ 39). DPA was so sure that www.deltapilot.org belonged to the "hacker" that it conducted third-party discovery to learn the owner's identity.  (SOF ¶ 31). Yet, the Second Amended Complaint now asserts that *DPA itself* owns www.deltapilot.org (Docket Entry # 85, SAC ¶ 47), and the evidence from Squarespace shows that www.deltapilot.org had been linked in DPA's Squarespace account since April 2012. (SOF ¶¶ 21-22).

Likewise, DPA seems unsure about which website was misdirected. While DPA's emails with Squarespace customer support focused on www.deltapilotsassociation.org (SOF ¶ 18), the SAC does not allege that www.deltapilotsassociation.org is DPA's website or that it was

"hacked" or misdirected.  Rather, the SAC makes allegations only about http://delta-pilot.org. (Docket Entry # 85, SAC ¶ 21). Thus, the issues with www.deltapilotsassociation.org that DPA raised to GoDaddy and Squarespace are not the subject of DPA's complaint.[2]

While DPA may not be sure which domains it owns and which website was errantly pointing, it expressed immediate certainty on November 9, 2013 and thereafter that it had been "hacked" and that the perpetrator was its rival, the Air Line Pilots Association ("ALPA"), which represents Delta's pilots and which DPA hopes to unseat. (SOF ¶¶ 18, 36, 38).  However, in a telling demonstration of DPA's paranoia, Mr. Caplinger had actually told Squarespace in a customer service exchange one month *earlier* that it believed ALPA was likely to hack its website.  (SOF ¶ 27). Clearly, Mr. Caplinger was predisposed to believe that any problem with the website was somehow the fault of his "enemy," as DPA characterized ALPA on November 10, 2013. (SOF ¶ 39).[3]  Caplinger went so far as to claim to Squarespace that the "hacker" was "now spoofing/forging our Constant Contact database and sending out emails to my membership while posing as us." (SOF ¶ 25). Since that allegation does not appear in the SAC, we assume that DPA later acknowledged that this did not in fact happen. (SOF ¶ 26).

The evidence here lends weight to the concern expressed by the Court in a status conference nearly four years ago, before Defendant Melvin was added to this case:  "It seems to me that you are using this case as a fishing expedition for a lot of other information that is

_____

[2] Given that this is a second amended complaint, filed after more than two years of third-party discovery, the absence of any allegation about www.deltapilotsassociation.org cannot be excused as an error or an oversight, and DPA should not be permitted to amend its pleadings yet again, particularly after the Defendant has been burdened by discovery and motion practice.

[3] Inexplicably, DPA ignores the evidence it obtained in third-party discovery that suggests the involvement of three other individuals: Matthew Hobbs (who registered www.deltapilot.org) (SOF ¶¶ 32-34), and Mark McClain and D.A. Hart (who Squarespace lists as the owners of www.deltapilot.org). (SOF ¶¶ 23-24).

intended as relevant not to this case but for other purposes in your jurisdictional dispute [with ALPA]. I want you to know that this Court will not lend itself to that practice." (Transcript of August 14, 2014 conference, at Tr. 11:1-5).

DPA has certainly been eager to obtain information from many sources, but for reasons that have not been explained, DPA did not produce records of its *own* GoDaddy or Squarespace log-ons or records of its own and its leaders' IP addresses. This information was readily accessible to DPA, did not require a subpoena upon any third party, and could have revealed who was responsible for the pointing of www.deltapilotsassociation.org in the first place.

Ultimately, DPA's own statements confirm that the elements of a successful CFAA claim are not present here.  As DPA made clear in a message to members on November 13, 2013, "DPA is viewing this attack as simply a momentary distraction[.]" (SOF ¶ 41). It went on to say that "[o]ther than the loss of some valuable rest, there really has been no other negative impact to our campaign." (SOF ¶ 41).  In that sentiment, DPA is correct.

As we show below, none of DPA's claimed losses are cognizable under CFAA, and for that reason the claim cannot proceed.

