UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
DELTA PILOTS ASSOCIATION,

                                         Plaintiff,

            -against-

RUSSELL C. MELVIN,

                                         Defendant.
------------------------------------------------------------------------X

**DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Case No. 1:14-CV-00225-AKH

Defendant hereby submits, in support of his motion for summary judgment, the following statement of material facts as to which there is no dispute, pursuant to Local Rule 56.1 of the United States District Court for the Southern District of New York.

Exchange of Evidence

1. Defendant served its first request for the production of documents upon DPA on or around December 22, 2017. (*See* Defendant's Requests for Production of Documents, annexed as Exhibit A to the Declaration of Dana Lossia, dated May 25, 2018, hereafter "Lossia Decl.").

2. DPA served responses and objections to Defendant's first set of requests for the production of documents on or around January 22, 2018. (S*ee* Plaintiff's Responses and Objections to Defendant's Requests for Production of Documents, annexed as Exhibit B to the Lossia Decl.).

3. DPA has produced all documents that are required to be produced by Rule 26(a)(1) concerning Initial Disclosure. (F.R.C.P. 26(a)(1)).

The Alleged Violation

4. Tim Caplinger is the founder of DPA, a member of its Board of Directors and its Interim President. (*See* Docket Entry #85, SAC ¶ 17).

5. Rick Eagan was DPA's webmaster at all times relevant to this litigation. (*See* Docket Entry #85, SAC ¶ 27).

6. DPA's website can be located on the internet at the web address of http://delta-pilots.org. (*See* Docket Entry #85, DPA's Second Amended Complaint, hereafter "SAC" at ¶ 21).

7. The Second Amended Complaint does not allege that DPA's website can be located at www.deltapilotsassociation.org. (*See* Docket Entry #85, SAC).

8. The Second Amended Complaint does not allege a CFAA violation with respect to www.deltapilotsassociation.org. (*See* Docket Entry #85, SAC).

9. The Second Amended Complaint does not allege that DPA's website can be located at www.deltapilotsassociation.squarespace.com. (*See* Docket Entry #85, SAC).

10. The Second Amended Complaint does not allege a CFAA violation with respect to www.deltapilotsassociation.squarespace.com. (*See* Docket Entry #85, SAC).

11. DPA learned on November 9, 2013 that www.deltapilotsassociation.org was directing toward tim-caplinger.squarespace.com. (*See* Exhibit C to the Lossia Decl., which are pages of documents produced by DPA, at DPA 134-139)

12. During the time of the alleged violation, deltapilotsassociation.org (without the www.) was not redirected and did not require a remedy. (Lossia Decl., Ex. C at DPA 134-139).

13. Tim Caplinger used the Squarespace account tim-caplinger.squarespace.com in September 2012. (Lossia Decl., Ex. C at DPA 129-130)

14. DPA produced a document showing that a pro-ALPA "Work Together" message appeared on the website www.deltapilotsassociation.org. (*See* Lossia Decl., Ex. Q at DPA 272).

15. DPA produced no document showing a pro-ALPA "Work Together" message on the website http://delta-pilots.org, which is the website that DPA claims as its website at ¶ 21 of the SAC.

16. DPA has produced no documents that verify who owns the email account amp.chumbawamba@ausi.com.

17. DPA has produced no documents that show who *used* the email address amp.chumbawamba@ausi.com on November 8, 2013 or at any time thereafter.

DPA's Communications with Squarespace

18. On November 9, 2013, DPA wrote the following to Squarespace: "I need URGENT HELP! My site www.deltapilotsassociation has been hijacked." (Lossia Decl., Ex. C at DPA 134). That same day, DPA also wrote the following to Squarespace: "Somehow, SquareSpace has added deltapilot.org to our domain list. This is a clone site DPA does not own. We need to remove it from our domain list immediately. Also, please research who has set up the trial squarespace account using deltapilot.org. This is our hacker. Please email us with results." (Lossia Decl., Ex. C at DPA 96-97). Also that day, DPA wrote to Squarespace: "Our opposition owns deltapilots.org and deltapilot.org. They are doing the hacking/redirecting." (Lossia Decl., Ex. C at DPA 136).

