UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x
DELTA PILOTS ASSOCIATION,     :
     :
                  Plaintiff,    :
     :
        - against -         :        Case No. 1:14-CV-00225-AKH
     :
RUSSEL C. MELVIN,     :
     :
              Defendant.  :
------------------------------------------------------ x

# PLAINTIFF'S MEMORANDUM OF LAW
## OPPOSING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

Seham, Seham, Meltz & Petersen, LLP
199 Main Street, Seventh Floor
White Plains, New York 10601
Tel (914) 997-1346
Fax (914) 997-7125
ngranath@ssmplaw.com

On the Brief:   Nicholas Granath

# **TABLE OF CONTENTS.**

Table Of Authorities ...................................................................................................iii

I.  SUMMARY .......................................................................................................1

II. FACTS..............................................................................................................2

III. STANDARD ...................................................................................................11

    A.  Summary Judgment Standard ...........................................................11

    B.  Damages And Loss Under The Computer Fraud And Abuse Act.......12

IV. ARGUMENT ..................................................................................................16

    A.  Defendant's Motion Precedes Any Depositions And Requires The Court To Weigh Evidence And Draw Inferences In Favor Of The Movant But Under Rule 56 That Requires A Trial. ..........................................................16

    B.  The Evidence Shows That Plaintiff Incurred "Damage" And "Loss" Of At Least $5,000, As Defined In The Computer Fraud And Abuse Act – Or At Minimum There Is A Genuine Dispute Of Material Fact That It Has.................20

        1)  Admissible Evidence, Both Testimonial And Exhibits, Show That DPA's Website Sustained "Damage" By Impairment And Interruption Of Service Within The Meaning Of The Computer Fraud And Abuse Act, Or At A Minimum There Is At Least A Genuine Dispute Of Material Fact That It Has......................................20

        2)  Admissible, Evidence Both Testimonial And Exhibits, Show That DPA Has "Loss" Aggregating To At Least $5,000 In Value To Any Victim Within A One Year Period, Within The Meaning Of The Computer Fraud And Abuse Act, Or At Minimum There Is A Genuine Dispute Of Material Fact That It Has......................................22

(a)  "Loss" In The Form Of Reasonable, Immediate Labor By The "Victims" To "Assess Damage" And To "Restore" DPA's Website Aggregate To $5,000 In Value Of Economic Damages Or More ....................................................................... 22

(b)  "Loss" In The Form Of Attorney Fees Incurred For The Purpose Of "Responding" To An Ongoing Offense By Concealed Perpetrators Aggregate To $5,000 In Value Of Economic Damages Or More ..................................................... 33

(c)  "Loss" From Other "Consequential Damages" Also Aggregate Or Contribute To $5,000 In Value Of Economic Damages Or More ....................................................... 42

C.  There Is No Basis In Law Or Fact For An Award To Defendant Of Attorneys' Fees Or Costs And To Do Would Reward A Crime ......................... 45

D.  Because Defendant Brought His Motion Before Taking Any Depositions, Denial Or At Least Deferral Of His Summary Judgment Motion Is Warranted Under Rule 56(d) .............................................................. 46

V.  CONCLUSION ........................................................................................... 47

Certificate of Service

<u>Separately Filed In Support Of This Brief:</u>

Plaintiff's Local Rule 56.1 Statement Of Material Facts Opposing Motion For Summary Judgment

Declaration of Nicholas Paul Granath, with its attached Exhibits 1 through 36

Declaration of Tim Caplinger

Declaration of Richard Eagan

Declaration of Howard Hollander

# <u>TABLE OF AUTHORITIES.</u>

<u>CASELAW</u>                                                                                                                     <u>PAGE</u>

*A.V. ex rel. Vanderhye v. iParadigms, LLC*,
    562 F.3d 630 (4th Cir. 2009) ......................................................................13, 14, 30, 34

*Anderson v. Liberty Lobby Inc*.,
    477 U.S. 242 (1986) ...................................................................................................... 11

*Arkansas ACORN Fair Hous., v. Greystone Dev.*,
    160 F.3d 433 (8th Cir. 1998) .........................................................................................26

*Beard v. Banks*,
    548 U.S. 531 (2006) ......................................................................................................11

*Bellwood v. Dwivedi*,
    895 F.2d 1521 (7th Cir. 1989).......................................................................................26

*Brown Jordan Int'l, Inc. v. Carmicle*,
    846 F.3d 1167 (11th Cir., 2017) ...................................................................... 13, 15, 35

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ......................................................................................................11

*Cleveland v. Policy Management Systems Corp*.,
    526 U.S. 795 (1999) ......................................................................................................11

*Crawford v. Metropolitan Govt. of Nashville & Davidson County*,
    555 U.S. 271 (2009) ......................................................................................................11

*Hutchinson v. Proximire*,
    443 U.S. 111 (1979) ......................................................................................................11

*Doubleclick Privacy Litig.,*
    154 F. Supp. 2d 497 (S.D. N.Y. 2001), ........................................................................14

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ......................................................................................................11

*Facebook, Inc. v. Power Ventures, Inc.*,
    844 F.3d 1058 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 313 (2017). ........................ 15, 34

*Glob. Policy Partners, LLC v. Yessin*,
    686 F. Supp. 2d 642 (E.D. Va. 2010).............................................................................14

*Hunt v. Cromartie,*
526 U.S. 541 (1999) .............................................................................................

*In re 650 Fifth Ave. & Related Properties,*
830 F.3d 66 (2d Cir. 2016) ...................................................................... 11

*In re AOL, Inc. Version 5.0 Software Litig.,*
168 F. Supp. 2d 1359 (S.D. Fla. 2001)................................................... 14

*In re DoubleClick Inc. Privacy Litig.,*
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ..................................................... 13

*Kaytor v. Elec. Boat Corp.,*
609 F.3d 537 (2d Cir. 2010) .................................................................... 11

*Louisiana Acorn Fair Hous. v. Quarter House,* 952 F. Supp.
352,(U.S. Dist. E. La.) ............................................................................. 27

*Nexans Wires S.A. v. Sark-USA, Inc.,*
166 F. App'x 559 (2d Cir. 2006) ............................................................. 15

*NovelPoster v. Javitch Canfield Group,*
140 F. Supp. 3d 954 (N.D. Cal. 2014)..................................................... 29

*Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack,*
2018 WL 2059653 (S.D.N.Y. May 1, 2018) ............................................ 34

*Ortiz v. Jordan,*
562 U.S. 180 (2011) ................................................................................. 11

*Ragin v. Harry Macklowe Real Estate Co.,*
6 F.3d 898 (2nd Cir. 1993) ...................................................................... 27

*Scott v. Harris,*
550 U.S. 372, 380 (2007) ......................................................................... 11

*Shamrock Foods Co. v. Gast,*
535 F.Supp.2d 962 (D.Ariz.2008)...................................................... 15, 35

*SuccessFactors, Inc. v. Softscape, Inc.,*
544 F. Supp. 2d 975 (N.D. Cal. 2008).......................................... 15, 35, 36

*Tolan v. Cotton,*
134 S. Ct. 1861 (2014).............................................................................. 11

(iv)

*Turner W. Branch, P.A. v. Osborn,*
    2014 WL 12593991 (D.N.M. Mar. 26, 2014)................................................................34

*United Methodist Church v. Dunlop Constr. Products Inc.,*
    1992 Ohio App. LEXIS 1983 (Ohio, April 16, 1992)....................................................26

*United States v. Fowler,*
    2010 U.S. Dist. LEXIS 118260 (M.D. Fla. Oct. 25, 2010) .......................................29, 30

*United States v. Larsen,*
    190 F. App'x 552 (9th Cir. 2006) ..............................................................................30

*United States v. Middleton,*
    231 F.3d 1207 (9th Cir. 2000)...............................................................................14, 28

*United States v. Millot,*
    433 F.3d 1057 (8th Cir. 2006)...........................................................................14, 29, 30

*United States v. Sablan,*
    92 F.3d 865 (9th Cir. 1996) ......................................................................................29

*United States v. Shahulhameed,*
    2014 U.S. Dist. LEXIS 52364 (E.D. Ky. Apr. 16, 2014) .........................................31, 32

*Yoder & Frey Auctioneers, Inc. v. Equipment Facts, LLC ,*
    774 F.3d 1065 (6th Cir. 2014)...................................................................................13

<u>STATUTES</u>                                                      <u>PAGE</u>

18 USC § 1030 (Computer Fraud And Abuse Act; "CFAA") *et seq.* .................................*passim*

26 USC § 501(c)(5)...................................................................................................2

<u>RULES</u>

Fed. R. Civ. P. 26....................................................................................................20

Fed. R. Civ. P. 56.............................................................................................1, 11, 22

# I.      SUMMARY.

In this Rule 56 motion for summary judgment the movant, Defendant ("Melvin"), reprises an argument at least in part already made on his earlier motion to dismiss, which was not successful. (Doc. 68, p. 14; Doc. 80, p. 14).   Defendant's latest motion hinges on the same underlying argument, that Plaintiff, the Delta Pilots Association ("DPA"), cannot meet the jurisdictional requisite of injury contained in the Computer Fraud and Abuse Act ("CFAA" or "Act").  This Court has already determined that DPA adequately alleged three claims under CFAA, which must and do allege both of the Act's separate "damage" and "loss" elements of injury. (Doc. 84).  In Melvin's latest motion he now argues that the record of discovery to date, albeit only in the form of documents produced unassisted by any depositions or declarations, does not show that DPA has an aggregate minimal threshold "loss" of $5,000 in "value" to "any victim" within one year.  He goes further to make a separate and radical argument that there never was any "damage" or "impairment" to DPA's website at all.  Yet when properly read the documents produced – and now the declarations submitted by DPA – are all to the contrary.  They show DPA can prove, or at least demonstrate that there is a genuine issue of material fact, that it meets the jurisdictional requisite of injury.  First, DPA meets its "damage" element with a record of evidence, both in discovery documents and in declarations by witnesses not yet deposed, that its website was in fact "impaired" and service "interrupted" within the meaning of the Act for several weeks following the November 2013 hacking.  Second, DPA easily meets its $5,000 "loss" threshold with at least three components of evidence: i) 72 hours of labor by "victims" to assess damage and to restore the website, valued at $12,496, ii) at least $5,000 in attorneys' fee allocable to "responding to an offense" that was ongoing and, iii) at least $5,000 in "other consequential damages" incurred because of the interruption in service.  Hence, Defendant's motion should be denied or at least deferred until depositions can be taken.

## II.    FACTS.

**Note on citations used in this brief**: Cites to ECF docketed filings shall be indicated by "Doc." and cites to pages therein are to the ECF-generated page number (not to the document's internal page numbers). Cites to <u>Plaintiff's Rule 56.1 Statement Of Material Facts Opposing Motion For Summary Judgment</u> shall be to "PSOF" followed by the numbered contention. DPA's separate contentions of fact therein are numbered sequentially, starting at 91 after Defendant's last numbered contention in order to avoid confusion. Cites to documents produced in discovery by DPA, all of which are grouped in numbered exhibits 1 through 33 to the Declaration of Nicholas Paul Granath, shall be to their 'bate stamp' number, in the format of "DPA #". Emphasis added is indicated by "[e.a.]" for short-hand.

Plaintiff, the Delta Pilots Association ("DPA" or "plaintiff"), is an association recognized by the IRS as a 501(c)(5) labor organization, which is incorporated in the State of Florida. (PSOF ¶ 91). DPA seeks to organize and exclusively represent the craft and class of pilots at Delta Airlines, Inc. ("Delta"). (PSOF ¶ 92). However, there is currently no representational election pending. (Caplinger Decl. ¶ 6). DPA maintains a home office in Tampa, Florida. (PSOF ¶ 93).

In May of 2010, the DPA was founded out of dissatisfaction with the representation of Delta pilots by the Air Line Pilots Association ("ALPA") with the specific goal of replacing it as the union representing Delta pilots. (PSOF ¶ 94). Tim Caplinger, who is a resident of Florida and a pilot employed by Delta, is the founder of DPA, a member of its Board of Directors, and its Interim President. (PSOF ¶ 95).