## ARGUMENT

### I.    RULE 56 STANDARD

Summary judgment is appropriate where the evidentiary record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* Fed.R.Civ.P. 56(c). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must "view the evidence in the light most favorable to the party opposing summary judgment, ... draw all

reasonable inferences in favor of that party, and ... eschew credibility assessments." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 122 (2d Cir. 2004). However, the non-moving party may not rely on conclusory allegations or unsubstantiated speculation to defeat the summary judgment motion. *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998).

## II.   THE CFAA CLAIMS MUST BE DISMISSED BECAUSE THE EVIDENCE DOES NOT SHOW $5,000 IN COGNIZABLE LOSSES.

The Computer Fraud and Abuse Act, 18 U.S.C. §1030(c)(4)(A)(i) and §1030(g), permits "[a]ny person who suffers damage or loss by reason of a violation of this section" to "maintain a civil action against the violator" only if – as is claimed here – "the offense caused . . . loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value."

Here, DPA asserts that http://delta-pilots.org is its website (Docket Entry # 85, SAC ¶ 21), but the evidence does not show damage or interruption of service to that website.  (SOF ¶¶ 14-15).  Moreover, the evidence does not show losses aggregating $5,000 in value during any 1-year period.  The CFAA defines "loss" as:

> any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage[4] assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service....

18 U.S.C. § 1030(e)(11) (footnote added).

Plaintiff lists six categories of losses in its Rule 26(a)(1)(A)(iii) computation (SOF ¶ 48; Lossia Decl., Ex. K), each of which is discussed below.  As we show, none of the alleged losses are cognizable under the CFAA.

---

[4] "Damage" is defined as "any impairment to the integrity or availability of data, a program, a system, or information." *Id.* § 1030(e)(8).

(1)     Lost earnings of Tim Caplinger and Rick Eagan

DPA claims that it suffered losses resulting from the time that Tim Caplinger, its founder and interim president, and Rick Eagan, its webmaster, spent responding to an alleged service interruption. (SOF ¶ 53-54; Lossia Decl., Ex. K at pp.1-2).  DPA further asserts that the value of their time should be calculated at the rate of pay they would have earned from Delta had they been working as pilots during that time. (SOF ¶ 54; Lossia Decl., Ex. K at p. 2). These assertions are flawed on many levels. First, to the extent that Caplinger and Eagan seek to personally recover the wages they believe they could have earned as pilots while they were dedicating their time to DPA, they have no standing to seek such a recovery as they are not plaintiffs in this action. Nor has DPA produced any evidence that either Caplinger or Eagan were scheduled to fly for Delta on the days in question (SOF ¶ 65); that they missed any of those scheduled flights because of the alleged service interruption (SOF ¶ 66); or that they could have picked up additional flights during that time period but did not do so because of the work they needed to perform for DPA. (SOF ¶ 64).

Second, Caplinger and Eagan received no salary or other monetary compensation from DPA for any of the time they spent doing work for the organization in 2013, 2014 or 2015. (SOF ¶¶ 57-62). Thus, it is more accurate to say that DPA *benefitted* from Caplinger and Eagan's time; it did not *lose* anything because of it. Moreover, Caplinger's and Eagan's salaries as airline pilots have no bearing on the value to DPA of the time they spent responding to a website issue.

Time spent to respond to a CFAA violation is recoverable as a loss to the plaintiff when the work is performed by the plaintiff's paid employees or contractors and is, consequently, draining the plaintiff's resources. In such cases, the losses are calculated based on compensation *paid by the plaintiff* to those individuals. *See, e.g.,  United States v Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000) (approving district court's computation of loss based on the hourly wage of

7

the victim bank's employees," because "the bank would have had to pay a similar amount had it hired an outside contractor to repair the damage.") (emphasis added); *see also NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 954, 959 (N.D. Cal. 2014) (where the plaintiff's founders and primary employees expended ten hours per week and estimated their losses based on the hourly wage they previously received for performing "computer work.").