19. On November 10, 2013, Rick Eagan wrote the following to Squarespace: "Managed Domains in our account still shows "DELTAPILOT.ORG", which as you are aware does not belong to us." (Lossia Decl., Ex. C at DPA 91-95).

20. On November 10, 2013, Squarespace wrote to DPA and stated, in part: "We noticed that both www.deltapilotsassociation.org and deltapilotsassociation.org are both presently point [*sic*] to the Squarespace site deltapilotsassociation.squarespace.com, however the domain without the www is now displaying your Squarespace URL . . . This likely means that you have domain forwarding turned on. You will want to disable this for your domain to display correctly with or without the www.  The site that this was directing towards was: tim-caplinger.squarespace.com[.] This site has since been removed and the issue appears to have been resolved." (*See* Lossia Decl., Ex. C at DPA 139).

21. On November 13, 2013, Squarespace emailed DPA and stated, in part, "From what I can tell the domain deltapilot.org was purchased through Squarespace as part of your plan in April of 2012[.]" (*See* Lossia Decl., Ex. C at DPA 146)

22. On November 14, 2013, Squarespace emailed DPA and stated, in part, "As mentioned previously, the domain deltapilots.org within your account, is showing in our records as having been chosen in April of 2012[.]" (Lossia Decl., Ex. C at DPA 148).

23. Squarespace's production for November 14, 2013 includes an internal exchange between Squarespace representatives that list the www.deltapilot.org "owner contact" as mark_mcclain@cox.net and the "Owner email" as daharte@bellsouth.net. (Lossia Decl., Ex. C at DPA 148).

24. Mark McClain and Donald A. Harte are current or former Delta pilots.

25. On November 11, 2013, Tim Caplinger wrote to Squarespace and stated, in part: "I need to tell you that the culprit is now spoofing/forging our Constant Contact database and sending out emails to my membership while posing as us." (Lossia Decl., Ex. C at DPA 143).

26. The SAC does not allege that any person spoofed or forged DPA's Constant Contact database or sent out emails to DPA's membership while posing as DPA, *see* Docket Entry # 85, SAC, and there is no other evidence of this occurring.

27. On October 27, 2013, Tim Caplinger wrote to Squarespace, in part, "It is the nature of my organization that means I am especially vulnerable to malicious attacks. The opposing union we are trying to replace is on the ropes and would certainly hack our site if they could." (Lossia Decl., Ex. C at DPA 110-114).

DPA's Communications with GoDaddy

28. On November 9, 2013 and November 10, 2013, Tim Caplinger spoke over the phone with GoDaddy customer support concerning www.deltapilotsassociation.org, and

GoDaddy maintained records of those calls, which are reproduced in part at DPA 411-412. (*See* Lossia Decl., Ex. I, at DPA 411-412).

29. On November 9, 2013, GoDaddy advised Caplinger to "change the www points to for square space[.]" (*See* Lossia Decl., Ex. I, at DPA 412).

30. DPA made several domain forwarding updates to its site on the evening of November 9, 2013 and the early morning of November 10, 2013 and, with some additional customer service assistance, the "redirected" domain began pointing correctly. (*See* Lossia Decl., Ex. I, at DPA 411).

www.deltapilot.org

31. DPA conducted third-party discovery concerning the registration and ownership of www.deltapilot.org. (S*ee* Lossia Decl., Ex. J at DPA 265-268).

32. The domain name deltapilot.org was created on April 30, 2012, with the registrant email address "hobbsmsb@aol.com" and the registrant organization "Squarespace." (*See* Exhibit D to the Lossia Decl., which are publicly-accessible domain lookup pages, at Def. 00060-62 and Def. 00097-99; *see also* Lossia Decl., Ex. J at DPA 265-268).