In 2010, the DPA began a campaign to collect authorization cards ("cards") signed by individual Delta pilots in order to demonstrate that a majority of them desire to be represented by DPA. (PSOF ¶ 96). This campaign was for the purpose of securing and winning a representational election conducted by the National Mediation Board ("NMB"), pursuant to the RLA, and ultimately to have DPA certified by the NMB as the new and exclusive representative of Delta pilots. (PSOF ¶ 97). By early November 2013, DPA had collected cards from more than 50% of all Delta pilots – a critical threshold – but had not yet filed an application for a representational

dispute with the NMB. (PSOF ¶ 98).

DPA's primary means of conducting its business, including communicating with Delta pilots, raising donations, and campaigning, was through its website. (PSOF ¶ 99).  DPA's website could be located, or "surfed" to on the Internet, or "web," at the uniform resource locator ("URL"), or web address of, http://delta-pilots.org. (PSOF ¶ 100).  DPA's website contained publicly accessible web "pages" as well as private pages requiring a login and password. (PSOF ¶ 101). On the public portion of its website, DPA displayed a running count of the number of cards signed by Delta pilots in its campaign to replace ALPA. (PSOF ¶ 102).

SquareSpace, Inc. is a New York company that "hosts" DPA's website. (PSOF ¶ 103). Through SquareSpace, DPA also linked to various domain names or other URLs or websites on other computers used in inter-state commerce, and there maintained a web master account. (PSOF ¶ 104).  Hence, critical files, code, and programs that constituted DPA's website are maintained on computers located in the state of New York. (PSOF ¶ 105).

Tim Caplinger was authorized to, and had personal access to, DPA's SquareSpace account on behalf of DPA at all relevant times. (PSOF ¶ 106).  Rick Eagan, also a pilot employed by Delta, at all relevant times was DPA's Web Master.  Eagan was authorized by Caplinger to access DPA's SquareSpace account on behalf of DPA at all relevant times. (PSOF ¶ 107).

Russel C. Melvin, a Delta pilot, joined DPA on or about January 5, 2011, giving an address of 7050 Corsica Drive, Germantown, Tennessee, 38138. (PSOF ¶ 108).  However, at no time was Melvin ever authorized for administrative access to DPA's website, computer files, or computers used by DPA for its website. (PSOF ¶ 109).  Sometime after, in 2012, Melvin withdrew from DPA. (PSOF ¶ 110).

Starting on or about November 8, 2013, and continuing thereafter, the integrity of DPA's

website was dramatically and visibly disrupted when Melvin "hacked" into it by unauthorized use of the DPA administrative login and password causing damage and loss by the transmission of commands (or code) that caused the website to cease functioning and instead to serve Melvin's unauthorized use by means of redirection to another website. (PSOF ¶ 111).   On November 8, 2013, at approximately 7:18 p.m. EST, Melvin transmitted commands (or code) to the "master files" of Squarespace computer and files hosting DPA's website and opened a trial account called "Tim-Caplinger.squarespace.com" for the purpose of creating a hoax or fake website on that trial account in order to redirect the DPA website to the trial account website. (PSOF ¶ 112).

To accomplish this unauthorized act Melvin impersonated "Tim-Caplinger" and used an email address of amp.chumbawamba@ausi.com, as SquareSpace computer records show. (PSOF ¶ 113).   At approximately 7:18 p.m. EST, using the DPA domain administrative credentials, Melvin transmitted commands (or code) to cause his primary domain name of "Tim-Caplinger.squarespace.com" to display false and harmful information on another domain name – "deltapilot.org." (PSOF ¶ 114).   The site "deltapilot.org" was a domain listed in the DPA Administrative account but was not being used by DPA, nor was DPA aware the domain was present in the account at the time of the attack.   The domain was apparently created without authorization from DPA in April of 2012 by the registered owner "hobbsmsb@aol.com."  DPA is presently unaware what mechanism was used to add the domain to its account. (PSOF ¶ 115).

Melvin transmitted commands (or code) which caused the "deltapilot.org" site, whose true creator/owner was concealed by "ContactPrivacy.com" – a domain privacy service which was located in Canada and which had previously been established by unknown parties who appeared to have conspired with Melvin – to 'point to' files existing in the Tim-Caplinger.squarespace.com trial account. (PSOF ¶ 116).

As a direct and immediate consequence of this attack, DPA's website ceased to function as designed and web pages containing data and information in the public portion of it were made inaccessible. (PSOF ¶ 117).  The ability of DPA's website to accept on-line monetary donations from members and/or supporters ceased to function properly when software links to a secure third-party credit card website were severed. (PSOF ¶ 118).  The ability of the website to display video messages and important updates was severely disrupted. (PSOF ¶ 119).  Further, that portion of the website that was private became inaccessible. (PSOF ¶ 120).  Visitors to DPA's website were all involuntarily redirected away from it to sites not of DPA's making, nor owned, nor controlled by DPA – and inimical to its purpose. (PSOF ¶ 121).

In the early stages of the attack, viewers attempting to access DPA's website were involuntarily redirected to a web page that falsely claimed DPA had abandoned its card collection campaign and now urged support for its rival ALPA (i.e., the "work together" message).  This false message also contained a link to an ALPA website. (PSOF ¶ 122).  In the later stages of the attack, viewers were redirected back to "deltapilot.org" which then mimicked DPA's website, i.e., a malicious "clone" of the DPA website. (PSOF ¶ 123).  The false web-broadcasted message and the clone site were intended to dissuade any further Delta pilots from signing cards in DPA's campaign or to otherwise abandon DPA or its campaign, by knowingly and intentionally making false statements of material fact about DPA and its campaign. (PSOF ¶ 124).  This computer attack thereby disrupted DPA's website, interfering with its service, and effectively "hijacked" it to other sites, one intended to appear as part of DPA's website in order to deceive viewers of it or cut-off monetary donations to DPA. (PSOF ¶ 125).

The November 8, 2013 computer attack also severed software links to other computers used in interstate commerce relied upon by DPA's website, both for receiving monetary donations

and for displaying videos. (PSOF ¶ 126).  Some severed links were not discovered or repaired until January 2014. (PSOF ¶ 127).

In attempting to assess damage and restore the integrity of DPA's website software, and to restore availability of data and severed linked programs, Caplinger initially expended approximately 40 man-hours and Eagan 32 man-hours in the time between discovering the damage and about December 3, 2013. (PSOF ¶ 128).  At the time, as pilots, Caplinger earned approximately $150 an hour and Eagan $203 an hour. (PSOF ¶ 129).

Further, DPA sustained loss through donations not received during that portion of time the DPA website's contribution page was rendered inoperable. (PSOF ¶ 130).  As a direct consequence of the severed links to the donation pages – as well as the success of the attack itself – approximately $11,000 donations to DPA were lost during November and December 2013, when the site was being repaired. (PSOF ¶ 131).

DPA further suffered loss by incurring costs and expenditures to identify and pursue the offender(s) in order to ensure the current and future security and integrity of the DPA website. (PSOF ¶ 132).

DPA also suffered the consequence of lost good will when the hacking, and the redirection to a website falsely claiming DPA had ceased its organizing campaign, interfered with, frustrated, or simply dissuaded members or potential supporters either from exercising their lawful rights under the RLA to choose DPA as an alternative representative, or from supporting DPA at all. (PSOF ¶ 133).

Despite DPA's efforts to mitigate damage to its website and to restore control over it, Melvin succeeded in inserting commands (or code) into accounts on computers relied upon by DPA that were necessary for the proper and uninterrupted functioning of DPA's website. (PSOF

¶ 134).   To date, DPA has not necessarily been successful in removing all of the malicious commands (or code) and consequently DPA's website remains potentially vulnerable to renewed "backdoor" attacks by defendant. (PSOF ¶ 135).

On November 9, 2013, DPA published in its publicly accessible Facebook and Twitter accounts a message stating, "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice …" (PSOF ¶ 136).

On or about November 13, 2013, Melvin sent an email to ALPA using the email address of "rcmelvin@mac.com" that attached a digital, unsigned letter of five pages written by him. (PSOF ¶ 137).   Proof of this email from Melvin to ALPA was provided by ALPA, on subpoena by DPA, and is now part of the existing docketed materials in this case. (*See*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4; *see also* Granath Decl., Ec. 36, p. 7-8).   While Melvin's letter to ALPA is part of the existing docket in this case (Doc. 13-4, p. 2), it is also provided herewith in support of DPA's brief. (*See*, Granath Decl., Decl. Ex. 1 at DPA 47-51 and Ex. 15 at DPA 248-252).

In his letter Melvin made *key admissions* of fact that establish his culpability in interfering with DPA's website (even if, according to Melvin's letter, it was all some kind of accident). Melvin's letter disclosed that in the time frame of the hacking *he owned a trial account at SquareSpace* and he had supposedly shut it down. (PSOF ¶ 138).   Melvin's letter contained details about the disruption to DPA's website that were *not then publicly known*. (PSOF ¶ 139).   Key admissions by Melvin in his letter are as follows:

- That he was "writing to address the issue of DPA's most recent claim that their website was in some way redirected" (DPA 248);

- That he the owned or controlled three SquareSpace websites: "I have two website accounts. One is personal. One is for business … this third website was in Trial Mode …" (DPA 248);

- That Melvin's "personal, unpublished website *was mapping to a domain name owned and*

*controlled by DPA …"*  (DPA 248) [e.a.];

- That "strangers may well have viewed my personal thoughts" [i.e., through *DPA's* website] (DPA 251).

- That his "private writings and thoughts of a personal nature were briefly accessible to those visiting a DPA owned domain …" [i.e. through *DPA's* website] (DPA 248);

- That his "private thoughts" were available to the "public" once redirected from DPA's site to his own [i.e. through *DPA's* website] (DPA 249);

- That he took "steps" to remedy this "mapping issue" [i.e. the redirection] on November 9, 2013 (DPA 249);

- That he knew DPA's website had a "domain name setting" issue [a detail not then public] (DPA 249);

- That he "shut down" his site that was displaying through DPA (DPA 251);

- That he was a former member of DPA but later he "revoked my membership …" (DPA 250);

- That he "regret[s] this whole incident …" [i.e., his interference with DPA's website] (DPA 251).

On November 14, 2013, DPA published in its email-newsletter an article entitled "DPA Status Report" that stated in part, "Hacking Update … our investigation has led us to a point we did not want to arrive at, filing a lawsuit …" (PSOF ¶ 140).  This apparently alarmed Melvin, whose identity and involvement in disrupting DPA's website he had just disclosed to ALPA.

The very next day, November 15, 2013, Tim Caplinger received three phone calls at his residence from a male person who refused to identify himself, but who admitted he was responsible for interfering with DPA's website. (PSOF ¶ 141).

That caller was Melvin, as was later determined on August 14, 2014, after this Court granted DPA's then motion to compel compliance with a subpoena *duces tecum* served on ALPA,

and from evidence provided by ALPA. (PSOF ¶ 142). In addition, corroborating evidence obtained by DPA through third-party discovery confirmed that the caller to Caplinger's home, who admitted his role in interrupting DPA's website, was Melvin. The originating phone number used to call Caplinger on November 15 was "901 871-7877". (PSOF ¶ 143). That "901 871-7877" phone number had been billed by AT&T to an account *at Melvin's property* of 7050 Corsica Drive, Germantown, Tennessee, 38138. (PSOF ¶ 144).

In his November 15, 2013, call to Caplinger, Melvin made key admissions and attempted, unsuccessfully, to negotiate with Caplinger to avoid being "pursued" – of which Caplinger has first-hand, personal knowledge. (PSOF ¶ 146). Melvin's letter to ALPA also *admitted* he called Caplinger (PSOF ¶ 145). Melvin's five-page letter admitted this about his call to Caplinger:

- That "In an effort to resolve this issue … *I contacted Tim Caplinger personally* …" (DPA 250) [e.a.];

- That "I made this contact …" [with Caplinger] (DPA 250);

- That in his call to Caplinger, Melvin "discussed the whole matter" [i.e., interference with DPA's website] (DPA 250);

- That Melvin "had hoped that our discussion [with Caplinger] would lead to a *man to man resolution to this iss*ue" (DPA 250) [e.a.];

- That Caplinger "threatened me with civil and criminal charges …" (DPA 250);

- That "I was *expressing my regret* that the mapping problem *interfered with the operation of the website* …" (DPA 250) [e.a.];

- That Melvin's disclosure of the "technical details" of this interference to Caplinger, as Caplinger had demanded, would be "akin to '*professional suicide*'…" (DPA 250-51) [e.a.];

- That "during [Melvin's] brief conversation … *I offered to cover any expenses incurred by him or his organization should I be found negligent in any way*" (DPA 251) [e.a.];

- That he "didn't have anything to 'confess' to …" and did "not offer to 'bribe' [Caplinger] in order to stop pursuing answers" (DPA 251).