The requirement that the plaintiff have used the resources of paid employees exists in every man-hours case, even if it is not explicitly stated. *See United States v. Millot*, 433 F.3d 1057, 1061 (8th Cir. 2006) ("hours spent" by employees may qualify as a CFAA "loss"); *United States v. Larsen*, 190 F. App'x 552, 553 (9th Cir. 2006) ("loss" under CFAA "includes the time that the *victim's salaried employees* spend responding to the unauthorized intrusion")(citing *Middleton*) (emphasis added); *A.V. v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009)(recognizing expenditure of employee man-hours as possibly covered by CFAA); *United States v. Fowler*, No. 8:10-cr-65-T-24 AEP, 2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25, 2010) (cognizable loss where "[victim's] *employees* spent significant time responding to and fixing the damage to the computers and reconfiguring the new firewall and that such time amounted to $7,226.60 *of their salaries and wages*") (emphasis added); *United States v. Shahulhameed*, No. 5:12-118-KKC, 2014 U.S. Dist. LEXIS 52364, at *4 (E.D. Ky. Apr. 16, 2014) ("Losses can include the cost of time spent by *a salaried employee of the victim* in responding to the damage.") (emphasis added).

Here, DPA spent nothing for Caplinger and Eagan's time, so there is nothing to recoup.[5]

---

[5] Even if DPA had a legal basis to claim that the *un*compensated time Caplinger and Eagan spent constitutes an economic loss to DPA because they could have been doing more productive work, no documents were produced to show that DPA had any entitlement to certain volunteer hours from Caplinger or Eagan, to show how many hours were spent by Caplinger or Eagan on which DPA-related tasks. (SOF ¶ 63).

We therefore respectfully ask the Court to reject the unsupported claim that time spent by Caplinger and Eagan constitute losses on behalf of DPA.

(2)   Lost donations

DPA produced its detailed financial ledgers for 2012 and 2013.  (SOF ¶ 68, Lossia Decl. Exhibit M). They include a line item for each donation received by DPA, indicating the date of the donation, and whether it is a "Check Donation" a "Cash Donation" or a "Member Donation." (*Id.*) Member ID numbers are associated with many of the donations, some of which are recurring contributions. (*Id.*) For example, Member 985430 gave $25 roughly every 30 days in 2012 and 2013. (*Id.*)

The ledgers show that DPA's claim of lost donations is groundless. November 2013 was not marked by any decrease in giving as compared to surrounding months in 2013 or the same timeframe in 2012. *See* Table 1. (SOF ¶ 75).

Table 1.

| Month | Number of Donations | Dollar Value of Donations |
|---|---|---|
| September 2012 | 24 | $1,465.90 |
| October 2012 | 40 | $3,026.49 |
| November 2012 | 18 | $1,694.90 |
| December 2012 | 40 | $5,084.89 |
| September 2013 | 38 | $3,088.79 |
| October 2013 | 67 | $6,151.00 |
| November 2013 | 88 | $7,495.97 |
| December 2013 | 33 | $2,948.33 |

Rather than decreasing, DPA's donation increased overall from 2012 to 2013. (SOF ¶ 74). Even so, in neither year did DPA ever receive donations amounting to $5,000 in a single week. (SOF ¶ 72; Lossia Decl., Ex. N). In 2012 and 2013, DPA received donations of more than $3,000 in a single week only four times, and one of those times was in November 2013 *after* the alleged CFAA violation. (SOF ¶ 73; Lossia Decl., Ex. N).

If DPA asserts that the relative share of online donations – as opposed to check donations – was lower than expected in 2013, that is likely because DPA itself announced to its members that it should donate via check rather than doing so online. (SOF ¶ 38). In any event, DPA received far more in donations in November 2013 than it had a year earlier in November 2012. (SOF ¶ 75).

DPA produced no documents showing that any person did not donate, or donated less money, because of the alleged service interruption to www.deltapilotsassociation.org. (SOF ¶ 70). Its "estimate" of $11,000 in losses is not only speculative but wildly so.

DPA's allegation that its "donation button" was affected by the redirection of www.deltapilotsassociation.org is, like its other claims, not supported by documentary evidence. (SOF ¶ 44).  In any event, when DPA discovered on November 15, 2013 that its donation button what not working – regardless of the cause – it was able to correct that issue immediately and without paying any fee to any company.  (SOF ¶ 43, ¶¶ 51-52). DPA's own ledgers show that, as DPA asserted in a member email, donations "IMMEDIATELY" began coming in once the button was fixed. (SOF ¶ 43, ¶ 76, Lossia Decl., Ex. M at DPA 527-531).  This is evidence of DPA members' patience and loyalty. It also demonstrates an important point – that donations to a labor organization are not analogous to retail sales. An online shopper looking to buy a toaster may turn to a different retailer if her preferred store's website is down, resulting in a lost sale. But, DPA is a mission-driven membership organization. Supporters of DPA's efforts to unseat ALPA cannot simply shop the internet for another labor organization to which to donate in order to achieve their goal. Instead, if the website is down temporarily, they are likely to either write a check – which many did – or simply make the donation on the following day.