33. The email address hobbsmsb@aol.com belongs to Matt R. Hobbs of Eagan, MN. (*See also* Lossia Decl. at Ex. E, at Def. 00057, which is a property information search showing Matthew and Sarah Hobbs as the owner of property in Eagan, MN; *see also* Lossia Decl. at Ex. F, at Def. 00058-59, which is a publicly-accessible "Whois" page showing Matthew Hobbs of Eagan, MN as the registrant of a website using hobbsmsb@aol.com as his email address).

34. Matthew Hobbs of Eagan, MN is a current or former Delta pilot.

DPA's Communications to Members

35. DPA maintains the Twitter account @DeltaPilots.

36. On November 9, 2013, DPA tweeted: "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice. Watch email for instructions. Stay the course!" (*See* Exhibit G to the Lossia Decl., which shows two DPA tweets, at Def. 00055).

37. On November 10, 2013, DPA tweeted: "The attack on the DPA website has been defeated. The site is fully operational and secure. Let's focus on our advance to independence!" (*See* Exhibit G to the Lossia Decl., which shows two DPA tweets, at Def. 00055)

38. On November 9, 2013, DPA sent an email to members stating in part, "ALERT! ALPA has hacked part of the DPA website." It also stated: "The content of our site has not been hacked, only where the address takes you." It also stated: "If you would like to

4

donate to DPA, please do not donate via the web until we straighten this out. Mail checks to: DPA, P.O. Box 17025, Tampa, FL 33682." (*See* Exhibit H to the Lossia Decl., which reproduces the text of certain newsletter-style emails sent by DPA to members in 2013 and 2014, at Def. 00003-4).

39. On November 10, 2013, DPA sent an email to members stating in part, "ALERT! The DPA Site is now back up and running." It also stated: "The site is secure and functioning properly. Again, our site was not compromised internally. No data was lost or accessed. We do not store member data on the DPA website as a side note. The hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA and may have contained other malicious content. Thank you to all who demonstrated patience and restraint during this event." It also stated: "In any battle, there will be moments where the enemy advances. While we experienced a temporary disruption to our website access, our resolve was not weakened, it was strengthened." (*See* Exhibit H to the Lossia Decl., at Def. 00005)

40. DPA's November 10, 2013 email to members also stated: "CLICK HERE to contribute to DPA. Mail checks and Authorization Cards to: DPA, P.O. Box 17025, Tampa, FL 33682." (*See* Exhibit H to the Lossia Decl., at Def. 00006).

41. On November 13, 2013, DPA sent an email to members that contained a "HACKING UPDATE" which stated, in part, "DPA is viewing this attack as simply a momentary distraction and we must consider very carefully whether or not it makes sense to waste valuable time and resources pursuing those responsible." It also stated: "Other than the loss of some valuable rest, there really has been no other negative impact to our campaign." (*See* Exhibit H to the Lossia Decl., at Def. 00007).

42. The alleged CFAA violation did not involve any DPA member data being lost or accessed. (*See* Exhibit H to the Lossia Decl., at Def. 00005).

43. On November 15, 2013, DPA sent an email to members that stated in part:

ITEM 1: Hacking Update

We discovered today that last weekend's attack disconnected the link to our secure credit card transaction facility. The redirect of our URL simply broke the link to our account and those that tried to donate to DPA using the 2nd option received an error and could not enter their contribution. No data was compromised since we do not store data on our site, but no donations were received either.

The Donation Link has been restored and IMMEDIATELY donations began coming in. Because we have now been possibly harmed financially, the importance of completing this investigation properly just went up.

(*See* Exhibit H to the Lossia Decl., at Def. 00011)

44. DPA produced no documents that show that the alleged CFAA violation "disconnected the link to [its] secure credit card transaction facility." (*See* Exhibit H to the Lossia Decl., at Def. 00011).

45. DPA produced no documents that show that any "malicious commands or code" were placed on its website. (*See* Docket Entry #85, SAC ¶ 71).