After this November 15, 2013 call to his home, Caplinger knew that there was a hacker, knew that he *refused to identify himself*, knew that the website was still dysfunctional, but for reasons not then fully understood, and thus Caplinger concluded that the website either remained under *ongoing* attack or was imminently vulnerable to a new attack – until the identity of the hacker/caller could be ascertained to neutralize this threat. (PSOF ¶ 147). Based on this clear and present threat, later that same day, Caplinger made a criminal complaint about the hacking of DPA's website (PSOF ¶ 147, 148) and then hired a civil law firm to find out the identity of the attacker/caller in order to stop or neutralize the attack by unmasking him. (Caplinger Decl., ¶ 64). Ascertaining the identity of the caller/hacker did not occur until August 14, 2014, when Melvin's name was revealed. (Granath Decl., Ex. 36).

It is undisputed that, prior to Defendant's motion (Doc. 90, p. 5, fn. 1), DPA disclosed in its Rule 26 disclosure a computation and quantification of damages for all counts – but *not* just limited to CFAA's jurisdictional amount. The disclosure listed these elements:

- Immediate and direct cost to respond to the offense, assess damage, and restore the website, by the labor of victims: $12,496 approximately;

- Attorney fees incurred: $149,955 as of May 11, 2018 and continuing;

- Consequential damages from lost donations: $11,000 approximately;

- Consequential damages from loss of good will: irreparable due to loss of status as bargaining unit representative;

- Litigation costs incurred: $4,541.21 as of May 11, 2018 and continuing;

- Expert witness fees: $10,850.

(Granath Decl., Ex. 35).

# III.    STANDARD.

## A)    Summary Judgment Standard.

Summary judgment under Rule 56 shall be granted only if the record shows that: 1) there is no genuine dispute; 2) as to any material fact; and 3) the moving party is entitled to judgment. *See Beard v. Banks*, 548 U.S. 531, 529 (2006).

A dispute is "genuine" if it has a real basis in the evidentiary record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  A fact is "material" if it might affect the outcome of the case. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 254 (1986).  Whether a fact is material depends on the substantive law at issue. (*Id*.).  Judgment is appropriate "as a matter of law" when the moving party should prevail – but the mere fact that the moving party's record is uncontested, or even un-responded to, is not enough. *See Edwards v. Aguillard*, 482 U.S. 578, 595 (1987).  Summary judgment is appropriate only when the non-moving party fails to make an adequate showing of an essential element of its case, as to which that party has the burden. *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 804 (1999).  The moving party bears the initial burden. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, a court should never weigh the evidence or find the facts. *See Anderson* 477 U.S. at 252.  Instead, a court's role under Rule 56 is narrowly limited to assessing the threshold evidence of whether a genuine dispute exists as to material facts requiring trial. *See Anderson* 477 U.S. at 249.  Thus, the evidence of the non-moving party will be believed as true, all evidence will be construed in the light most favorable to the non-moving party, and all doubts and reasonable inferences will be drawn in the non-moving party's favor. *See Tolan v. Cotton,* 134 S. Ct. 1861, 1863 (2014); *Crawford v. Metropolitan Govt. of Nashville & Davidson County*, 555 U.S. 271, 274 (2009).

Nor will a court on a summary judgment motion weigh the credibility of witnesses or other

evidence. *See Anderson,* 477 U.S. at 255. Cases where a person's state of mind is an issue thus seldom lend themselves to summary disposition because questions of credibility will ordinarily be reserved for the jury. *See Hutchinson v. Proximire*, 443 U.S. 111 (1979); *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010).

Hence, any evidence that shows a triable controversy defeats summary judgment. *See e.g., In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 94 (2d Cir. 2016). If the nonmoving party succeeds in showing any material dispute, or otherwise demonstrates why the moving party is not entitled to a judgment, then a court must deny the motion. *See Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). In this way Rule 56 imposes a "relatively lenient standard" to survive a motion and continue on to trial. *See Anderson,* 477 U.S. at 248.

## B.     Damages And Loss Under The Computer Fraud And Abuse Act.

The Computer Fraud And Abuse Act, 18 USC § 1030 *et. seq.*, is both a criminal and civil statute. It provides for civil recovery in § 1030(g), which provides in whole:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses [subclause] (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

There is no dispute that the amended Complaint in this matter alleges "conduct described in subsection (c)(4)(A)(i)(I)" (*see* SAC at Doc. 85, ¶¶ 87-110).

Subsection 1030(c)(4)(A)(i)(I) provides as follows:

> [L]oss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $ 5,000 in value;

In § 1030(g) the Act contains *separate definitions* of the terms "damage" and "loss".

Section 1030(g)(8) defines the term "damage" as follows:

> the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

Section 1030(g)(11) defines the term "loss" as follows:

> the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

The above are the operative statutory terms relating to the issue of damages and loss in

CFAA.  Hence, under CFAA there are two types of injury, "damages" and "loss."  However, in

terms of the "loss" component, courts have found there are two types of loss:

> We agree with the Fourth and Sixth Circuits. The plain language of the statutory definition includes two separate types of loss: (1) reasonable costs incurred in connection with such activities as responding to a violation, assessing the damage done, and restoring the affected data, program system, or information to its condition prior to the violation; and (2) any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. *See* 18 U.S.C. § 1030(e)(11). The statute is written in the disjunctive, making the first type of loss independent of an interruption of service. *Yoder*, 774 F.3d at 1073. Contrary to the assertion of the court in *Continental Group*, this interpretation does not reduce "interruption of service" to surplusage. *See Cont'l Grp.*, 622 F.Supp.2d at 1371. "Loss" includes the direct costs of responding to the violation in the first portion of the definition, and consequential damages resulting from interruption of service in the second.

*Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1073 (11th Cir., 2017), *citing Yoder & Frey*

*Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1073–74 (6th Cir. 2014); *A.V. ex rel.*

*Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009).

The first type of loss – that for responding, assessing and restoring – has been interpreted

broadly.  The legislative history demonstrates that Congress intended to use a broad definition that

included losses that are not considered direct damage caused by computer hackers. *In re*

*DoubleClick Inc. Privacy Litig.*, 154 F. Supp. 2d 497, 520 (S.D.N.Y. 2001).

It is widely accepted that man-hours spent repairing the damage caused by a CFAA violation constitute a CFAA "loss." *United States v. Millot*, 433 F.3d 1057, 1060-1061 (8th Cir. 2006),  2006 U.S. App. LEXIS 430, *7-9; *United States v. Middleton*, 231 F.3d 1207 (9th Cir. 2000), 1213-1214, 2000 U.S. App. LEXIS 29131, *19-20, 2000 Cal. Daily Op. Service 9194, 2000 Daily Journal DAR 12198; *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016). Further, it is also accepted that the cost of these man-hours can be determined by multiplying the number of hours spent repairing the damage by an estimated hourly rate. *United States v. Millot*, 433 F.3d 1057, 1060-1061 (8th Cir. 2006), 2006 U.S. App. LEXIS 430, *7-9; *United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000) ("There is no basis to believe that Congress intended the element of 'damage' to depend on a victim's choice whether to use hourly employees, outside contractors, or salaried employees to repair the same level of harm to a protected computer.").

The plain language of the statute allows *different victims to aggregate claims* to reach the $5,000 jurisdictional threshold.  The offense is defined to include loss to "1 or more persons during any 1-year period." 18 U.S.C.A. § 1030(c)(4)(A)(i)(I)( (West).  Courts agree that this plainly-worded provision allows for the aggregation of civil claims by multiple victims. *In re AOL, Inc. Version 5.0 Software Litig.*, 168 F. Supp. 2d 1359 (S.D. Fla. 2001), 1373-1374, 2001 U.S. Dist. LEXIS 6595, *36, 2002-1 Trade Cas. (CCH) P73,528 ("That the CFAA specifically defines damage in terms of aggregation lends further support to the consumers' position that their injuries can be aggregated to meet the $5,000 threshold"); *Doubleclick Privacy Litig.*, 154 F. Supp. 2d 497, 523 (S.D.N.Y. 2001).

Circuit courts have considered the broad category of loss to include the investigation of a CFAA violation. *A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 646 (4th Cir.2009).

These costs can be considered loss under CFAA so long as they are "reasonable and … were caused by a CFAA violation." *Glob. Policy Partners, LLC v. Yessin*, 686 F. Supp. 2d 642, 647 (E.D. Va. 2010).  Acceptable investigatory costs have been found to include assessments into both the *method and extent* of the CFAA violation. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1173–75 (11th Cir. 2017); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 313, 199 L. Ed. 2d 206 (2017).

This circuit has also defined loss to include costs related to "any type of computer investigation or repair, or *any preventative security* measures or inspections." *Nexans Wires S.A. v. Sark-USA, Inc.*, 166 F. App'x 559, 563 (2d Cir. 2006) [e.a.].

Courts interpreting CFAA have also recognized that *different attacks require different responses* based on the nature of the attack, and that a determination into whether a certain method of investigatory response counts as a "loss" under CFAA, is to be made on a case-by-case basis. *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980–81 (N.D. Cal. 2008). ("[H]owever, in cases like this, where the offense involves unauthorized access and the use of protected information, the reasonable cost of responding to [the] offense will be different from such cost in a case where the primary concern is the damage to the plaintiff's computer system itself.); *Shamrock Foods Co. v. Gast*, 535 F.Supp.2d 962, 963–64 (D.Ariz.2008).

No court has held that there is one single way to respond to a CFAA offense.  What matters for the purpose of determining if a response is a cognizable "loss" under CFAA is that the response was reasonable under the circumstances and that there is a connection between the response and the offense. 18 U.S.C. § 1030(e)(11); *Nexans Wires S.A. v. Sark-USA, Inc.,* 166 F. App'x 559, 563 (2d Cir. 2006).  That calls for a case-*by-case assessment* of the evidence and facts.

# IV.    ARGUMENT

## A)    Defendant's Motion Precedes Any Depositions And Requires The Court To Weigh Evidence And Draw Inferences In Favor Of The Movant But Under Rule 56 That Requires A Trial.

Defendant's pending motion (Doc. 89) fails to make explicit what particular claim, defense, or issue he is supposedly entitled to judgment on.  Instead his motion simply seeks an order "dismissing the Complaint in its entirety." (*Id.*, p.1).  It does so notwithstanding Defendant's earlier denied motion to dismiss, which both in his moving brief and reply brief he addressed the issue of damages. (Doc. 69 and 84).  But now, in his main brief for his pending summary judgment motion, in his "Background" section, Defendant focuses entirely on the issue of impairment to DPA's website, i.e., the "damage" component – but then – in his "Argument" section, he focuses entirely on his claim that "losses" do not aggregate to $5,000.

Consequently, DPA construes Defendant's summary judgment motion to assert but two grounds (or defenses) for his claim to entitlement to summary judgment, on all three claims in the amended Complaint. These are:

First, the defense that "the evidence does not show *damage or interruption of service* to that [DPA's] website" (Doc. 90, p. 10) [e.a.] – i.e. the "damage" issue;

Second, the defense that "[m]oreover, the evidence does not show *losses aggregating [to] $5,000* in value during any 1-year period" to all victims (Doc. 90, p. 10) [e.a.] – i.e. the "loss" issue.

Assuming this is a correct read of Defendant's latest motion then, at the threshold of the Court's consideration of the merits of it, the Court should note that the *timing and nature* of Defendant's motion require the Court to weigh evidence and make credibility determinations that are inappropriate on a motion for summary judgment.