(3)     Lost good will

DPA's assertion that it lost "good will" as a result of the alleged website redirection is, like the claimed lost donations, entirely speculative and is unsupported by documentary evidence. Not a single email, text message or web posting from a member or former member was produced to show, for example, that anyone lost confidence in DPA because of its one-day website trouble or – much less – decided to switch support from DPA to ALPA. (SOF ¶ 78). DPA itself wrote in a newsletter on November 13, 2013 that "[o]ther than the loss of some valuable rest, there really has been no other negative impact to our campaign." (SOF ¶ 41).

There was certainly no diminishment in donations to DPA after the redirection was resolved, as shown by the data on donations above. (SOF ¶ 75). In fact, DPA likely made money off of its highly-sensationalized treatment of this issue. In its newsletters, DPA repeatedly asked its members for donations to help cover the cost of this litigation, including at least eleven such appeals in 2014. (SOF ¶ 79). Apparently DPA's messaging bore fruit because on August 19, 2014, DPA sent an email to its members that stated, in part: "We would like to thank our members for the outpouring of financial support we are receiving *related to the pursuit of those responsible for hacking the DPA website*. Friday, August 15th, we set an all time record for single day donations of over $6,000!" (SOF ¶ 80)(emphasis added).

As DPA itself cannot even place a dollar value on the alleged loss of good will, we respectfully suggest that the Court should decline to do so and should treat this claim as unfounded.

(4)     Attorneys' fees

DPA produced records of its attorneys' fees for the period from December 23, 2013 through May 11, 2018, totaling a whopping $149,955 "for any purpose including damage assessment." (SOF ¶ 83). For reasons that are not apparent, DPA has not disclosed a computation

11

of the amount of attorneys' fees that it alleges were incurred specifically for "damage assessment." (SOF ¶ 84). Nonetheless, a close review of DPA's attorneys' fees does not reveal work performed by DPA's counsel for purposes of conducting a "damage assessment" or "restoring the data, program, system, or information to its condition prior to the offense," nor would such work have been necessary given that, according to DPA, "[t]he content of our site has not been hacked, only where the address takes you" (SOF ¶ 38), and the site was "fully operational and secure" as of November 10, 2013, again according to DPA itself. (SOF ¶ 37).

Instead, DPA's counsel spent hundreds of hours in their efforts to track down the alleged offender, which is not an expense that is recoverable under CFAA. *See, e.g., Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14 CV 6498-LTS-HBP, 2018 WL 2059653, at *30 (S.D.N.Y. May 1, 2018)("Any recoverable damages or loss under the CFAA must be directly caused by computer impairment or damage," and this does not include litigation costs.); *Nexans Wires, S.A. v. Sark-USA, Inc.*, 319 F. Supp. 2d 468, 475 (S.D.N.Y. 2004), *aff'd*, No. 05-3820-CV, 2006 WL 328292 (2d Cir. Feb. 13, 2006); *Turner W. Branch, P.A. v. Osborn*, No. CV 13-00110 MV/WPL, 2014 WL 12593991, at *17 (D.N.M. Mar. 26, 2014)("Courts consistently have held that costs not related to computer impairment or computer damages are not compensable "loss" sufficient to satisfy the jurisdiction threshold contained in Section 1030(c)(4)(A)(i) of CFAA.")(collecting cases).

As DPA itself put it on November 13, 2013, "we must consider very carefully whether or not it makes sense to waste valuable time and resources *pursuing those responsible*." (SOF ¶ 41) (emphasis added). While DPA ultimately did choose to devote immense time and money pursuing those it believes to be responsible, such efforts are not cognizable under CFAA.