46. At no time in November 2013 was DPA locked out of its ability to configure its domain settings.

47. At no time in November 2013 was DPA prevented from posting to or modifying the contents of its website http://delta-pilots.org.

The Alleged Losses

48. In its Rule 26(a)(1)(A)(iii) computation, DPA lists its alleged losses. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure.)

49. DPA did not pay any fee to Squarespace for the customer service it received in November 2013.

50. DPA did not pay any fee to GoDaddy for the customer service it received in November 2013.

51. DPA did not pay a fee to PayPal or any other credit card processing company for customer service it may have received on November 15, 2013.

52. DPA did not pay a fee to PayPal or any other company to restore the link to its secure credit card transaction facility.

   *Lost Earnings of Tim Caplinger and Rick Eagan*

53. DPA asserts that it lost approximately $12,496 as an immediate and direct cost of responding to the alleged violation, assessing damage and restoring the affected website. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 1-2).

54. The $12,496 loss figure consists of earnings Caplinger and Eagan would have received from Delta had Caplinger worked 40 hours as a pilot at the rate of $150 per hour and had Eagan worked 32 hours as a pilot at the rate of $203 per hour. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

55. In 2013, Caplinger earned $150 per hour as a Delta pilot.

56. In 2013, Eagan earned $203 per hour as a Delta pilot.

57. In 2013, Caplinger did not take a salary from DPA for his work for DPA. (*See* Exhibit L to the Lossia Decl., which contains DPA's Form 990s for 2013-2015).

58. In 2013, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).

59. In 2014, Caplinger did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).

60. In 2014, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).

61. In 2015, Caplinger did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).

62. In 2015, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).

63. DPA produced no documents – such as timesheets, activity logs, or other records – showing the hours spent by either Caplinger or Eagan to respond to the alleged violation, conduct a damage assessment or restore the integrity and availability of the DPA website.

64. DPA produced no documents – such as paystubs, flight schedules, or correspondence – to show that either Caplinger or Eagan lost out on specific flying opportunities for Delta in order to attend to the alleged violation of the DPA website in November or December 2013.

65. DPA produced no documents to show that either Caplinger or Eagan were scheduled to fly for Delta on November 9, 10, 11, 12, 13, 14 or 15, 2013.

66. DPA produced no documents to show that either Caplinger or Eagan opted not to fly for Delta on November 9, 10, 11, 12, 13, 14 or 15, 2013 because of the DPA website problem or for any other reason(s).

   *Lost Donations*

67. DPA asserts that it lost approximately $11,000 as consequential damages from lost donations. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

68. DPA's financial ledgers for 2012 and 2013 were produced in discovery, and they contain a line item for each donation received by DPA, along with the date of the donation, and whether it is a "Check Donation" a "Cash Donation" or a "Member Donation." (*See* Exhibit M to the Lossia Declaration, at DPA 486-531).

69. Member ID numbers are associated with many of the donations that appear in DPA's financial ledgers, and some donations appear to recur on a regular basis. For example, Member 985430 gives $25 roughly every 30 days in 2012 and 2013. (*See* Exhibit M to the Lossia Declaration, at DPA 486-531).

70. DPA produced no evidence that any particular individual did not donate to DPA because of the alleged interruption in service to www.deltapilotsassociation.org.

71. DPA produced no evidence that any particular individual donated less money, or donated less often, to DPA because of the alleged interruption in service to its website.

72. In 2012 and 2013, DPA never received donations amounting to $5,000 in a single week. (*See* Exhibit M to the Lossia Decl., at DPA 486-531; *see also* Exhibit N to the Lossia Decl., which is an analysis of DPA 486-531).

73. In 2012 and 2013, DPA received donations of more than $3,000 in a single week only four times, and one of those times was in November 2013 after the alleged CFAA violation. (*See* Exhibit M to the Lossia Decl., at DPA 486-531; *see also* Exhibit N to the Lossia Decl., which is an analysis of DPA 486-531).