It is beyond dispute that no deposition has been noticed or taken in this matter prior to

Defendant's filing of its pending motion. (Granath Decl., ¶ 4).   Neither party has waived depositions and both have indicated that they would take them.  It is also beyond dispute that the deadline to take depositions has not yet expired; indeed, a Scheduling Order has yet to be ordered. (Doc. 87).   And, as the Court may see from Defendant's brief and his supporting papers, Defendant's motion relies *exclusively* on documents disclosed in discovery to date by either party, but mostly by DPA.   Not cited nor offered are any fact-witness declarations, affidavits, or deposition testimony.   Thus, Defendant places exclusive reliance on the documentary record *wholly unassisted by any fact witness's explanation or interpretation*.  Consequently, the meaning or interpretation of the 594 pages of discovery produced by DPA or the 420 pages produced by Defendant is, on Defendant's motion, only provided by counsel. (Granath Decl., ¶ 4).  That is a weak reed for the Defendant to rely on.

While it is true that sometimes documents 'speak for themselves' nevertheless Defendant's reliance on documents alone for his contentious interpretations of his counsel is highly problematic in a case of this kind.  This case is centered on computer abuse under CFAA.  Specifically, Defendant has brought a summary judgment motion, in part, on the issue of whether DPA can meet the statutory definition of "damage" to DPA's computer under CFAA. (§ 1030(e)(8).  That inquiry involves and compels consideration of evidence of "impairment" to the "integrity" of a computer and website "data" or "program" or "system of information" – all in the context of determining whether material facts are genuinely disputed or not (*Id.*).  The Court cannot conclude, merely from the *discovery documents alone,* that there is no genuine dispute about the fact, as claimed by Defendant, that "DPA cannot show that the [violations alleged] caused damages" to computer systems, software, and websites. (Doc. 90, p. 5).  Indeed, to reach judgment on the record that Defendant points to now would compel the Court to weigh such evidence or make credibility

determinations at procedural stage where such determinations are not permitted.

As confirmed by DPA's supporting declarations, each of the following claimed facts asserted in Defendant's "Background" section of his brief to support his argument that there was no impairment or "damage" to DPA's website and supporting computer systems within the meaning of CFAA (as distinguished from the issue of "loss" above $5,000) – in other words that there was no hacking at all – would be *contested by testimony from witnesses who have not yet been deposed* or testified elsewhere:

- The claim that DPA's website was not ever actually impaired by "any pointing issue" (Doc. 90, p. 6) or did not even "require a remedy" – is contested. (PSOF ¶¶ 11, 12, 114, 116, 121, 122, 124, 125).

- The claim that DPA had mis-set its own website settings – is contested. (PSOF ¶¶ 11, 12, 13).

- The claim that "in other words DPA needed to change where the 'www' version of its domain was pointing" to (Doc. 90) – which is based only on a surmise by Defendant's counsel, or her own read of technical correspondence – is contested. (PSOF ¶¶ 117, 126, 128).

- The claim that "no evidence of any … 'malicious commands or code' has been produced …" – is contested. (PSOF ¶¶ 45, 116).

- The claim that "what emerges most clearly from the evidence supplied by Plaintiff is that DPA's leaders are technically unskilled …" (Doc. 90, p. 7) – an assertion that cites to no evidence at all while boldly asking this Court to weigh "what emerges most clearly" – is contested. (Caplinger Decl. 62); (Eagan Decl., ¶ 4).

- The claim that DPA suffered from "paranoia" – is contested. (Doc. 90, p. 8); (PSOF, ¶¶ 141, 142, 147); (Caplinger Decl., ¶¶ 58, 64).  Indeed, DPA has been methodical, systematic, and relentless in its effort to protect its website, as Caplinger's testimony (and the history of this litigation) confirms.

- The claim that DPA "was predisposed to believe that any problem with the website was somehow the fault of his 'enemy' …" (Doc. 90, p. 8) – is contested. (PSOF, ¶¶ 39, 141, 142, 147).  DPA did not jump to sue ALPA its prime rival; rather it ferreted out the evidence that led to Melvin.

- The claim that "the evidence here lends weight to the concern expressed by the Court [that DPA was using the case to gather information not relevant to this case but relevant in its contest with ALPA]" (Doc. 90, p. 8) – is contested and outdated. That concern of the Court's was obviated in its ruling granting DPA the right to amend its case to name Melvin, which was based on credible evidence produced in a sealed motion (Doc. 50). Defendant's naked invitation to "weigh" that evidence once again for any purpose on *this* motion is certainly no grounds for summary judgment on the question of whether or not DPA's website suffered "damage" within the meaning of CFAA. Rather, the evidence shows at least a reasonable dispute of material fact over Defendant's violation of CFAA. (PSOF ¶¶ 91-147).

- The claim that DPA did not produce "records of … its own leaders IP addresses … [which] could have revealed who was responsible for the [the disruption to the website] in the first place" (Doc. 90, p. 9) is a naked invitation for the Court to speculate on discovery about which Defendant never made any motion on, as well as to assess the credibility of DPA with the insinuation that DPA has somehow concealed some evidence. It has nothing to do with what *damage* occurred to DPA's website (but does impliedly admit that there was damage). The Court cannot rely upon such claims without weighing evidence. This claim, too, is contradicted by evidence that shows a CFAA violation by Defendant. (PSOF ¶¶ 91-147).

Moreover, some of the assertions made by Defendant to argue there was no website "damage" within the meaning of CFAA are *inherently contradictory* so they, too, necessarily require weighing of evidence that is only suited for a trial. For example:

- The statement that two days after the start of the hack "… with some additional customer service assistance, the allegedly 'redirected domain name began pointing to the correct website" (Doc. 90, p. 6) – *concedes* that the website was not functioning properly even while Defendant has no evidence to point to that this malfunctioning was accidental or self-inflicted;

- The statement that "viewers … were temporarily directed to an apparently pro-ALPA page …" (Doc. 90, p. 7) *concedes* the heart of the impairment alleged, that DPA's main competitor, ALPA, benefited *at DPA's expense*, as it were, from Melvin's hacking.

In response to all of the above contentions claimed by Defendant to argue that DPA's website was never damaged at all, Tim Caplinger and Rick Eagan, who were both named in the original and all amended Complaints, can and will offer contradictory testimony. (*See*, Decl. Caplinger; *See also*, Decl. Eagan). That Defendant has chosen to make a broad-based attack, one

that encompasses both the "damages" as well as the "loss" provisions in CFAA, and do so before any depositions were taken and without the support of any declarations, or affidavits, by any fact witnesses – leaves this Court with no choice but to either weigh evidence and make credibility determinations – or to deny or defer the motion. (*See*, Rule 56(d)(1)).

**B)** **The Evidence Shows That Plaintiff Incurred "Damage" And "Loss" Of At Least $5,000, As Defined In The Computer Fraud And Abuse Act – Or At Minimum There Is A Genuine Dispute Of Material Fact That It Was.**

**1.** **Admissible Evidence, Both Testimonial And Exhibits, Show That DPA's Website Sustained "Damage" By Impairment And Interruption Of Service Within The Meaning Of The Computer Fraud And Abuse Act, Or At A Minimum There Is At Least A Genuine Dispute Of Material Fact That It Has.**

As disclosed in it Rule 26 disclosures, DPA sustained computer system impairment from damage to the functionality of its website and from the re-routing of internet traffic away from its website to a defamatory website set up by the hacker or his confederates, falsely claiming that DPA had halted its campaign and threw its support to ALPA. (Granath Decl., Ex. 35, p. 2-3). Admissible evidence supporting the fact that DPA suffered CFAA cognizable "damage" in the form of "impairment to the integrity or availability of" the computer "program" or "system" that made up its website (§ 1030(e)(11)) – or contesting denial of its allegation – is cited in support of DPA Contentions of fact at PSOF ¶¶ 111-114, 116-127, 135 (*see also*, Granath Decl., Ex. 1, 15 and 36; Caplinger Decl.; Eagan Decl.).  In sum, on November 8, 2013, DPA's website stopped working and displayed a website making false statements about DPA. (*See* Caplinger Decl., ¶¶ 25-30, 39-40).  The website ceased to function in several other important respects, such as displaying content, running videos, linking to a donations web page, or linking to other computers. (*See* Caplinger Decl., ¶¶ 31-34, 40).  The damage took days and weeks to recover from, and even then was not fully restored, and the website remained flawed at least until January of the next year. (*See* Caplinger Decl., ¶¶ 42, 48, 49, 57, 58, 59).

Nevertheless, without expressly saying so, Defendant in the "Background" section of his brief (Doc. 90, p. 6-9), implies that DPA suffered no cognizable "damage" to it website at all. But his arguments are technically flawed, unsupported by admissible evidence, and contradicted by the testimony of the victims, including DPA President Tim Caplinger and DPA webmaster, Rick Eagan (*See*, Caplinger Decl., Eagan Decl.) as follows:

- The claim (Doc. 90, p. 6) that certain websites or URL addresses were not implicated (in the allegations in the amended Complaint) introduces confusion over technical details, is misleading, and is contested with admissible evidence. (*See* PSOF at responses 7, 8, 9, 10, 12, 13, 14); (*See also*, Caplinger Decl., ¶ 14).

- The claim that there was "no pointing issue" (Doc. 90, p. 6) is false, and is contested with admissible evidence. (*See* PSOF at responses 12, 20).

- The claim that DPA was never "locked out of its ability to configure its domain settings" (Doc. 90., p. 6) is also false and contested with admissible evidence. (*See* PSOF at responses 47 and 48); (*See also*, Caplinger Decl., ¶ 58 – "During the month of November 2013 following the hack, DPA was locked out of its ability to configure its domain settings. During the initial attack, I did not know how or why the website was redirecting to the "tim-caplinger.squarespace.com" account.").

- The claim that "none" of DPA's website "content was modified" (Doc. 90, p. 6) is misleading and contested with admissible evidence. While the underlying content in terms of the *data* was not "modified" still the *integrity* of the software that made DPA's website run was most certainly "modified" to interfere with it in a hostile way and not just temporarily. (*See* PSOF responses at 38, 39, and contentions at 111, 112, 114, 116, 117, 122, 125).

- The claim there were no "malicious commands" (Doc. 90, p. 7) is false and contested with admissible evidence. (*See* PSOF responses at 45, and contentions at 147, 149); (*See also* Caplinger Decl. ¶¶ 58, 64).

- The claims that "what emerges most clearly" are that "DPA leaders are technically unskilled" and "unaware of which websites it actually owns" and that "paranoia" are all to blame for the impairment of DPA's website (Doc. 90, p. 7-8) are, tellingly, all unsupported by reference to any admissible or credible evidence and thus are mere characterizations of counsel. They in fact rest on obfuscation of the documentary record unassisted by any fact witness who can explain it. In contrast, DPA offers sworn declarations by its President and "web master" who can explain DPA's website and the reality and extent of the observable impairment and interruption to it. (*See* Caplinger, Decl. ¶¶ 14, 15, 25-30, 56, 60); (*See also*, Eagan Decl., ¶ 4, 5, and 8).

Consequently, summary judgment on the issue of "damages" or impairment to DPA's website and the integrity of the software running it should be denied or at least deferred until depositions have been completed. (*See*, Rule 56(d)(1)).

2. **Admissible Evidence, Both Testimonial And Exhibits, Show That DPA Has "Loss" Aggregating To At Least $5,000 In Value To Any Victim Within A One Year Period, Within The Meaning Of The Computer Fraud And Abuse Act, Or At Minimum There Is A Genuine Dispute Of Material Fact That It Has.**

(a) **"Loss" In The Form Of Reasonable, Immediate Labor By The "Victims" To "Assess Damage" And To "Restore" DPA's Website Aggregate To $5,000 In Value Of Economic Damages Or More.**

The first direct loss in terms of "economic damages" (*see* § 1030 (g)) suffered by the victims of Melvin's computer attack and resulting impairment to the software running DPA's website, the functioning of it, and the interruption or impairment to the computer "system" that made the website work (*see* § 1030(e)(8)) – was the labor expenditure by DPA through the man-hours expended by its President, Tim Caplinger, and its webmaster, Rick Eagan, to immediately respond to the offense, to assess the damage, and to restore functionality, in the first days and weeks after November 8, 2013 (*see* § 1030(e)(11)).  This labor amounted to approximately 72 man-hours: 40 for Caplinger and 32 for Eagan. (PSOF 128).  Defendant, as addressed herein below, makes two objections to the "losses resulting from the time that Tim Caplinger … and Rick Eagan … spent responding to an alleged interruption" (Doc. 90, p. 11) – but Defendant does *not* dispute and cannot dispute that they did spend time, or that a total of 72 man-hours were spent, just as alleged (SOC ¶ 61) and as supported by admissible evidence (Decl. Caplinger, ¶ 42); (Eagan Decl., ¶ 7).