(5)     Litigation costs

DPA's attorneys incurred $4,541.21 in litigation costs from December 23, 2013 through May 11, 2018, excluding expert witness costs. (SOF ¶ 85)  As noted above, these are not cognizable losses under CFAA because they were not incurred in "conducting a damage assessment, [or] restoring the data, program, system, or information to its condition prior to the offense" and were not "revenue lost, cost incurred, or other consequential damages incurred because of an interruption in service," which are the only categories of losses recognized under CFAA, 18 U.S.C. § 1030(e)(11). Instead, these costs – which include copying, postage and FedEx costs; service fees; transcript fees; Mr. Granath's *pro hac vice* admission and Certificate of Good Standing; and Mr. Silverstone's travel and parking for a court appearance in Manhattan (Lossia Decl., Ex. O at DPA 591-594) – are the types of litigation costs that courts have found to be non-cognizable under CFAA.     *See, e.g., Obeid*, No. 14 CV 6498-LTS-HBP, 2018 WL 2059653, at *30 ("Any recoverable damages or loss under the CFAA must be directly caused by computer impairment or damage," and this does not include litigation costs.); *Nexans Wires,* 319 F. Supp. 2d at 475; *Turner W. Branch, P.A.*, No. CV 13-00110 MV/WPL, 2014 WL 12593991, at *17 ("Courts consistently have held that costs not related to computer impairment or computer damages are not compensable" under CFAA)(collecting cases).

(6)     Expert witness costs

Finally, DPA asserts that its attorneys were billed $10,850 by Carney Forensics, which DPA characterizes as its "expert witness," from May 2014 through October 2014. (SOF ¶ 87). DPA has produced no contract, retainer agreement or service agreement between Carney Forensics and DPA or its counsel; has produced no invoices from Carney Forensics related to its work; and has produced no evidence of actual payments by DPA or its counsel to Carney Forensics. (SOF ¶ 88).

The initial Complaint in this matter was filed on January 13, 2014 (Docket Entry # 1), and it contained a detailed description of the alleged CFAA violation. The Court granted DPA's request to take third party discovery very shortly thereafter on January 28, 2014 for the express purpose of identifying the purported offender.  (Docket Entry # 5).

In seeking permission from this Court to conduct third-party discovery in this case, DPA asserted that "the hacker, here John Doe, had to have left indications of her or her actions" and that "[t]hose "tracks" can be analyzed, by forensic experts if necessary, for telltale signs revealing Doe's true identity." (Docket Entry # 4 at 9).  This statement, and the fact that Carney Forensics was retained in May or June of 2014 – while DPA was analyzing discovery obtained from third parties, and long after the pointing error was noticed and corrected – makes clear that this cost was incurred to locate and pursue the alleged offender, *not* to assess damage or to restore data or systems, as would be cognizable under CFAA § 1030(e)(11).

Even drawing all inferences in favor of DPA, it is apparent that the cost associated with the expert witness Carney Forensics was a cost "to identify and pursue the offender(s)" and is therefore non-cognizable. (Docket Entry # 85, SAC ¶ 67).  "Costs associated with 'locating and collecting information about the hacker' are not recoverable under the CFAA." *Reis, Inc. v. Spring11 LLC*, No. 15 CIV. 2836 (PGG), 2016 WL 5390896, at *9 (S.D.N.Y. Sept. 26, 2016)(quoting *Millennium TGA, Inc. v. Leon*, No. 12-CV-01360 MKB, 2013 WL 5719079, at *18 (E.D.N.Y. Oct. 18, 2013); *see also Mintel Int'l Grp., Ltd. v. Neergheen,* 08–CV–3939, 2010 WL 145786, at *9–10 (N.D.Ill. Jan. 12, 2010) (finding no CFAA-qualifying loss where the plaintiff's expert "was not assessing whether [defendant] had damaged [plaintiff's] computers or data ...; rather, the expert was hired for assistance in [this] lawsuit") (internal quotation marks

omitted); *In re DoubleClick Inc. Privacy Litigation,* 154 F.Supp.2d 497, 524-25 (S.D.N.Y. 2001) (recognizing only costs in remedying damage as recoverable under CFAA).