74. DPA collected more in donations in calendar year 2013 than it did in calendar year 2012.

75. DPA's number of donations and the dollar value of those donations in September – December of 2012 and 2013 are reflected in the table below, which is based upon Lossia Ex. M, DPA 486-531):

| Month | Number of Donations | Dollar Value of Donations |
|---|---|---|
| September 2012 | 24 | $1,465.90 |
| October 2012 | 40 | $3,026.49 |
| November 2012 | 18 | $1,694.90 |
| December 2012 | 40 | $5,084.89 |
| September 2013 | 38 | $3,088.79 |
| October 2013 | 67 | $6,151.00 |
| November 2013 | 88 | $7,495.97 |
| December 2013 | 33 | $2,948.33 |

76. Online donations came in to DPA on and after November 15, 2013. (Lossia Decl., Ex. M at DPA 527-531).

*Lost Good Will*

77. DPA asserts that it lost an unquantified amount of money from loss of good will due to loss of status as bargaining unit representative. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

78. Not a single email, text message or web posting from a member or former member was produced to show that anyone lost confidence in DPA or switched their support from DPA to ALPA because of the alleged CFAA violation.

79. DPA asked its members for donations to help cover the cost of the instant litigation in emails dated February 20, 2014, February 28, 2014, May 1, 2014, May 31, 2014, June 10, 2014, July 3, 2014, July 17, 2014, August 5, 2014, August 15, 2014, August 19, 2014, and October 18, 2014.  (Lossia Decl., Ex. H, at Def. 00028-54).

80. On August 19, 2014, DPA sent an email to its members that stated in part: "We would like to thank our members for the outpouring of financial support we are receiving related to the pursuit of those responsible for hacking the DPA website. Friday, August 15th, we set an all time record for single day donations of over $6,000!" (Lossia Decl., Ex. H, at Def. 00044).

81. Delta airlines employs nearly 13,700 commercial pilots. (Docket Entry # 85, SAC ¶ 10)

82. As of Thursday, November 14, 2013, DPA had 5,678 total members, among which 220 needed to renew their authorization cards.  (Lossia Decl., Ex. H, at Def. 00009).

*Attorneys Fees and Litigation Costs*

83. DPA produced records of its attorneys' fees from December 23, 2013 through May 11, 2018, totaling $149,955 "for any purpose including damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit O to the Lossia Decl., which attaches DPA's records of attorneys' fees and litigation costs, at DPA 532-594).

84. DPA has not disclosed a computation of the amount of attorneys' fees that DPA alleges were incurred specifically for "damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

85. DPA's attorneys incurred $4,541.21 in litigation costs from December 23, 2013 through the present, excluding expert witness costs. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit O to the Lossia Decl., at DPA 591-594).

86. DPA has not disclosed any computation of the amount of its litigation costs that were allegedly incurred specifically for "damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

*Expert Witness Costs*

87. DPA produced records of its "expert witness costs" totaling $10,850 billed to DPA's attorneys by Carney Forensics as of May 11, 2018. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit P to the Lossia Decl., at DPA 485).

88. DPA has produced no contract, retainer agreement or service agreement between Carney Forensics and DPA or its counsel; has produced no invoices from Carney

Forensics related to its work; and has produced no evidence of actual payments by DPA or its counsel to Carney Forensics.

89. DPA's record of payments to "expert witness" Carney Forensics indicates that the earliest date of work performed was May 31, 2014. (Exhibit P to the Lossia Decl., at DPA 485).

90. DPA produced no documents that show "an ongoing means to re-access and to potentially disable, disrupt, or interfere with the integrity of DPA's web site at any time." (Docket Entry # 85, SAC ¶ 70).

Dated: New York, NY
       May 25, 2018

                                        LEVY RATNER, P.C.

                                        _____
                                    By: Dana E. Lossia
                                        Attorneys for Defendant
                                        80 Eighth Avenue, Floor 8
                                        New York, New York 10011
                                        (212) 627-8100
                                        (212) 627-8182 (fax)
                                        dlossia@levyratner.com