There are two components to the labor loss that allow a dollar figure to be put on it: time and price.  The *time* component in terms of man-hours, here 72 man-hours, is not in dispute.  Nor has Defendant argued that the type of the labor expended in those 72 man-hours is not by its *nature*

cognizable loss under the Act.  In other words, there is no argument from Defendant that what labor was performed does not constitute "loss" under the statute in the form of "costs of responding to an offense, conducting a damage assessment, and restoring the …. System." (*see* § 1030(e)(11)). Nevertheless, it is worth noting that the nature of that work is spelled out in some detail in Caplinger's Declaration as this:

> In attempting to assess damage and to restore the integrity of DPA's website and restore availability of data and severed linked programs, I initially expended approximately 40 man-hours and Eagan 32 hours between discovering the damage and about December 3, 2013. The time I and Eagan took to work on responding to the hacking was time lost from DPA's campaign. A great deal of time (more than 12 hours) was spent initially trying to regain control of the website during the 21 hours and 27 minutes the hacker had control of the DPA website.  This is evidenced by the extensive chat logs between myself and Squarespace and between Eagan (media@delta-pilots.org) and Squarespace as well as phone calls to GoDaddy and chat support.  After the DPA website was recovered from the control of the hacker, many more hours were spent going page by page through the hundreds of DPA web pages looking for broken links and malicious code wherever possible.  By the third day after the attack, only occasional repair efforts (one to two hours in duration each approximately three times a week) were made as DPA members brought new broken links to our attention or we found additional damage on our own.  This occasional effort lasted until January 2014 when the last known broken link was found. Additional communications via email, Twitter and text messaging had to be drafted and sent out to our members explaining what we thought was happening to us at the time and asking for their help.  These explanatory communications cost us a great deal of extra time and effort to accomplish that would have been spent on campaign communications, organizing, video production and meeting preparation otherwise.  All of this time spent on damage control detracted from critical campaign efforts.

(Caplinger Decl., ¶ 42; *see also* PSOF 128).

As to the *price* component, Defendant makes an indirect argument, addressed and refuted herein below.  But what is not in dispute is the fact that, at the time of the attack, Caplinger earned $150 an hour as a pilot and Eagan $203. (PSOF 129; *see also* Caplinger Decl., ¶ 43; Eagan Decl. ¶ 5).  Nothing in Defendant's brief challenges this fact, nor could it.  DPA has therefore assigned a 'price' to Caplinger and Eagan's time, when the attack occurred, based on what they were paid as pilots. (SOC ¶ 62).  That assignment is not arbitrary but rather *based on industry practice*.

(Caplinger Decl., ¶ 67);(Hollander Decl., ¶ 4).   And that assignment produces a sum, in a computation that Defendant has not challenged on math grounds, of a labor loss of $12,496 (40 hrs. * $150 = $6,000 + 32 hrs. * $203 = $6,496 = $12,496). (Granath Decl., Ex. 35).   As addressed herein below, Defendant makes an argument about whether the labor loss alleged by DPA is cognizable at all albeit based on a misinterpretation of CFAA.   Nevertheless, as a threshold matter the Court should note that an argument about what is the correct *price* of the labor involved is a *separate* argument from the argument that claims that because the price of labor might be in question, therefore, its price must be zero.   That is to say, while it is conceivable that the price of the 72 man-hours may be measured differently, lower or perhaps even higher, that mere fact alone does not establish in law or in fact that the price must be *nothing*.   If the 72 man-hours is a cognizable labor loss under CFAA, and it is, then its value is something, but not zero.   And even reduced by half, it's still over $5,000.

Defendant, however, argues for summary judgment on the component of loss that it chooses to title as "lost earnings of Tim Caplinger and Rick Eagan" but which it effectively concedes is the undisputed evidence of the "time that Tim Caplinger … and Rick Eagan … spent responding" to the attack (Doc. 90, p. 11).   Not able to challenge the evidence of this labor loss, Defendant resorts to making legal arguments around two axes, both of which are flawed and, if accepted, would render CFAA toothless.   They are: One, Defendant argues that there is no labor loss to the "extent" that "Caplinger and Eagan seek to personally recover the wages … they could have earned" because they "have no standing … as they are not plaintiffs" and because there is no proof they lost wages, by for example not flying or missing work. (Doc. 90, p. 11); Two, Defendant argues that DPA "did not lose anything" because the labor of Caplinger and Eagan was donated as volunteer workers so therefore it can "have no bearing on the value to DPA of the time they spent

responding to a website issue." (*Id.*).

Defendant's first argument, that non-plaintiffs Caplinger and Eagan seek a personal recovery for which they have no standing, is a red-herring for these reasons:

Of course, Caplinger and Eagan are not making claims for themselves personally, therefore their standing is immaterial.  It is DPA's standing that matters and it is not challenged.  Nothing in CFAA requires a plaintiff, such as DPA, which is a non-profit entity and counts as its loss volunteer labor performed on its behalf in responding to an attack, to implead those who performed that labor.  The Act recognizes "loss" as "any reasonable cost to any victim" which losses can be aggregated (§ 1030(e)(11)).  The question is, can DPA, who has standing, count the labor spent on its behalf to respond to the attack as part of its "economic damage" inflicted by the attack? – it is *not* whether those who performed that labor can or should seek to personally recover.  There is no evidence or law that Defendant cites, or could, for the proposition that the volunteer labor of DPA's President Caplinger and DPA webmaster Eagan *cannot* constitute labor and hence labor loss for DPA.  Therefore, of course Caplinger and Eagan do not cite or claim that they personally lost earnings paid by their employer, Delta; that is immaterial.  The issue is the *value of their time* to DPA, the 72 man-hours they spent responding to the attack, not what other gainful employment that their 'labor' could earn elsewhere for those 72 hours.  Defendant misunderstands the reference to Caplinger and Eagan's per hour wages at Delta as a claim for their lost earnings from Delta.  It is not.  The reference to the Delta wage is benchmark for pricing purposes of DPA's loss.  And that benchmark is reasonable and even predictable because there is no dispute that this is what Caplinger and Eagan then made for comparison purposes – and because that type of comparison is exactly how airline unions across this country typically compensate their union 'workers' or volunteers. (Caplinger Decl., ¶ 67); (Hollander Decl., ¶ 4).

What Defendant fails to recognize is that *diversion* of time from labor resources of an entity, away from more productive endeavors that would benefit that entity, to that of responding to a computer offense, assessing its damage, and repairing losses – is an economic harm to the entity. That, as a labor organization, DPA depended on volunteers who were not compensated by it, does not mean that DPA did not suffer tangible economic damage by the *diversion* of its dedicated volunteer labor away from organizing, campaigning, or any of the other necessary activities it takes to staff an active labor campaign and to run a union. This diversion of human resources, as much as the diversion of contributions and smothering of voter interest, had the collective impact of destroying DPA's momentum and snuffing out the drive for an election. It stopped all other activity that would have normally occurred. It has inherent economic value. And to attribute zero value to the diversion of essential volunteer manpower resources would be to allow the offending party to inflict damage without consequences.

Placing a dollar value on such volunteer labor and assigning that value to an entity that relies on it is certainly no foreign concept to the law. *See e.g., United Methodist Church v. Dunlop Constr. Products Inc.*, 1992 Ohio App. LEXIS 1983 *34; 1992 WL 80054 (Ohio, April 16, 1992) (placing a $2,000 value on volunteer labor in a breach of contract case over a roof: "Buttressing this finding is the fact that these volunteer services are rendered directly as a result of appellee's defective roof"). Nor is the notion that the deflection of an entity's resources, including the time of its volunteer labor, constitutes actionable injury conferring standing on the entity for the value of that loss. *See e.g., Arkansas ACORN Fair Hous., v. Greystone Dev.*, 160 F.3d 433, 434 (8th Cir. 1998) ("the deflection of an organization's monetary and human resources from counseling or educational programs to legal efforts aimed at combating discrimination, such as monitoring and investigation, is itself sufficient to constitute an actual injury …"); *Bellwood v. Dwivedi*, 895 F.2d

1521, 1525 (7th Cir. 1989) ("the only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination, since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination.); *Louisiana Acorn Fair Hous. v. Quarter House*, 952 F. Supp. 352, 357 (U.S. Dist. E. La.) ("The complaint alleges that ACORN is a nonprofit corporation whose activities include education and information services, housing referral services, and mediation and conciliation of disputes arising from fair housing violations. The complaint asks for damages based on its staff time, volunteer time, and other costs it has expended in efforts that have been thwarted by Defendants. From this evidence, the Court concludes that ACORN has standing to sue."); *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2nd Cir. 1993) (plaintiff "was forced to 'devote significant resources to identify and counteract' the defendants' advertising practices and did so to the detriment of their 'efforts to [obtain] equal access to housing through counseling and other referral services.' [citation omitted]. That some of the [plaintiff's] staff's time was spent exclusively on litigating this action does not deprive the organization of standing to sue in federal court. [citation omitted].").

The failure to attribute *any* economic value to the diversion of volunteer labor would be enormous and unwarranted step in removing statutory protection that entities like charitable organizations, start-up companies, or independent labor unions such as DPA, are in need of and *more so than for profit entities are*.  Nothing in CFAA allows this, nothing in CFAA or its history contemplates this.  Rather, Congress chose a different exclusion, a minimal floor of $5,000 in economic damages for civil actions.  Here, either DPA's diverted labor is valued at $12,496 as its admissible evidence shows, or there is a genuine dispute over that.  But in either case the law does

not allow summary judgment to Defendant by simply ignoring all of the value of that diverted labor.

Defendant's second argument, that DPA did not lose anything because the labor was voluntary, is related to his first but it is not one that Defendant can support under CFAA.  In fact, it would read-into CFAA an exception to the definition of "loss" that is not there.  Defendant sums his argument here claiming, "DPA spent nothing for Caplinger and Eagan's time, so there is nothing to recoup."  (Doc. 90, p. 12).  But as Defendant is forced to admit, he cannot cite to a single CFAA decision in which it is "explicitly stated" that a loss consisting of diverted human resources *must involve paid employees*. (Doc. 90, p. 12).  That is because there isn't any.  As cited above, in context of civil claims outside of CFAA, the value of volunteer labor has certainly been recognized as actionable and attributable to the entity that would have, but for the diversion, benefitted from it.

Indeed, even cases cited by Defendant hold that a violator of CFAA's prohibitions cannot evade liability by pointing to the lack of out-of-pocket salary losses by an employer.  Rather, the cases emphasize placing a fair value on the time spent on damage assessment and control.  Perhaps this is why Defendant cites his cases without discussing their relevant facts.  Defendant cites two such cases (Doc. 90, p. 1-12):

First, in *United States v. Middleton,* 231 F.3d 1207 (9th Cir. 2000), the defendant's arguments in that case against treating the value of the plaintiff employee's time were, if anything, stronger than in the case at hand: (1) the employee received a fixed salary, (2) the plaintiff paid no additional monies to the employee to fix the problems caused by the defendant's conduct, and (3) there was no evidence that the employee was diverted from his other responsibilities or that such a diversion caused the employer a financial loss.  *Id*. at 1214.  The Ninth Circuit *rejected* these

arguments as contrary to the intent of Congress:

> There is no basis to believe that Congress intended the element of "damage" to depend on a victim's choice whether to use hourly employees, outside contractors, or salaried employees to repair the same level of harm to a protected computer. Rather, whether the amount of time spent by the employees and their *imputed hourly rates* were reasonable for the repair tasks that they performed are questions to be answered by the trier of fact.