In *Tyco Int'l (US) Inc. v. John Does 1-3*, the court declined to recognize, under CFAA, investigative costs related to the plaintiff's efforts "to track down the offending party." *Tyco,* No. 01 CIV. 3856 RCCDF, 2003 WL 21638205, at *2 (S.D.N.Y. July 11, 2003). As the court explained, "Tyco's investigative costs would be compensable only if the investigation was necessary in order to reveal the actionable activity[.]" *Id.* In that case, as here, the plaintiff "did not need an investigation to reveal [the actionable activity] because, by their nature, any, such acts would have been immediately apparent[.]" Here, too, the alleged redirection of a website was immediately apparent, and no forensic expert was necessary to detect it.  DPA has produced no evidence that show "an ongoing means to re-access and to potentially disable, disrupt, or interfere with the integrity of DPA's web site at any time," or to show that any "malicious commands or code" were placed on its website as was alleged in the SAC. (Docket Entry # 85, SAC ¶ 70-71) (SOF ¶ 45, ¶ 90).

When DPA finally filed its First Amended Complaint on October 26, 2016, more than two years after retaining Carney Forensics, its description of the alleged offense did not change. (Docket Entry # 51). The alleged violation was – and remained – the errant pointing of a web domain. The remedy was to point the domain to the correct site. There was no cost associated with doing so, and the fix was accomplished within hours of DPA recognizing the issue. Thus, as the court found in *Tyco*, "the only purpose of Tyco's investigation was to locate [the alleged offender] and collect information about him." *Id.*[6]

---

[6] One court has reasoned that where an "offender has actually accessed protected information, discovering who has that information and what information he or she has is essential to remedying the harm," whereas in a case where no protected information was accessed,

To the extent that DPA paid Carney Forensics to *improve* its internet security, such costs are not cognizable either. CFAA does not recognize "costs that would merely create an improved computer system unrelated to preventing further damage resulting from Defendant's conduct." *United States v. Middleton*, 231 F.3d 1207, 1213 (9th Cir. 2000). While CFAA recognizes the cost to "resecure" a computer, "the term "resecure" implies making the system as secure as it was before, not making it more secure than it was before." *Id.* To qualify under CFAA, a plaintiff's loss must be sustained in the effort to "restor[e] the data, program, system or information to its condition prior to the offense." 18 U.S.C. § 1030(e)(11). In other words, the cost must "be directed in some way at the effects of the prior intrusion, not at those of some potential future offense." *Reis, Inc. v. Lennar Corp.*, No. 15 CIV. 7905 (GBD), 2016 WL 3702736, at *6 (S.D.N.Y. July 5, 2016)(citing *Int'l Chauffeured Serv., Inc. v. Fast Operating Corp.*, No. 11 Civ. 2662, 2012 WL 1279825, at *4 (S.D.N.Y. Apr. 16, 2012)).

Based upon the record evidence, Plaintiff's payments to Carney Forensics cannot qualify as losses under CFAA.

*     *     *

In summary, none of the categories of losses claimed by DPA in this lawsuit are cognizable losses under the CFAA. As such, summary judgment is warranted.

---

identifying the offender "is not essential to remedying or discovering the extent of the harm." *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008). Here, DPA does not allege that any protected information was accessed. In fact, it took pains to explain to its members on November 10, 2013 that "The site is secure and functioning properly. Again, our site was not compromised internally. No data was lost or accessed. We do not store member data on the DPA website as a side note. The hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA and may have contained other malicious content." (SOF ¶ 39). Thus, again, locating the offender in this case is not necessary to remedy the alleged "harm," which was well understood within hours of DPA noticing the pointing error.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully submits that summary judgment is proper here and moves the Court to dismiss the Second Amended Complaint in its entirety, with prejudice, and to grant Defendant such other and further relief as the Court deems just and proper, including attorney's fees and costs.

Dated: May 25, 2018
        New York, New York

LEVY RATNER, P.C.

By:     _____
        Dana E. Lossia
        Attorneys for Defendant
        80 Eighth Avenue, 8th Floor
        New York, New York 10011
        (212) 627-8100
        (212) 627-8182 (fax)
        dlossia@levyratner.com

TO:  All Counsel Via ECF.