*Id*. In short, a defendant cannot evade liability simply because the human resources deployed by the plaintiff resulted in no out-of-pocket monetary loss. As the Ninth Circuit suggested, one approach to the dollar calculation would be whether the plaintiff "would have had to pay a similar amount had it hired an outside contractor to repair the damage." *Id*. *citing United States v. Sablan*, 92 F.3d 865, 869 (9th Cir. 1996). *See also*, *United States v. Fowler*, No. 8:10-cr-65-T-24 AEP, 2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25, 2010) (Time spent by salaried employees can be considered a loss under the CFAA, citing with approval Ninth Circuit's *Middleton* hold that Congress did not intend calculation to be dependent on "victim's choice" of the persons to remediate the damage inflicted). Here, 72 hours of an IT contactor would easily have exceeded $5,000. That such a bill was avoided by using voluntary labor instead does not mean that the diversion of 72 man-hours did not occur. And it has economic value.

Second, in *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 954, 959 (N.D. Cal. 2014), the court found that the plaintiff had adequately pled a sufficient loss as it related to employee services "[b]y alleging the approximate number of hours [the employees] spent on their restorative efforts, and the *approximate value* of their services." *Id*. at 963 [e.a.]. Here, the approximate value of Caplinger and Eagan's labor was $12,496.

Defendant asserts that under CFAA a plaintiff must necessarily "have used the resources of paid employees ... *even if it is not explicitly stated* [in the Act]" (Doc. 90, p. 12) [e.a.]. But not only is this supposed requirement to use paid employees not stated anywhere in CFAA as

Defendant concedes, it isn't supported in the five cases that Defendant cites to either (Doc. 90, p. 12):

First, Defendant mischaracterizes *United States v. Millot*, 433 F.3d 1057 (8th Cir. 2006) as standing for the proposition that hours spent by "employees" may qualify as a CFAA loss.  In fact, the individuals who performed the remedial work were not employed by the plaintiff in that case.  Rather they worked for a contractor.  And in that case defendant argued that "the cost of the work performed was absorbed by [the contractor] under its existing contract with [the plaintiff]."  *Id*. at 1061.  The Eighth Circuit, relying on the Ninth Circuit's *Middleton* and *Sablan* decisions, emphasized the *value of the services rendered* was the relevant issue rather than the dollars spent, as reflected in the observation that, "the hours spent … addressing the issues … could have been spent on other duties under the contract."  *Id*. at 1061.  The Eighth Circuit concurred with Ninth Circuit view that calculation of the $5,000 threshold should *not depend on the "victim's choice"* of the persons to remediate the damage inflicted.  *Id*. *citing United States v. Middleton*, 231 F.3d at 1214 [e.a.].  But here, Defendant cites *Millot* for exactly for that mistaken proposition.

Second, Defendant cites *United States v. Larsen*, 190 F. App'x 552, 553 (9th Cir. 2006) for the proposition that loss includes the victim's salaried employees.  But *Larsen* was a criminal prosecution, not a civil case, and although the court recognized "time that the victim's salaried employees spend responding" still nothing the court held or said excluded any other type of loss. (*Id*.).

Third, Defendant cites *A.V. v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009) for its "recognizing expenditure of employee man-hours as possibly covered by CFAA."  But all that occurred in *iParadigms* is that the court accepted as part of the plaintiff's loss that it "assigned several employees to determine what happened. According to iParadigms, over the course of about

one week, numerous man-hours were spent responding …" (*Id.*).  DPA's case is no different except that while the employees in *iParadigms* would have been paid anyway, DPA's volunteer labor was not on salary – but still its labor would have, as in *iParadigms*, not been diverted but for needing to respond to the offense.  Nothing in *iParadigms* says diversion of labor of the plaintiff is any less a loss to the plaintiff because the labor is voluntary.

Fourth, Defendant cites *United States v. Fowler*, No. 8:10-cr-65-T-24 AEP, 2010 U.S. Dist. LEXIS 118260, at *8 (M.D. Fla. Oct. 25, 2010) where it points out the Court found CFAA losses for the "employees' … significant time responding to and fixing damage … and that such time amounted to $7,226.60 of their salaries and wages."   This is another criminal case, but an examination of it shows nothing in the court said in *Fowler* stated or suggested that loss excludes labor from non-employee volunteers.

Fifth, Defendant cites *United States v. Shahulhameed*, No. 5:12-118-KKC, 2014 U.S. Dist. LEXIS 52364, at *4 (E.D. Ky. Apr. 16, 2014) for the proposition that "Losses can include the cost of time spent by a salaried employee of the victim in responding to the damage."  *Shahulhameed* is another criminal case that in no way states or implies that labor losses are only cognizable if they include time spent by a salaried employee of the plaintiff.  It merely found that losses "can" be from salaried employees.

The above CFAA case law confirms that violators of the statute cannot evade liability based on the "victim's choice" to avoid out-of-pocket dollars costs.  The diversion of employees, contractors – or volunteer labor – are all sources of "loss."  DPA relied heavily on Caplinger and Eagan's time to remediate the damage inflicted by Melvin because the union's limited economic resources gave it little choice.  This diversion of human resources was as devastating to DPA's organizing efforts as was the disruption of pilot contributions and contributed mightily to

destroying DPA's momentum and snuffing out the drive for an election.  To attribute zero value to the diversion of essential volunteer manpower resources would be to allow the offending party to inflict damage without consequences.  Indeed, the failure to attribute value to volunteer services would be an enormous and unwarranted step in removing from the protection of CFAA those entities that are in most need of its protection, including charitable organizations, start-up companies, and independent unions such as DPA.

Last, in a footnote, Defendant makes the claim that "even if DPA had a legal basis to the uncompensated time [that] Caplinger and Eagan spent … because they could have been doing more productive work, no documents were produced to show that DPA had any entitlement to certain volunteer hours … [or] to show how many hours were spent by Caplinger and Eagan on which DPA-related tasks." (Doc. 90, p. 11, fn. 5).   The fact that DPA did not create a contract between its founder, Tim Caplinger, or its webmaster, Rick Eagan, and itself is hardly surprising and in any event absolutely immaterial given the evidence that Caplinger can testify to or that Eagan can. (Caplinger Decl. ¶P 4, 9); (Eagan Decl., ¶ 4).  That there is no documentation of this labor is an argument that was rejected in a case that Defendant cites, *Shahulhameed*.  In that case the court stated:

> The defendant contends that this evidence is insufficient for a rational trier of fact to conclude that the $5,000 threshold was met. He points to the fact that the government failed to introduce "certified business records" and the fact that Exhibit 6 did "not show what was supposedly worked on, the damage that existed, how said damage was fixed, any description of the work performed or any other illuminating information." … While it might be true that the government could have provided even more evidence to establish the damage at issue, the evidence presented at trial is sufficient on its own for a rational trier of fact to find that the losses exceeded $5,000. Considering the testimony of the various witnesses in conjunction with the summary exhibit of Toyota's costs, and viewing it all in the light most favorable to the government, the evidence was more than sufficient to establish the minimum amount of damage required.

2014 U.S. Dist. LEXIS 52364, *5-6.  Likewise, DPA will present testimony to provide admissible

evidence of its loss of labor valued at $12,496.

### (b)   "Loss" In The Form Of Attorney Fees Incurred For The Purpose Of "Responding" To An Ongoing Offense By Concealed Perpetrators Aggregate To $5,000 In Value Of Economic Damages Or More.

Defendant acknowledges that DPA has "produced records of its attorney's fees" which as of May 11, 2018 were $149,955. (Doc. 90, p. 15).  In fact, there should be no dispute that DPA incurred within one year of the hacking on November 8, 2013, far in excess of $5,000. (*See*, Granath Decl., Exhibit 31 at DPA 532 to Exhibit 32 at DPA 562).

Defendant's motion, however, argues that DPA cannot use *any* attorneys' fees to show that it suffered any "loss" by any victim, as defined under CFAA. (Doc. 90, p. 15).  To support that claim, Defendant cites case law for the proposition that litigation costs *in general* have been found to be non-cognizable under the statute. (*Id.*)   But Defendant erroneously lumps all of the incurred attorneys' fees into one category, for one purpose, to argue that, "While DPA ultimately did choose to devote immense time and money pursuing those it believes to be responsible, such efforts are not cognizable under CFAA." (Doc. 90, p. 16).  This is both too narrow a read of the statute and too narrow a read of the evidence.

Instead, what a closer look at both the case law and the record of evidence in this case shows is that an amount over $5,000 of attorney's fees, which DPA indisputably incurred within one year and all before that effort successfully identified Melvin, are cognizable under CFAA as "reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, [.]" 18 U.S.C.A. § 1030(d)(11).   In short, this is so because DPA incurred legal costs *because it had to* in order to respond to an *ongoing* offense by an attacker who *concealed* his identity even as he surfaced to anonymously admit his actions and menace Caplinger with a call to his home.  Hence, DPA's initial legal costs were incurred to identify the attacker in order to stop

the attack or neutralize the attacker, not simply to pursue him for recompense.  On the facts unique to this case, legal fees of this type are cognizable and – once past $5,000 level – measuring them or their initial computation with exactitude is immaterial for the motion at bar.

Nothing in CFAA restricts what *type* of "costs of responding to an offense" may be counted within the definition of "loss."  Defendant cites no case to the contrary, either.  In fact, legal costs are cognizable as "loss" depending on their *purpose*.  Even the caselaw cited by Defendant confirms this point.  Defendant cited two cases to argue that no attorney's fees incurred by DPA can be considered cognizable costs: first, *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14 CV 6498-LTS-HBP, 2018 WL 2059653 (S.D.N.Y. May 1, 2018) ("*Obeid*") and second, *Turner W. Branch, P.A. v. Osborn*, No. CV 13-00110 MV/WPL, 2014 WL 12593991 (D.N.M. Mar. 26, 2014) ("*Turner*").

But the court in *Obeid* said this: "Litigation costs are not recoverable, *but legal expenses* associated with remediating any damage, including any necessary preceding investigation, *are recoverable.*" *Obeid* at *95 [e.a.].  And, in support, the *Obeid* court cited *Turner*. (*Obeid* at *95).  Consequently, the court in *Obeid* went on to make this finding:

> Here, La Mack and Massaro both assert in their declarations that they incurred legal expenses to prevent Obeid from continuing to access their information, which is sufficient to raise a genuine issue of material fact as to whether they suffered compensable losses. Obeid's motion for summary judgment dismissing the CFAA counterclaim is therefore denied.

(*Obeid* at *95-96).  Similarly, in *Turner* the court made its determination in that case based on the *nature or purpose of the attorney's fees*, not simply by applying a categorical rule about litigation fees. (*Turner* at * 55-56).  The court in *Turner* found that:

> The allegation that Plaintiff "has been forced to retain, interact with and pay attorneys to investigate defendants' acts and to prosecute this action," … does not allow the Court to infer that the attorneys' investigation *was related to* damage to the computer. *Cf. Koch Indus., 2011 U.S. Dist. LEXIS 49529, 2011 WL 1775765, *8.* Rather, the allegation

suggests that the attorneys were hired to investigate and prosecute this CFAA case. Plaintiff therefore has not "'nudged [its] claims across the line from conceivable to plausible.'"

(*Turner* at * 56) [e.a.].

Recent circuit court decisions have found that the plain language of CFAA was written to include costs incurred while investigating attacks on computer systems. *A.V. ex rel. Vanderhye v. iParadigms*, LLC, 562 F.3d 630, 646 (4th Cir. 2009) ("This broadly worded provision plainly contemplates consequential damages of the type sought by [Plaintiff] – costs incurred as part of the response to a CFAA violation, including the investigation of an offense."); *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1066 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 313, 199 L. Ed. 2d 206 (2017) ("It is undisputed that Facebook employees spent many hours, totaling more than $5,000 in costs, analyzing, investigating, and responding to Power's actions. Accordingly, Facebook suffered a loss under the CFAA."); *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1173–75 (11th Cir. 2017).

There is no 'one size fits all' method of identifying and remedying the effects of unauthorized access. *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008). In *SuccessFactors*, the court acknowledged that the reasonable cost of responding to an offense differs on a case-by-case basis. *Id.* *SuccessFactors* concerned a case in which the plaintiff's concern was not limited to the damage that had already been done to the computer system, but also included future damage in the form of the potential spread of sensitive information. *Id.* The *SuccessFactors* court held that when "discovering who has that information and what information he or she has is essential to remedying the harm," the costs of discovering the identity of the offender and the method of attack are considered losses under CFAA. *Id. See also Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962 (D. Ariz. 2008).

Despite Defendant's claim to the contrary, the instant case falls under *SuccessFactors*. As

in *SuccessFactors*, the reasonable method of responding to the offense in this case involved more than just making repairs to the DPA website.  DPA acted in response to an attack that continued for a period of time after the initial attack on November 8, 2013. (Caplinger Decl., ¶ 48).  That attack was or appeared to be *ongoing* and Caplinger reasonably feared a "backdoor" attack meant the attack would continue and that the possibility of spyware or keylogger software meant imminent future attacks. (Caplinger Decl., ¶¶ 49, 64).  The ability of the hacker to re-penetrate the system, combined with the call to his home about the attack, led Caplinger to believe that the attacker intended to strike again, and so the only way to ensure the security of the website was to find and unmask the hacker or hackers.  (Caplinger Decl., ¶ 64).  It was this reasonable anticipation of ongoing or an imminent repeat attack that led Caplinger to make a criminal complaint and to engage a civil law firm. (Caplinger Decl., ¶ 64).  Caplinger reasonably believed that the legal process presented the best opportunity to stop the ongoing attack and to prevent future ones. *Id*. Caplinger knew there had been a computer attack, he knew he did not fully comprehend the means or extent of the damage, nor did his webmaster; he knew a person was out there who personally admitted to him involvement; he knew that person wanted some form of 'deal' but would not reveal his identity; and he reasonable suspected the possibility of "some sort of spyware or keylogger on the website or even on my own computer." (Caplinger Decl., ¶ 64).

As in *SuccessFactors*, DPA's concerns while formulating its response to the attack were not limited to the damage that had already taken place, but also included a fear of additional attacks that its president reasonably believed could occur in the future or were in fact ongoing. (Caplinger Decl., ¶ 64).  Legal costs to unmask the caller/hacker were necessary for him to respond to the offense and determine the damage done to date.

Moreover, while Defendant may and has argued that Caplinger was 'paranoid' or

predisposed to assume a hacking, because Caplinger contests these allegations and because the objective facts at the time matter less than Caplinger's subjective assessment, there is no way that this Court can resolve this point without *assessing Caplinger's credibility*.   But assessing Caplinger's state of mind at that time precludes summary judgment.

Further, Defendant complains that there has been no computation of those portions of DPA's attorneys' fees going to damage assessment or responding to the offense. (Doc. 90, p. 15). But that is immaterial to this motion.  First, *nothing in CFAA* requires that computation, or dictates the timing of it.  Second, there can be no dispute that all fees that make up this category have been fully disclosed to the Defendant and were before Defendant made his present motion. (Granath Decl., Ex. 34).  Third, what matters is whether any of the attorney fees are cognizable to reach or exceed the statutory $5,000 level – not their total computation.  Fourth, the fees identified in the previously disclosed record of attorneys' fees, billed and paid for by DPA, which were incurred for the purpose of responding to the offense by identifying the perpetrator – in the time it took to do that from commencement of the John Doe action on January 1, 2014 to August 14, 2014 – are all set forth in the following table (all the underlying data of which Defendant could also compute for himself):

| Service | Date | Amount | Cite to Granath Decl., Ex. 31, 32 |
|---|---|---|---|
| Begin drafting of John Doe Complaint in anticipation of aggressive litigation schedule (framework and outline) | 12/26/2013 | $67.5 | DPA 533 |
| Receive, manage and analyze several documents requested of Tim Caplinger as potential evidence(including emails with DPA members and SquareSpace) | 12/27/2013 | $292.50 | DPA 533 |
| Receive, manage and, analyze additional documentary evidence from Tim Caplinger (terms of service, additional correspondence, etc .) | 12/30/2013 | $202.5 | DPA 534 |

| | | | |
|---|---|---|---|
| Receive, manage and analyze additional information from Tim Caplinger (re damages, witnesses, etc.). | 12/30/2013 | $90 | DPA 534 |
| Continue drafting Complaint (Counts I, II and II and remedy sections, start facts section; revise all drafted to date | 12/30/2013 | $585 | DPA 534 |
| Final revisions to first draft of John Doe complaint; correspond with client re same | 1/3/2014 | $112.5 | DPA 535 |
| Revise Draft 1 of Complaint; forward to client for approval | 1/7/2014 | $90 | DPA 535 |
| Receive, analyze and manage new evidence that would support injunctive relief | 1/8/2014 | $22.5 | DPA 535 |
| Prepare summons, complaint, and civil cover sheet for filing | 1/10/2014 | $157.5 | DPA 535 |
| Draft and edit for filing motion for expedited discovery (to allow serving of subpoenas on third-parties). | 1/17/2014 | $382.5 | DPA 536 |
| Draft and edit for filing Brief in support of expedited discovery (to allow serving of subpoenas on third parties) | 1/17/2014 | $900 | DPA 536 |
| Draft and edit for filing Proposed Order in support of expedited discovery (to allow serving of subpoenas on third parties) | 1/17/2014 | $157.50 | DPA 536 |
| Revise and finalize motion for leave to take immediate discovery and file with court . | 1/17/2014 | $675 | DPA 536 |
| Draft subpoena for Square Space including Exhibit A containing instructions and specific requests | 1/22/2014 | $382.5 | DPA 536 |
| Draft subpoena for Verizon including Exhibit A containing instructions and specific requests. | 1/22/2014 | $202.5 | DPA 536 |
| Draft subpoena for ALPA including Exhibit A containing instructions and specific requests. | 1/22/2014 | $180 | DPA 536 |
| Review and revise draft subpoenas to Square Space, Verizon and ALPA; teleconference with Judge's clerk regarding motion for leave to take discovery | 1/23/2014 | $360 | DPA 536 |
| Edit subpoena for Square Space including Exhibit B containing instructions and specific requests | 1/23/2014 | $202.5 | DPA 536 |
| Edit subpoena for Verizon including Exhibit A containing instructions and specific requests | 1/23/2014 | $180 | DPA 537 |
| Edit subpoena for ALPA including Exhibit A containing instructions and specific requests. | 1/23/2014 | $157.5 | DPA 537 |
| Revise and finalize letter to Judge Hellerstein regarding supplemental information for motion to take immediate discovery | 1/24/2014 | $180 | DPA 537 |
| Receipt and review of order granting motion for immediate discovery; revise and finalize subpoena to SquareSpace | 1/29/2014 | $337.5 | DPA 537 |
| Update, final check, and assemble for service of | 1/29/2014 | $337.5 | DPA 537 |

| | | | |
|---|---|---|---|
| subpoena, exhibit A, and court order on SquareSpace | | | |
| Update, final check, and assemble for service of subpoena, exhibit A, and court order on Verizon | 1/29/2014 | $202.5 | DPA 537 |
| Prepare SquareSpace subpoena to send to process server, and prepare email to process server regarding same; prepare Verizon subpoena to fax to Verizon; teleconference with Verizon | 1/30/2014 | $495 | DPA 538 |
| Investigate leads to potential John Doe | 1/31/2014 | $135 | DPA 538 |
| Draft subpoena to AT&T Mobility | 2/3/2014 | $67.5 | DPA 538 |
| Draft Exhibit A to AT&T Mobility | 2/3/2014 | $135 | DPA 538 |
| Finalize AT&T subpoena, review of AT&T subpoena policies on AT&T website, and serve subpoena by fax | 2/4/2014 | $225 | DPA 539 |
| Receive and analyze SquareSpace production in response to subpoena | 2/14/2014 | $135 | DPA 539 |
| Conduct IP address investigation, draft report for consultation with attorneys and client (including managing results) | 2/14/2014 | $180 | DPA 540 |
| Review Square Space subpoena response documents and confer with Nick Granath regarding additional research related to same | 2/14/2014 | $50 | DPA 540 |
| Review SquareSpace subpoena response documents and confer with Nick Granath regarding additional action needed in response to same. | 2/19/2014 | $225 | DPA 540 |
| Draft second subpoena for SquareSpace | 2/19/2014 | $157.5 | DPA 540 |
| Teleconference with AT&T regarding status of subpoena | 2/25/2014 | $45 | DPA 541 |
| Receive and analyze subpoena response from Fiberhub | 3/7/2014 | $112.5 | DPA 541 |
| Telecon with Aty for Square Space on production from second subpoena. | 3/10/2014 | $45 | DPA 542 |
| Begin analysis of new Square Space production from second subpoena. | 3/10/2014 | $112.5 | DPA 542 |
| Continue analysis of new Square Space production from second subpoena | 3/11/2014 | $67.5 | DPA 542 |
| Receipt and review of documents received from Time Warner, and research regarding subscriber name disclosed in documents | 4/10/2014 | $67.5 | DPA 543 |
| Investigate leads form AT&T subpoena response. | 4/21/2014 | $112.5 | DPA 544 |
| Begin analysis of all evidence to date in preparation for status/planning conference with client. | 4/22/2014 | $337.5 | DPA 544 |
| Begin drafting memo on prime suspects in preparation for status/planning conference with client. | 4/22/2014 | $337.5 | DPA 544 |
| Receive, analyze and manage additional documentary analysis and report from T Caplinger. | 4/24/2014 | $112.5 | DPA 544 |

| | | | |
|---|---|---|---|
| Finalize subpoenas to ALPA International and ALPA Delta MEC and prepare subpoenas for service; prepare email to process server in Washington DC to instruct service of subpoena on ALPA International; teleconference with Atlanta process server; prepare email to Atlanta process | 5/27/2014 | $382.5 | DPA 546 |
| Teleconference with Atlanta process server regarding status of service of subpoena on ALPA Delta MEC;teleconference with attorney for ALPA regarding subpoena ;teleconference with ALPA attorney regarding subpoena ; receipt and review of confirmation of service of subpoena on ALPA Delta MEC from process server in Atlanta; receipt and review of emailfrom ALPA attorney regarding subpoenas; confer with N. Granath regarding email from ALPA attorney; prepare email response to ALPA attorney regarding Request No. 1 and deadline for responding to subpoena. | 6/3/2014 | $405 | DPA 547 |
| Analysis of ALPA response to subpoena. | 6/12/2014 | $180 | DPA 548 |
| Review ALPA subpoena production documents and confer with Nick Granath regarding potential motion to compel outstanding items | 6/13/2014 | $50 | DPA 548 |
| Review of client emails and documents regarding Tim-Caplinger domain; review of ALPA response to subpoena ; research regarding motion procedure before Judge Hellerstein for motion to compe l response to subpoena ; confer with N. Granath regarding response to ALPA objections; prepare letter to ALPA to respond to objections to subpoenas . | 6/16/2014 | $1237.5 | DPA 549 |
| Review of draft motion to compel compliance with subpoena; review of Federal Rule 45 regarding availably of contempt for failure to comply with subpoena | 7/1/2014 | $67.5 | DPA 550 |
| Start drafting Motion to compel compliance with subpoena. | 7/1/2014 | $202.5 | DPA 550 |
| Start assembling exhibits for Declaration in support of motion o compel subpoena | 7/1/2014 | $247.5 | DPA 550 |
| Revise and finalize notice of motion to compel compliance with subpoena , memorandum of law in support of motion, declaration, and proposed order. | 7/2/2014 | $607.5 | DPA 550 |
| Finish drafting Motion to compel compliance with subpoena. | 7/2/2014 | $157.5 | DPA 551 |
| Finish drafting Proposed Order in support of motion to compel subpoena. | 7/2/2014 | $135 | DPA 551 |
| Finish assembling exhibits for Declaration in support | 7/2/2014 | $202.5 | DPA 551 |

| | | | |
|---|---|---|---|
| of motion to compel subpoena. | | | |
| Finish drafting Declaration in support of motion to compel subpoena. | 7/2/2014 | $12.5 | DPA 551 |
| Confer with attorneys Middlebrook and Silverstone on motion to compel subpoena . | 7/2/2014 | $67.5 | DPA 551 |
| Finalize first draft of memorandum in support of motion to compel documents from ALPA; review and edit motion and declaration in support of same; compile and organize exhibits and citations to same within memorandum; confer with Nick Granath regarding same | 7/2/2014 | $950 | DPA 551 |
| Receive and review ALPA response to motion to compel subpoena. | 7/14/2014 | $382.5 | DPA 551 |
| Draft Reply brief. | 7/14/2014 | $900 | DPA 552 |
| Receipt and review of ALPA's response to Motion to Compel; review draft reply brief | 7/14/2014 | $157.5 | DPA 552 |
| Review ALPA response in opposition to motion to compel and discuss reply strategy with Nick Granath | 7/14/2014 | $175 | DPA 552 |
| Edit final Reply brief; confer with Aty Seham and Silverstone re same | 7/15/2014 | $202.5 | DPA 552 |
| Review of revisions to reply brief; confer with N. Granath regarding revisions to reply brief; prepare revisions to reply brief; file reply brief | 7/15/2014 | $607.5 | DPA 552 |
| Prepare third subpoena to SquareSpace | 7/29/2014 | $360 | DPA 552 |
| Prepare SquareSpace subpoena to send to process server | 8/1/2014 | $112.5 | DPA 553 |
| Prepare for court hearing on motion to compel compliance with ALPA subpoena | 8/13/2014 | 540 | DPA 553 |
| Continue preparation for, and attend, court hearing on motion to compel compliance with ALPA subpoena, including call with client from court; confer with N. Granath regarding results of court | 8/14/2014 | 1575 | DPA 553 |
| | | **$19,530** | |

Hence, between commencement of the investigation and the unmasking of the caller/hacker, cognizable attorney fees, as summed above, reached $19,530, and so easily meet the $5,000 minimum. (And expert witness costs, additional attorney fees, or litigation costs all *beyond* that amount, even if not necessarily "loss" for the purpose of meeting the jurisdictional minimum, are still recoverable if DPA prevails, hence were disclosed).

### (c)    "Loss" From Other "Consequential Damages" Also Aggregate Or Contribute To $5,000 In Value Of Economic Damages Or More.

The attack on DPA's website disrupted and suppressed monetary donations to it, DPA's only source of income, resulting in a loss of approximately $11,000. (PSOF 67, 75, 99, 118, 125, 126, 130, 131).   Defendant acknowledges that DPA has produced its ledgers, but claims its donation loss is "groundless." (Doc. 90, p. 13).   Defendant makes the following arguments, which should all fail for the reasons given:

First, Defendant argues DPA's ledgers do not show any loss. (Doc. 90, p. 13).   But that reading of the ledgers is contested. (PSOF 75).   Based on July 2013 total donations of over $11,000 for *that* month, November and December 2013 were only $10,641 combined, implying a loss of approximately $11,000 for the November and December 2013 period. (Caplinger Decl., ¶ 45); (*See also*, Granath Decl., Exhibits 29 and 30, DPA 486-531).

Second, Defendant argues that DPA received more donations in November of *2012* than in November of *2013*, when the hacking occurred. (Doc. 90, p. 14).   But this comparison is arbitrary and self-serving so it does not prove there was no loss at all.   Rather, as Caplinger explains:

> As a direct consequence of the severed links to the donation pages, an unknown amount of donations were lost during November and December 2013, while the site was being repaired. Based on July 2013 total donations of over $11,000 for that month, November and December 2013 were only $10,641 combined, implying a loss of approximately $11,000 for the November and December 2013 period. (Caplinger Decl., ¶ 45)

Third, Defendant argues that the $11,000 estimate is "only speculative." (Doc. 90, p. 14). Yet it is undisputed that DPA has produced its ledgers as requested by Defendant in discovery, and that Caplinger can offer testimony to demonstrate the basis for his estimate. (Caplinger Decl., ¶ 45).   Caplinger observed a drop-off in donations from July 2013, the ledgers show this, and he

can testify about it.  Given this genuine dispute, the Court would have to weigh the evidence.

Fourth, Defendant argues that "in any event" DPA was "able to correct" its failed donations "button" on its website "immediately and without paying any fee to any company." (Doc. 90, p. 14).  But that that claim is contested and certainly misleading. (PSOF 43, 126, 131).  There was no "immediate" correction. (Caplinger Decl., ¶¶ 44, 45).  Caplinger and Eagan spent 72 man-hours restoring the website. (Caplinger Decl., ¶ 42); (Eagan Decl., ¶ 7).  And, it matters not that DPA did not have to pay a "fee" to restore the online donations function.  That would have been *additional loss*; it is not proof of no loss.

Fifth, Defendant argues that the nature of DPA as a "labor organization" rather than a commercial "retailer" makes it different and that "donations to a labor organization are not analogous to retail sales." (Doc. 90, p. 14).  From this Defendant claims that, "if the website is down temporarily, they [supporters of DPA] are likely to either write a check – which many did – or simply to make the donation on the following day." (*Id*.).  Yet this particular argument of Defendant bleeds into the issue of lost "good will" as a component of consequential loss and it fundamentally ignores the nature of the consequential loss incurred by DPA because of the interruption of service to DPA's website.

There is no requirement in CFAA that "victims" must be commercial enterprises, or even for-profit businesses.  There is no requirement that CFAA plaintiffs show lost "sales" or even costs, only that they sustain "economic damages."  Any "victim's" loss is cognizable regardless of whether they are an entity, a person, a business, or a non-profit.  Defendant cites no law to the contrary.  What DPA lost in good will was reflected in the drop-off in donations of *all kinds*, and its source was not confined to the inability to donate through the website but went to the very confidence that all or most Delta pilots lost seeing DPA's website so visibly, aggressively and

effectively 'taken out' by a directed computer attack – and just when DPA was apparently cresting in support. (Caplinger Decl., ¶ 47). That loss of 'good will' hurt DPA to be sure and may have cost it the opportunity to represent Delta pilots and all the dues income that implies. (Caplinger Decl., ¶ 63). More fundamentally, however, it undermined the very statutory process under the RLA that makes the choice of labor representatives a democratic one by undermining the choice any Delta pilots *actually had*. In terms of lost donations, what Defendant misses is that some pilots who would have made donations to a viable competitor to ALPA (indeed the only one), that is DPA – did not do so in *any form* whether check, cash or on-line, as a result of losing confidence in DPA *because* its website was effectively hijacked. That loss is no less an economic loss to DPA than it would be if DPA were a retailer or a for-profit business; it's just a different kind of loss. To hold otherwise would put into CFAA an exception that Congress has not.

Defendant also argues that litigation costs and expert witness costs are not cognizable relying on two different versions of the same argument, which is that these costs were not incurred for the purpose of damage assessment, restoring the system, nor were they, Defendant claims, consequential damages incurred because of the interruption of services. (Doc. 90, p. 17). Defendant asserts that these are the "*only* categories of losses recognized" in CFAA. (*Id.*) [e.a]. But a close read of that assertion shows that Defendant *omits* the very first element of the definition of "loss" in § 1030(e)(11), which is the "cost of responding to an offense." (*Id.*). But such a selective reading of the law is not one that this Court can engage in.

DPA does not claim that *all* its litigation costs can be relied upon to meet the $5,000 minimum, nor has it claimed that *all* of its attorney's fees can either. But, like the attorney's fees loss, some litigation costs surely is attributable *to the cost of responding* to the offense, and for the same reason that the attorney's fees are, as argued herein above. For example, DPA has offered

evidence of the costs of subpoenaing third parties which was incurred to stop an ongoing attack (Granath Decl., Ex. 35 at DPA 591-592) or service fees to serve Melvin, i.e. to 'unmask' him (*Id.* At DPA 593). Similarly, regarding expert fees, some portion of those costs were attributable to stopping, i.e. responding, to an ongoing offense. To that extent, based on their purpose, they were not incurred merely to assist litigation so are cognizable.

**C)      There Is No Basis In Law Or Fact For An Award To Defendant Of Attorneys' Fees Or Costs And To Do Would Reward A Crime.**

Beyond summary judgment Defendant also seeks with his motion an award of attorney fees. Setting aside the risk of rewarding criminal activity by doing so, Defendant points to no legal entitlement to such an award. There is none. Instead, in a footnote Defendant asserts that it has been "burdened by discovery and motion practice." (Doc. 90, p. 8, fn. 2). Two years ago, this Court found (Doc. 50) that evidence submitted to it on a sealed motion (Doc. 44) was sufficient to name Melvin as a defendant in an action, the underlying facts of which constitute a federal crime. Since then, Defendant has been burdened, it is true, but properly so and not unduly. The parties have exchanged written discovery, and Defendant has brought two dispositive motions before taking any deposition or bringing any discovery motion. Melvin himself has never appeared for any depositions, he has never appeared in court. There is no basis in fact to reward Defendant even if his pending motion were granted. If granted all that will have happened is DPA will not be able to hold him accountable: a wrong without a remedy.

Last, without unduly burdening the Court, a response is necessary to Defendant's comment that:

> Inexplicably, DPA ignores the evidence it obtained in third-party discovery that suggests the involvement of three other individuals: Matthew Hobbs (who registered www.deltapilot.org) (SOF ¶¶ 32-34), and Mark McClain and D.A. Hart (who Squarespace lists as the owners of www.deltapilot.org). (SOF ¶¶ 23-24).

(Doc. 90, p. 8, fn. 3). DPA has not ignored any evidence and has on the contrary always alleged that a group of actors conspired to disrupt its website. The amended Complaint explicitly alleges that:

> Defendant Russell C. Melvin ("Melvin" or "defendant") is an individual who is responsible alone – or with others individuals or entities acting as accomplices – for "hacking" into DPA's website by unauthorized access that was intended to, and did, cause damage and loss.

(SAC ¶ 4). Such remains the case today. In fact, as documents DPA disclosed to Defendant show, DPA sought discovery about Hobbs, McClain and Harte from third parties. (Granath Decl., Ex. 23, at DPA 327-329). What is significant about *Defendant's* comment is that these three individuals were, all like Melvin, known to be Delta pilots in ALPA at the time of the hacking, and either known then or later determined to be working to defeat DPA – as was Melvin.

**D)     Because Defendant Brought His Motion Before Taking Any Depositions, Denial Or At Least Deferral Of His Summary Judgment Motion Is Warranted Under Rule 56(d).**

For reasons stated elsewhere in this brief, the undisputed fact that no deposition testimony has been taken and that Defendant seeks summary judgment solely on its interpretation of documents – particularly in the technical area of what "damage" was done to DPA's computer systems – if the Court does not deny the motion it should, pursuant to Rule 56(d)(1), defer it until deposition can be taken.

## V.    CONCLUSION.

For all the reasons, herein, DPA respectfully asks that Defendant motion for summary judgment be denied, or in the alternative, deferred until depositions have been completed.

Dated:  June 15, 2018                        Respectfully submitted,

Nicholas Granath, Esq. (*pro hac vice*)
ngranath@ssmplaw.com
Lee Seham, Esq. (*pro hac vice*)
lseham@ssmplaw.com
Lucas Middlebrook, Esq. (*pro hac vice*)
lmiddlerook@ssmplaw.com

**SEHAM, SEHAM, MELTZ & PETERSEN, LLP**
199 Main Street, Seventh Floor
White Plains, NY 10601
Tel.: 914 997-1346
Fax: 914 997-7125

*Attorneys For Plaintiff, the Delta Pilots Association*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2018, I electronically filed the following documents and their attachments, if any:

Plaintiff's Memorandum Of Law Opposing Defendants Motion For Summary Judgment (together will all supporting papers filed with the above)

I further hereby certify that the above listed documents were filed with the Clerk of this Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Dana Lossia, Esq.
dlossia@levyratner.com
LEVY RATNER, P.C.
80 Eighth Avenue Floor 8
New York, New York 10011
Tel. 212 627-8100
Fax. 212 627-8122

On this day of  June 15, 2018

Nicholas Paul Granath, Esq.