UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- x
DELTA PILOTS ASSOCIATION,      :
                                   :    **PLAINTIFF'S LOCAL RULE 56.1**
                   Plaintiff,   :    **STATEMENT OF MATERIAL FACTS**
                                   :    **OPPOSING MOTION FOR**
      - against -          :    **SUMMARY JUDGMENT**
                                   :
RUSSEL C. MELVIN,          :    Case No. 1:14-CV-00225-AKH
                                   :
                 Defendant.    :
----------------------------------------------------- x

Plaintiff, the Delta Pilots Association ("DPA"), in support of its "Plaintiff's Memorandum Of Law Opposing Defendant's Motion For Summary Judgment" hereby submits the following statement of, pursuant to Local Rule 56.1(b) of the United States District Court for the Southern District of New York.[1]

## Part A: DPA's Responses To Defendant's Contentions

**Defendant's Contention No. 1:** Defendant served its first request for the production of documents upon DPA on or around December 22, 2017. (*See* Defendant's Requests for Production of Documents, annexed as Exhibit A to the Declaration of Dana Lossia, dated May 25, 2018, hereafter "Lossia Decl.").

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 2:** DPA served responses and objections to Defendant's first set of requests for the production of documents on or around January 22, 2018. (S*ee* Plaintiff's Responses and Objections to Defendant's Requests for Production of Documents, annexed as Exhibit B to the Lossia Decl.).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

---

[1] As used herein, "DPA" followed by a number refers to discovery documents produced by Plaintiff DPA to Defendant Melvin, which were 'bate stamped' with the label "DPA" followed by a number. All such documents are included in separately submitted exhibits to the Declaration of Nicholas Paul Granath, exhibit numbers 1 through 33.

**Defendant's Contention No. 3:** DPA has produced all documents that are required to be produced by Rule 26(a)(1) concerning Initial Disclosure. (F.R.C.P. 26(a)(1)).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 4:** Tim Caplinger is the founder of DPA, a member of its Board of Directors and its Interim President.  (*See* Docket Entry #85, SAC ¶ 17).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter (also noting that Defendant previously denied this allegation; *see* Answer at Doc. # 86 ¶ 17).

**Defendant's Contention No. 5:** Rick Eagan was DPA's webmaster at all times relevant to this litigation. (*See* Docket Entry #85, SAC ¶ 27).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter (also noting that Defendant previously denied this allegation; *see* Answer at Doc. # 86 ¶ 27).

**Defendant's Contention No. 6:** DPA's website can be located on the internet at the web address of http://delta-pilots.org. (*See* Docket Entry #85, DPA's Second Amended Complaint, hereafter "SAC" at ¶ 21).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter (also noting that Defendant previously denied this allegation; *see* Answer at Doc. # 86 ¶ 21).

**Defendant's Contention No. 7:** The Second Amended Complaint does not allege that DPA's website can be located at www.deltapilotsassociation.org. (*See* Docket Entry #85, SAC).

    **DPA's Response:** <u>Contested</u>.  This is not accurate and misunderstands or misreads the amended Complaint.  The Second Amended Complaint ("SAC") in ¶ 21 alleges that: "DPA's web site can be located, or 'surfed' to on the Internet, or 'web,' at the uniform resource locator ('URL'), or web address of, http://delta-pilots.org." That address was always publicly accessible from several other addresses – including "www.deltapilotsassociation.org".  This address and others all pointed to the same website, the site DPA alleged in its Complaints as amended, i.e. they were linked.  This fact, too, was alleged at SAC ¶ 25: "Through SquareSpace, DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account." Thus, a CFAA allegation was alleged with respect to www.deltapilotsassociation.org, which is just another link to DPA's hacked website. (*See*, Caplinger Decl., ¶¶ 14, 18).

**Defendant's Contention No. 8:** The Second Amended Complaint does not allege a CFAA violation with respect to www.deltapilotsassociation.org. (*See* Docket Entry #85, SAC).

    **DPA's Response:** <u>Contested</u>.  This is not accurate and misunderstands or misreads the amended Complaint.  The SAC in ¶ 21 alleges that: "DPA's web site can be located, or 'surfed' to on the Internet, or 'web,' at the uniform resource locator ('URL'), or web address of, http://delta-pilots.org." That address was always publicly accessible from several other addresses – including "www.deltapilotsassociation.org".  This address and others all pointed to the same website, the site DPA alleged in its Complaints as amended: they were linked.  This fact, too, was alleged at SAC ¶ 25: "Through SquareSpace DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account." Thus, a CFAA allegation was alleged with respect to www.deltapilotsassociation.org, which is just another link to DPA's hacked website. (*See*, Caplinger Decl., ¶¶ 14, 18).

**Defendant's Contention No. 9:** The Second Amended Complaint does not allege that DPA's website can be located at www.deltapilotsassociation.squarespace.com. (*See* Docket Entry #85, SAC).

    **DPA's Response:** <u>Contested</u>.  This is not accurate and misunderstands or misreads the amended Complaint.  The SAC in ¶ 21 alleges that: "DPA's web site can be located, or 'surfed' to on the Internet, or 'web,' at the uniform resource locator ('URL'), or web address of, http://delta-pilots.org."  The SAC also alleges in ¶ 24 that "SquareSpace, Inc. is a New York company that 'hosts' DPA's web site." The SAC in ¶ 25 goes on to alleged that: "Through SquareSpace DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account." Thus, the contention that DPA's website cannot be "located at" this web site is misleading and substantively inaccurate. (*See*, Caplinger Decl., ¶¶ 14, 18).

**Defendant's Contention No. 10:** The Second Amended Complaint does not allege a CFAA violation with respect to www.deltapilotsassociation.squarespace.com. (*See* Docket Entry #85, SAC).

    **DPA's Response:** <u>Contested</u>.  This is not accurate and misunderstands or misreads the amended Complaint.  The SAC in ¶ 21 alleges that: "DPA's web site can be located, or 'surfed' to on the Internet, or 'web,' at the uniform resource locator ('URL'), or web address of, http://delta-pilots.org."  The SAC also alleges in ¶ 24 that "SquareSpace, Inc. is a New York company that 'hosts' DPA's web site." The SAC in ¶ 25 goes on to allege that: "Through SquareSpace, DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account." Thus, the contention that DPA's website cannot be "located at" this web site is misleading and substantively inaccurate. (*See*, Caplinger Decl., ¶¶ 14, 18).

**Defendant's Contention No. 11:** DPA learned on November 9, 2013 that "www.deltapilotsassociation.org" was directing toward "tim-caplinger.squarespace.com". (*See* Exhibit C to the Lossia Decl., which are pages of documents produced by DPA, at DPA 134-139)

    **DPA's Response:** <u>Contested</u>.  This misunderstands or misreads DPA 134-139 and so is inaccurate. (*See*, Caplinger Decl., ¶¶ 14, 25, 26, 28, 29, 30, 37, 39, and 55).

**Defendant's Contention No. 12:** During the time of the alleged violation, deltapilotsassociation.org (without the www.) was not redirected and did not require a remedy. (Lossia Decl., Ex. C at DPA 134-139).

     **DPA's Response:** <u>Contested</u>.  This misunderstands or misreads DPA 134-139 and so is inaccurate. (*See*, Caplinger Decl., ¶¶ 14, 25, 26, 28, 29, 30, 37, 39).

**Defendant's Contention No. 13:** Tim Caplinger used the Squarespace account tim-caplinger.squarespace.com in September 2012. (Lossia Decl., Ex. C at DPA 129-130)

     **DPA's Response:** <u>Contested</u>. Misleading. (*See*, Caplinger Decl., ¶ 56)

**Defendant's Contention No. 14:** DPA produced a document showing that a pro-ALPA "Work Together" message appeared on the website www.deltapilotsassociation.org. (*See* Lossia Decl., Ex. Q at DPA 272).

     **DPA's Response:** <u>Contested</u>.  This misunderstand or misreads DPA 272.

**Defendant's Contention No. 15:** DPA produced no document showing a pro-ALPA "Work Together" message on the website http://delta-pilots.org, which is the website that DPA claims as its website at ¶ 21 of the SAC.

     **DPA's Response:** <u>Contested</u>. Not accurate. (*See* Granath Decl., Exhibit 19 at DPA 272).

**Defendant's Contention No. 16:** DPA has produced no documents that verify who owns the email account amp.chumbawamba@ausi.com.

     **DPA's Response:** <u>Contested</u>. Not accurate. Disclosed documents (*See* Granath Decl., Exhibit 1 at DPA 39, 40, 42, 43) show that <u>amp.chumbawamba@gmail.com</u> is associated with Russell Melvin.  The email address <u>amp.chumbawamba@ausi.com</u> is the address used to set up the trial account tim-caplinger.squarespace.com in 2013 as shown in DPA 149-168 and this trial account is admitted to belong to Russell Melvin in the letter to ALPA shown in DPA 47-51 and 293-297.  The similarity of the two email addresses corroborates Russell Melvin's admission that he owned the trial account tim-caplinger.squarespace.com in 2013 (*See*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8); (*See also*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4).

**Defendant's Contention No. 17:** DPA has produced no documents that show who *used* the email address amp.chumbawamba@ausi.com on November 8, 2013 or at any time thereafter.

     **DPA's Response:** <u>Contested</u>. Not accurate. Disclosed documents (*See* Granath Decl., Exhibits 1 and 4 at DPA 39, 40, 42, 43, 149, 150, 152) show that the trial Squarespace account tim-caplinger.squarespace.com was re-opened by the attacker in 2013 using a personal email address of <u>amp.chumbawamba@ausi.com</u> as shown in DPA 149-168. Russell Melvin admits to owning the trial account that contained his "private writings and thoughts of a personal nature" which was the false website including the pro-ALPA "Work Together" message in a letter he sent to ALPA shown in DPA 47 – 51 and 293 – 297. (*See*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8); (*See also*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4).

**Defendant's Contention No. 18:** On November 9, 2013, DPA wrote the following to Squarespace: "I need URGENT HELP! My site www.deltapilotsassociation has been hijacked." (Lossia Decl., Ex. C at DPA 134). That same day, DPA also wrote the following to Squarespace: "Somehow, SquareSpace has added deltapilot.org to our domain list. This is a clone site DPA does not own. We need to remove it from our domain list immediately. Also, please research who has set up the trial squarespace account using deltapilot.org. This is our hacker. Please email us with results." (Lossia Decl., Ex. C at DPA 96-97). Also that day, DPA wrote to Squarespace: "Our opposition owns deltapilots.org and deltapilot.org. They are doing the hacking/redirecting." (Lossia Decl., Ex. C at DPA 136).

    **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 19:** On November 10, 2013, Rick Eagan wrote the following to Squarespace: "Managed Domains in our account still shows "DELTAPILOT.ORG", which as you are aware does not belong to us." (Lossia Decl., Ex. C at DPA 91-95).

    **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon (and noting the correct cite is DPA 95).

**Defendant's Contention No. 20:** On November 10, 2013, Squarespace wrote to DPA and stated, in part: "We noticed that both www.deltapilotsassociation.org and deltapilotsassociation.org are both presently point [*sic*] to the Squarespace site deltapilotsassociation.squarespace.com, however the domain without the www is now displaying your Squarespace URL . . . This likely means that you have domain forwarding turned on. You will want to disable this for your domain to display correctly with or without the www. The site that this was directing towards was: tim-caplinger.squarespace.com[.] This site has since been removed and the issue appears to have been resolved." (*See* Lossia Decl., Ex. C at DPA 139).

    **DPA's Response:** <u>Contested</u>. This misreads and misstates the content of DPA 139.

**Defendant's Contention No. 21:** On November 13, 2013, Squarespace emailed DPA and stated, in part, "From what I can tell the domain deltapilot.org was purchased through Squarespace as part of your plan in April of 2012[.]" (*See* Lossia Decl., Ex. C at DPA 146)

    **DPA's Response:** <u>Contested</u>. Misleading. (*See* Caplinger Decl., ¶ 60).

**Defendant's Contention No. 22:** On November 14, 2013, Squarespace emailed DPA and stated, in part, "As mentioned previously, the domain deltapilots.org within your account, is showing in our records as having been chosen in April of 2012[.]" (Lossia Decl., Ex. C at DPA 148).

    **DPA's Response:** <u>Contested</u>. Misleading. (*See* Caplinger Decl., ¶ 60).

**Defendant's Contention No. 23:** Squarespace's production for November 14, 2013 includes an internal exchange between Squarespace representatives that list the www.deltapilot.org "owner contact" as mark_mcclain@cox.net and the "Owner email" as daharte@bellsouth.net. (Lossia Decl., Ex. C at DPA 148).

**DPA's Response:** Contested pursuant to Rule 56(d)(2): Further discovery through deposition of Russell Melvin should ascertain why his trial account was linked to deltapilot.org that was apparently controlled by mark_mcclain@cox.net and daharte@bellsouth.net. DPA has yet to determine why mark_mcclain@cox.net is listed as the "owner contact" of deltapilot.org or why daharte@bellsouth.net is listed as the "Owner email". The unused DPA domain "deltapilot.org" was initiated in 2012 as a free domain name provided and hosted by Squarespace. (*See*, Caplinger Decl., ¶ 60). At this stage of discovery, it is unknown exactly how the owner contact and owner email addresses were set to the unauthorized user email addresses of mark_mcclain@cox.net and daharte@bellsouth.net. (*See*, Caplinger Decl., ¶ 60).

**Defendant's Contention No. 24:** Mark McClain and Donald A. Harte are current or former Delta pilots.

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 25:** On November 11, 2013, Tim Caplinger wrote to Squarespace and stated, in part: "I need to tell you that the culprit is now spoofing/forging our Constant Contact database and sending out emails to my membership while posing as us." (Lossia Decl., Ex. C at DPA 143).

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 26:** The SAC does not allege that any person spoofed or forged DPA's Constant Contact database or sent out emails to DPA's membership while posing as DPA, *see* Docket Entry # 85, SAC, and there is no other evidence of this occurring.

**DPA's Response:** In part uncontested (regard the SAC), in part contested (regarding evidence) (*see* Granath Decl., Exhibit 4 at DPA 143).

**Defendant's Contention No. 27:** On October 27, 2013, Tim Caplinger wrote to Squarespace, in part, "It is the nature of my organization that means I am especially vulnerable to malicious attacks. The opposing union we are trying to replace is on the ropes and would certainly hack our site if they could." (Lossia Decl., Ex. C at DPA 110-114).

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon (noting the statement is found on DPA 111).

**Defendant's Contention No. 28:** On November 9, 2013 and November 10, 2013, Tim Caplinger spoke over the phone with GoDaddy customer support concerning www.deltapilotsassociation.org, and GoDaddy maintained records of those calls, which are reproduced in part at DPA 411-412. (*See* Lossia Decl., Ex. I, at DPA 411-412).

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 29:** On November 9, 2013, GoDaddy advised Caplinger to "change the www points to for square space[.]" (*See* Lossia Decl., Ex. I, at DPA 412)

     **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 30:** DPA made several domain forwarding updates to its site on the evening of November 9, 2013 and the early morning of November 10, 2013 and, with some additional customer service assistance, the "redirected" domain began pointing correctly. (*See* Lossia Decl., Ex. I, at DPA 411).

     **DPA's Response:** <u>Contested in part</u>. Misleading. (*See* Caplinger Decl., ¶ 59). To the extent not uncontested this does not entitled Defendant to judgment as a matter of law.

**Defendant's Contention No. 31:** DPA conducted third-party discovery concerning the registration and ownership of www.deltapilot.org. (S*ee* Lossia Decl., Ex. J at DPA 265-268).

     **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 32:** The domain name deltapilot.org was created on April 30, 2012, with the registrant email address "hobbsmsb@aol.com" and the registrant organization "Squarespace." (*See* Exhibit D to the Lossia Decl., which are publicly-accessible domain lookup pages, at Def. 00060-62 and Def. 00097-99; *see also* Lossia Decl., Ex. J at DPA 265-268).

     **DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); also contested, in part, pursuant to Rule 56(d)(2): Further discovery through deposition of Russell Melvin should ascertain why his trial account was linked to deltapilot.org that was apparently created by <u>hobbsmsb@aol.com</u> on April 30th, 2012 and controlled by <u>mark_mcclain@cox.net</u> and <u>daharte@bellsouth.net.</u>  DPA has yet to determine why or how deltapilot.org was created by <u>hobbsmsb@aol.com</u> or why or how <u>mark_mcclain@cox.net</u> is listed as the "owner contact" of deltapilot.org or why or how <u>daharte@bellsouth.net</u> is listed as the "Owner email".  The unused DPA domain "deltapilot.org" was initiated in 2012 as a free domain name provided and hosted by Squarespace. (*See*, Caplinger Decl., ¶ 60).  At this stage of discovery, it is unknown exactly how the owner contact and owner email addresses were set to the unauthorized user email addresses of <u>mark_mcclain@cox.net</u> and <u>daharte@bellsouth.net</u>. (*See*, Caplinger Decl., ¶ 60).

**Defendant's Contention No. 33:** The email address hobbsmsb@aol.com belongs to Matt R. Hobbs of Eagan, MN. (*See also* Lossia Decl. at Ex. E, at Def. 00057, which is a property information search showing Matthew and Sarah Hobbs as the owner of property in Eagan, MN; *see also* Lossia Decl. at Ex. F, at Def. 00058-59, which is a publicly-accessible "Whois" page showing Matthew Hobbs of Eagan, MN as the registrant of a website using hobbsmsb@aol.com as his email address).

     **DPA's Response:** <u>Contested,</u> in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 34:** Matthew Hobbs of Eagan, MN is a current or former Delta pilot.

**DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 35:** DPA maintains the Twitter account @DeltaPilots.

**DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 36:** On November 9, 2013, DPA tweeted: "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice. Watch email for instructions. Stay the course!" (*See* Exhibit G to the Lossia Decl., which shows two DPA tweets, at Def. 00055).

**DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 37:** On November 10, 2013, DPA tweeted: "The attack on the DPA website has been defeated. The site is fully operational and secure. Let's focus on our advance to independence!" (*See* Exhibit G to the Lossia Decl., which shows two DPA tweets, at Def. 00055)

**DPA's Response:** <u>Contested</u> in part on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); contested as inaccurate (*See* Caplinger Decl., ¶ 59).

**Defendant's Contention No. 38:** On November 9, 2013, DPA sent an email to members stating in part, "ALERT! ALPA has hacked part of the DPA website." It also stated: "The content of our site has not been hacked, only where the address takes you." It also stated: "If you would like to donate to DPA, please do not donate via the web until we straighten this out. Mail checks to: DPA, P.O. Box 17025, Tampa, FL 33682."(*See* Exhibit H to the Lossia Decl., which reproduces the text of certain newsletter-style emails sent by DPA to members in 2013 and 2014, at Def. 00003-4).

**DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 39:** On November 10, 2013, DPA sent an email to members stating in part, "ALERT! The DPA Site is now back up and running." It also stated: "The site is secure and functioning properly. Again, our site was not compromised internally. No data was lost or accessed. We do not store member data on the DPA website as a side note. The hijacking was simply a redirecting of our URL to a hostile site that asked the reader to support ALPA and may have contained other malicious content. Thank you to all who demonstrated patience and restraint during this event." It also stated: "In any battle, there will be moments where the enemy advances. While we experienced a temporary disruption to our website access, our resolve was not weakened, it was strengthened." (*See* Exhibit H to the Lossia Decl., at Def. 00005)

**DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 40:** DPA's November 10, 2013 email to members also stated: "CLICK HERE to contribute to DPA. Mail checks and Authorization Cards to: DPA, P.O. Box 17025, Tampa, FL 33682." (*See* Exhibit H to the Lossia Decl., at Def. 00006).

   **DPA's Response:** <u>Contested</u>, in part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise not contested.

**Defendant's Contention No. 41:** On November 13, 2013, DPA sent an email to members that contained a "HACKING UPDATE" which stated, in part, "DPA is viewing this attack as simply a momentary distraction and we must consider very carefully whether or not it makes sense to waste valuable time and resources pursuing those responsible." It also stated: "Other than the loss of some valuable rest, there really has been no other negative impact to our campaign." (*See* Exhibit H to the Lossia Decl., at Def. 00007).

   **DPA's Response:** <u>Contested</u> in part as misleading (*See*, Caplinger Decl., ¶ 57) and in further part on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise and to that extent, not contested.

**Defendant's Contention No. 42:** The alleged CFAA violation did not involve any DPA member data being lost or accessed.  (*See* Exhibit H to the Lossia Decl., at Def. 00005).

   **DPA's Response:** <u>Contested</u> on the objection that Defendant fails to cite to admissible evidence to support this contention as required by Rule 56(c)(2).

**Defendant's Contention No. 43:** On November 15, 2013, DPA sent an email to members that stated in part: ITEM 1: Hacking Update We discovered today that last weekend's attack disconnected the link to our secure credit card transaction facility. The redirect of our URL simply broke the link to our account and those that tried to donate to DPA using the 2nd option received an error and could not enter their contribution. No data was compromised since we do not store data on our site, but no donations were received either. The Donation Link has been restored and IMMEDIATELY donations began coming in. Because we have now been possibly harmed financially, the importance of completing this investigation properly just went up. (*See* Exhibit H to the Lossia Decl., at Def. 00011)

   **DPA's Response:** <u>Contested</u>, in part, as misleading (*See*, Caplinger Decl., ¶ 57) and in further part, on the objection that Defendant fails to cite admissible evidence to support this contention as required by Rule 56(c)(2); otherwise and to that extent, not contested.

**Defendant's Contention No. 44:** DPA produced no documents that show that the alleged CFAA violation "disconnected the link to [its] secure credit card transaction facility." (*See* Exhibit H to the Lossia Decl., at Def. 00011).

   **DPA's Response:** <u>Contested</u>. Not accurate. (*See,* Caplinger Decl. at ¶ 32); (*See also,* Granath Decl., Exhibit 1 at DPA 24, 26).  In addition, objection that Defendant fails to cite to admissible evidence to support this contention as required by Rule 56(c)(2).

**Defendant's Contention No. 45:** DPA produced no documents that show that any "malicious commands or code" were placed on its website. (*See* Docket Entry #85, SAC ¶ 71).

**DPA's Response:** <u>Contested</u>. Not accurate. (*See* Caplinger Decl. at ¶¶ 25, 26, 28, 30, 48, 49). (*See* Granath Decl., Exhibit 1 at DPA 24, 26).

**Defendant's Contention No. 46:** At no time in November 2013 was DPA locked out of its ability to configure its domain settings.

**DPA's Response:** <u>Contested</u>. Not accurate. (*See* Caplinger Decl. at ¶ 58).

**Defendant's Contention No. 47:** At no time in November 2013 was DPA prevented from posting to or modifying the contents of its website http://delta-pilots.org.

**DPA's Response:** <u>Contested</u>. Not accurate. (*See* Caplinger Decl. at ¶ 58).

**Defendant's Contention No. 48:** In its Rule 26(a)(1)(A)(iii) computation, DPA lists its alleged losses. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure.)

**DPA's Response:** Uncontested in part; <u>Contested</u> in part (the computation lists *more than just* jurisdictional losses).

**Defendant's Contention No. 49:** DPA did not pay any fee to Squarespace for the customer service it received in November 2013.

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 50:** DPA did not pay any fee to GoDaddy for the customer service it received in November 2013.

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 51:** DPA did not pay a fee to PayPal or any other credit card processing company for customer service it may have received on November 15, 2013.

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 52:** DPA did not pay a fee to PayPal or any other company to restore the link to its secure credit card transaction facility.

**DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 53:** DPA asserts that it lost approximately $12,496 as an immediate and direct cost of responding to the alleged violation, assessing damage and restoring the affected website. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 1-2).

**DPA's Response:** Uncontested. (*See also*, Caplinger Decl., ¶¶ 42, 43; Egan Decl., ¶¶ 7, 8).

**Defendant's Contention No. 54:** The $12,496 loss figure consists of earnings Caplinger and Eagan would have received from Delta had Caplinger worked 40 hours as a pilot at the rate of $150 per hour and had Eagan worked 32 hours as a pilot at the rate of $203 per hour. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

**DPA's Response:** <u>Contested</u>.  This misreads the disclosure which does *not* state this is the amount Caplinger and Eagan would have received in lost earnings. Nor was that alleged in the amended Complaint. (*See also*, Caplinger Decl., ¶¶ 42, 43; Egan Decl., ¶¶ 7, 8).

**Defendant's Contention No. 55:** In 2013, Caplinger earned $150 per hour as a Delta pilot.
  **DPA's Response:** Uncontested. (*See also*, Caplinger Decl., ¶¶ 42, 43; Egan Decl., ¶¶ 7, 8).

**Defendant's Contention No. 56:** In 2013, Eagan earned $203 per hour as a Delta pilot.
  **DPA's Response:** Uncontested. (*See also*, Caplinger Decl., ¶¶ 42, 43; Egan Decl., ¶¶ 7, 8).

**Defendant's Contention No. 57:** In 2013, Caplinger did not take a salary from DPA for his work for DPA. (*See* Exhibit L to the Lossia Decl., which contains DPA's Form 990s for 2013-2015).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 58:** In 2013, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 59:** In 2014, Caplinger did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 60:** In 2014, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 61:** In 2015, Caplinger did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 62:** In 2015, Eagan did not take a salary from DPA for his work for DPA. (*See* Lossia Decl., Ex. L).
  **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 63:** DPA produced no documents – such as timesheets, activity logs, or other records – showing the hours spent by either Caplinger or Eagan to respond to the alleged violation, conduct a damage assessment or restore the integrity and availability of the DPA website.

**DPA's Response:** Contested.   (*See* Granath Decl., Exhibit 4 at DPA 89-168); (*see also*, Caplinger Decl., ¶¶ 42, 43; Egan Decl., ¶¶ 7, 8).

**Defendant's Contention No. 64:** DPA produced no documents – such as paystubs, flight schedules, or correspondence – to show that either Caplinger or Eagan lost out on specific flying opportunities for Delta in order to attend to the alleged violation of the DPA website in November or December 2013.

      **DPA's Response:** Uncontested but not material therefore Plaintiff is not entitled to judgment as a matter of law in reliance thereon. (*See* Caplinger Decl., ¶ 42).

**Defendant's Contention No. 65:** DPA produced no documents to show that either Caplinger or Eagan were scheduled to fly for Delta on November 9, 10, 11, 12, 13, 14 or 15, 2013.

      **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon. (*See* Caplinger Decl., ¶ 42).

**Defendant's Contention No. 66:** DPA produced no documents to show that either Caplinger or Eagan opted not to fly for Delta on November 9, 10, 11, 12, 13, 14 or 15, 2013 because of the DPA website problem or for any other reason(s).

      **DPA's Response:** Uncontested but not material therefore Defendant is not entitled to judgment as a matter of law in reliance thereon. (*See* Caplinger Decl., ¶ 42).

**Defendant's Contention No. 67:** DPA asserts that it lost approximately $11,000 as consequential damages from lost donations. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

      **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 68:** DPA's financial ledgers for 2012 and 2013 were produced in discovery, and they contain a line item for each donation received by DPA, along with the date of the donation, and whether it is a "Check Donation" a "Cash Donation" or a "Member Donation." (*See* Exhibit M to the Lossia Declaration, at DPA 486-531).

      **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 69:** Member ID numbers are associated with many of the donations that appear in DPA's financial ledgers, and some donations appear to recur on a regular basis.  For example, Member 985430 gives $25 roughly every 30 days in 2012 and 2013. (*See* Exhibit M to the Lossia Declaration, at DPA 486-531).

      **DPA's Response :** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 70:** DPA produced no evidence that any particular individual did not donate to DPA because of the alleged interruption in service to www.deltapilotsassociation.org.

      **DPA's Response:** Contested. (*See* Caplinger Decl. at ¶ 61).

**Defendant's Contention No. 71:** DPA produced no evidence that any particular individual donated less money, or donated less often, to DPA because of the alleged interruption in service to its website.

**DPA's Response:** Contested. (*See* Caplinger Decl. at ¶ 61).

**Defendant's Contention No. 72:** In 2012 and 2013, DPA never received donations amounting to $5,000 in a single week. (*See* Exhibit M to the Lossia Decl., at DPA 486-531; *see also* Exhibit N to the Lossia Decl., which is an analysis of DPA 486-531).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 73:** In 2012 and 2013, DPA received donations of more than $3,000 in a single week only four times, and one of those times was in November 2013 after the alleged CFAA violation. (*See* Exhibit M to the Lossia Decl., at DPA 486-531; *see also* Exhibit N to the Lossia Decl., which is an analysis of DPA 486-531).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 74:** DPA collected more in donations in calendar year 2013 than it did in calendar year 2012.

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 75:** DPA's number of donations and the dollar value of those donations in September – December of 2012 and 2013 are reflected in the table below, which is based upon Lossia Ex. M, DPA 486-531):

| Month | Number of Donations | Dollar Value of Donations |
|---|---|---|
| September 2012 | 24 | $1,465.90 |
| October 2012 | 40 | $3,026.49 |
| November 2012 | 18 | $1,694.90 |
| December 2012 | 40 | $5,084.89 |
| September 2013 | 38 | $3,088.79 |
| October 2013 | 67 | $6,151.00 |
| November 2013 | 88 | $7,495.97 |
| December 2013 | 33 | $2,948.33 |

    **DPA's Response:** Contested. Not accurate and misleading. Based on July 2013 total donations of over $11,000 for that month, November and December 2013 were only $10,641 combined, implying a loss of approximately $11,000 for the November and December 2013 period. (Caplinger Decl., ¶ 45); (*See also*, Granath Decl., Exhibits 29 and 30, DPA 486-531)

**Defendant's Contention No. 76:** Online donations came in to DPA on and after November 15, 2013. (Lossia Decl., Ex. M at DPA 527-531).

    **DPA's Response:** Contested in part as misleading. (*See* Caplinger Decl., ¶¶ 61, 66).

**Defendant's Contention No. 77:** DPA asserts that it lost an unquantified amount of money from loss of good will due to loss of status as bargaining unit representative. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

**DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter. (*See also*, Caplinger Decl., ¶ 63).

**Defendant's Contention No. 78:** Not a single email, text message or web posting from a member or former member was produced to show that anyone lost confidence in DPA or switched their support from DPA to ALPA because of the alleged CFAA violation.
  **DPA's Response:** Contested. Not accurate. (*See* Caplinger Decl., ¶ 61).

**Defendant's Contention No. 79:** DPA asked its members for donations to help cover the cost of the instant litigation in emails dated February 20, 2014, February 28, 2014, May 1, 2014, May 31, 2014, June 10, 2014, July 3, 2014, July 17, 2014, August 5, 2014, August 15, 2014, August 19, 2014, and October 18, 2014. (Lossia Decl., Ex. H, at Def. 00028-54).
  **DPA's Response:** Contested on the objection that Defendant fails to cite to admissible evidence to support this contention as required by Rule 56(c)(2). In addition, even if established this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 80:** On August 19, 2014, DPA sent an email to its members that stated in part: "We would like to thank our members for the outpouring of financial support we are receiving related to the pursuit of those responsible for hacking the DPA website. Friday, August 15th, we set an all time record for single day donations of over $6,000!" (Lossia Decl., Ex. H, at Def. 00044).
  **DPA's Response:** Contested on the objection that Defendant fails to cite to admissible evidence to support this contention as required by Rule 56(c)(2). In addition, even if established this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 81:** Delta airlines employs nearly 13,700 commercial pilots. (Docket Entry # 85, SAC ¶ 10)
  **DPA's Response:** Uncontested.

**Defendant's Contention No. 82:** As of Thursday, November 14, 2013, DPA had 5,678 total members, among which 220 needed to renew their authorization cards. (Lossia Decl., Ex. H, at Def. 00009).
  **DPA's Response:** Contested on the objection that Defendant fails to cite to admissible evidence to support this contention as required by Rule 56(c)(2). In addition, even if established this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 83:** DPA produced records of its attorneys' fees from December 23, 2013 through May 11, 2018, totaling $149,955 "for any purpose including damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit O to the Lossia Decl., which attaches DPA's records of attorneys' fees and litigation costs, at DPA 532-594).
  **DPA's Response:** Uncontested. (*See also*, Granath Decl., at Exhibits 31, 32 and 33 containing Plaintiff's attorney fees and costs heretofore disclosed to Defendant and labeled DPA 532 through DPA 594; *see also*, Granath Decl., Exhibit 35).

**Defendant's Contention No. 84:** DPA has not disclosed a computation of the amount of attorneys' fees that DPA alleges were incurred specifically for "damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

    **DPA's Response:** <u>Contested</u>.  Misleading. (*See* Granath Decl., Exhibit 35, p. 2, item 4(b); *see also*, Granath Decl., at Exhibits 31, 32 and 33 containing Plaintiff's attorney fees and costs heretofore disclosed to Defendant and labeled DPA 532 through DPA 594).

**Defendant's Contention No. 85:** DPA's attorneys incurred $4,541.21 in litigation costs from December 23, 2013 through the present, excluding expert witness costs. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit O to the Lossia Decl., at DPA 591-594).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 86:** DPA has not disclosed any computation of the amount of its litigation costs that were allegedly incurred specifically for "damage assessment." (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 87:** DPA produced records of its "expert witness costs" totaling $10,850 billed to DPA's attorneys by Carney Forensics as of May 11, 2018. (*See* Exhibit K to Lossia Decl., DPA Rule 26(a)(1)(A)(iii) disclosure at p. 2; *see also* Exhibit P to the Lossia Decl., at DPA 485).

    **DPA's Response:** Uncontested but this does not entitle Defendant to judgment as a matter.

**Defendant's Contention No. 88:** DPA has produced no contract, retainer agreement or service agreement between Carney Forensics and DPA or its counsel; has produced no invoices from Carney Forensics related to its work; and has produced no evidence of actual payments by DPA or its counsel to Carney Forensics.

    **DPA's Response:** <u>Contested</u>.  Not accurate.  (*See*, Granath Decl., Exhibit 33, at DPA 592 and Granath Exhibit 28).

**Defendant's Contention No. 89:** DPA's record of payments to "expert witness" Carney Forensics indicates that the earliest date of work performed was May 31, 2014. (Exhibit P to the Lossia Decl., at DPA 485).

    **DPA's Response:** Not contested (but noting that Defendant's statement misreads DPA 485, which indicates May 31, 2014 is the earliest billing date) in addition, the contention is not material therefore Defendant is not entitle to judgment as a matter of law in reliance thereon.

**Defendant's Contention No. 90:** DPA produced no documents that show "an ongoing means to re-access and to potentially disable, disrupt, or interfere with the integrity of DPA's web site at any time." (Docket Entry # 85, SAC ¶ 70).

    **DPA's Response:** <u>Contested</u>. Not accurate or misleading. (*See* , Caplinger Decl. ¶ 48, 49, 58, 60, 62  and 64).

## Part B: DPA's Additional Contentions Of Material Fact

**DPA Contention No. 91:** DPA is an association recognized by the IRS as a 501(c)(5) labor organization, which is incorporated in the State of Florida. (*See*, Caplinger Decl., ¶ 5).

**DPA Contention No. 92:** DPA seeks to organize and exclusively represent the craft and class of pilots at Delta Airlines, Inc. ("Delta"). (*See*, Caplinger Decl., ¶ 6).

**DPA Contention No. 93:** DPA maintains a home office in Tampa, Florida. (*See*, Caplinger Decl., ¶ 7).

**DPA Contention No. 94:** In May of 2010, the DPA was founded out of dissatisfaction with ALPA's representation of Delta pilots and with the specific goal of replacing ALPA as the union representing Delta pilots. (*See*, Caplinger Decl., ¶ 8).

**DPA Contention No. 95:** Tim Caplinger, who is a resident of Florida and a pilot employed by Delta, is the founder of DPA, a member of its Board of Directors, and its Interim President. (*See*, Caplinger Decl., ¶ 9).

**DPA Contention No. 96:** In 2010, the DPA began a campaign to collect authorization cards ("cards") signed by individual Delta pilots in order to demonstrate that a majority of them desire to be represented by DPA.  (*See*, Caplinger Decl., ¶ 10).

**DPA Contention No. 97:** This campaign was for the purpose of securing and winning a representational election conducted by the National Mediation Board ("NMB"), pursuant to the RLA, and ultimately to have DPA certified by the NMB as the new and exclusive representative of Delta pilots. (*See*, Caplinger Decl., ¶ 11).

**DPA Contention No. 98:** By early November 2013, the DPA had collected cards from more than 50% of all Delta pilots but had not yet filed an application for a representational dispute with the NMB. (*See*, Caplinger Decl., ¶ 12).

**DPA Contention No. 99:** DPA's primary means of conducting its business, including communicating with Delta pilots, raising donations, and campaigning, is through its web site. (*See*, Caplinger Decl., ¶ 13).

**DPA Contention No. 100:** DPA's web site can be located, or "surfed" to on the Internet, or "web," at the uniform resource locator ("URL"), or web address of, http://delta-pilots.org. (*See*, Caplinger Decl., ¶ 14).

**DPA Contention No. 101:** DPA's web site contains publicly accessible web "pages" as well as private pages requiring a login and password. (*See*, Caplinger Decl., ¶ 15).

**DPA Contention No. 102:** On the public portion of its website, DPA displays a running count of the number of cards signed by Delta pilots in DPA's campaign to replace ALPA. (*See*, Caplinger Decl., ¶ 16).

**DPA Contention No. 103:** SquareSpace, Inc. is a New York company that "hosts" DPA's web site. (*See*, Caplinger Decl., ¶ 17).

**DPA Contention No. 104:** Through SquareSpace DPA also links to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintains a web master account. (*See*, Caplinger Decl., ¶ 18).

**DPA Contention No. 105:** Critical files, code, and programs that constitute DPA's web site are maintained on computers located in the state of New York. (*See*, Caplinger Decl., ¶ 19).

**DPA Contention No. 106:** Tim Caplinger was authorized to and had personal access to DPA's SquareSpace account on behalf of DPA at all relevant times. (*See*, Caplinger Decl., ¶ 20).

**DPA Contention No. 107:** Richard Eagan, also a pilot employed by Delta, was DPA's Web Master at all relevant times.  Eagan was authorized by Caplinger to access DPA's SquareSpace account on behalf of DPA at all relevant times. (*See*, Caplinger Decl., ¶ 21).

**DPA Contention No. 108:** Melvin joined DPA on or about January 5, 2011, giving an address of 7050 Corsica Drive, Germantown, Tennessee, 38138. (*See*, Caplinger Decl., ¶ 22).

**DPA Contention No. 109:** At no time was Melvin ever authorized for administrative access to DPA's web site, computer files, or computers used by DPA for its web site. (*See*, Caplinger Decl., ¶ 23).

**DPA Contention No. 110:** Sometime after, Melvin withdrew from DPA in 2012. (*See*, Caplinger Decl., ¶ 24).

**DPA Contention No. 111:** Starting on or about November 8, 2013, and continuing thereafter, the integrity of DPA's web site was dramatically and visibly disrupted when Melvin "hacked" into it by unauthorized use of the DPA administrative login and password and thereafter causing damage and loss by the transmission of code or commands to cause the web site to cease functioning and to instead serve Melvin's unauthorized use. (*See*, Caplinger Decl., ¶ 25); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 112:** On November 8, 2013, at approximately 7:18 p.m. EST, Melvin transmitted commands or code to the "master files" of Squarespace computer and files hosting DPA's web site and opened a trial account called "tim-caplinger.squarespace.com" for the purpose of creating a hoax or fake website on that trial account in order to redirect the DPA website to the trial account website using DPA domain administrative credentials. (*See*, Caplinger Decl., ¶ 26); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 113:** To accomplish this unauthorized act Melvin impersonated "Tim-Caplinger" and used an email address of amp.chumbawamba@ausi.com as Squarespace computer records show. (*See*, Caplinger Decl., ¶ 27); (*See also*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8).

**DPA Contention No. 114:** At approximately 7:18 p.m. EST using the DPA domain administrative credentials, Melvin transmitted commands or code to cause the domain name of "Tim-Caplinger.squarespace.com" to display on domain – "deltapilot.org" which delta-pilots.org and other associated DPA domains were redirected to without DPA authorization. (*See*, Caplinger Decl., ¶ 28); (*See also*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8).

**DPA Contention No. 115:** The site "deltapilot.org." was then owned by DPA but not being used by it. (*See*, Caplinger Decl., ¶ 29).  In addition, the "deltapilot.org" domain was initiated in 2012 by an unauthorized user "hobbsmsb@aol.com" within the DPA Administrative account and unauthorized password access to "deltapilot.org" within the DPA Administrative account was provided to "mark_mcclain@cox.net" and "daharte@bellsouth.net".

**DPA Contention No. 116:** Melvin transmitted commands or code to the Squarespace computer and other domain files hosting DPA's web site that caused the "deltapilot.org" site to 'point to' files existing in the tim-caplinger.squarespace.com trial account.  The "deltapilot.org" site owner was concealed by "ContactPrivacy.com" – a domain privacy service which was located in Canada and which had been previously established by unknown parties who, on information and belief, conspired with Melvin. (*See*, Caplinger Decl., ¶ 30); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 117:** As a direct and immediate consequence of this attack, DPA's web site ceased to function as intended and web pages containing data and information in the public portion of the web site were made inaccessible. (*See*, Caplinger Decl., ¶ 31); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 118:** Further, the ability of DPA's web site to accept monetary donations from member and/or supporters ceased to function properly when software links to a secure third-party credit card web site were severed. (*See*, Caplinger Decl., ¶ 32).

**DPA Contention No. 119:** Further, the ability of the web site to display video messages and important updates was severely disrupted. (*See*, Caplinger Decl., ¶ 33).

**DPA Contention No. 120:** Further, the private portion of the web site became inaccessible. (*See*, Caplinger Decl., ¶ 34).

**DPA Contention No. 121:** Further, visitors to DPA's web site were involuntarily redirected away from it to sites not of DPA's making, nor owned, nor controlled by DPA. (*See*, Caplinger Decl., ¶ 35); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 122:** In the early stages of the attack, viewers attempting to access DPA's web site were involuntarily redirected to a web page that falsely claimed DPA had abandoned its card collection campaign and now urged support for ALPA ("Work Together"). This false page also contained a link to an ALPA web site. (*See*, Caplinger Decl., ¶ 36); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32, 37-38; Ex. 2 at DPA 901-108, 134-168); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 123:** In the later stages of the attack, viewers were redirected back to "deltapilot.org," which was apparently configured to mimic DPA's web site, potentially a malicious "clone" of it. (*See*, Caplinger Decl., ¶ 37); (*See* Granath Decl., Ex. 1 at DPA 22, 24, 26, 28, 30, 32; Ex. 2 at DPA 901-108, 134-168; Ex. 15 at DPA 245); (*See*, Eagan Decl., ¶¶ 5, 8).

**DPA Contention No. 124:** The false web page and the clone site were calculated or intended to dissuade any further Delta pilots from signing cards in DPA's campaign or to otherwise abandon DPA, or its campaign, by knowingly and intentionally making false statements of material fact about DPA and its campaign. (*See*, Caplinger Decl., ¶ 38); (*See* Granath Decl. Ex. 15, at DPA 245).

**DPA Contention No. 125:** This attack thereby disrupted DPA's web site and effectively "hijacked" it to another site, one intended to appear as part of DPA's web site in order to deceive viewers of it and to inhibit or cut-off donations to DPA. (*See*, Caplinger Decl., ¶ 39).

**DPA Contention No. 126:** This attack further severed software links to other computers used in interstate commerce relied upon by DPA's web site both for receiving monetary donations and for displaying videos. (*See*, Caplinger Decl., ¶ 40).

**DPA Contention No. 127:** Some severed links were not discovered or repaired until January 2014. (*See*, Caplinger Decl., ¶ 41).

**DPA Contention No. 128:** In attempting to assess damage and to restore the integrity of DPA's web site and restore availability of data and severed linked programs, Caplinger initially expended approximately 40 man-hours and Eagan 32 hours between discovering the damage and about December 3, 2013. (*See*, Caplinger Decl., ¶ 42); (*see* Eagan Decl., ¶ 7)

**DPA Contention No. 129:** At the time, as pilots, Caplinger earned about $150 an hour and Eagan $203. (*See*, Caplinger Decl., ¶ 43); (*see* Eagan Decl., ¶ 5).

**DPA Contention No. 130:** DPA sustained loss through donations not received during that portion of time the DPA web site's contribution page and other links to that page were rendered inoperable. (*See*, Caplinger Decl., ¶ 44).

**DPA Contention No. 131:** As a direct consequence of the severed links to the donation pages, approximately $11,000 donations to DPA were lost during November and December 2013, when the site was being repaired. (*See*, Caplinger Decl., ¶ 45).

**DPA Contention No. 132:** DPA further suffered loss by incurring costs and expenditures to identify and pursue the offender(s) in order to ensure the future security and integrity of the DPA web site. (*See*, Caplinger Decl., ¶ 46).

**DPA Contention No. 133:** DPA also suffered the consequence of lost good will when the hacking and redirection to web sites falsely claiming plaintiff had ceased its organizing campaign interfered with, or frustrated, DPA members and supporting pilots' lawful exercise of rights under the RLA to choose their own representative, which DPA sought and seeks to facilitate. (*See*, Caplinger Decl., ¶ 47).

**DPA Contention No. 134:** Despite plaintiff's efforts to mitigate damage to its web site and to restore control over it, defendant succeeded in inserting commands or code into accounts on computers relied upon by plaintiff that are necessary to the proper and safe function of DPA's web site. (*See*, Caplinger Decl., ¶ 48).

**DPA Contention No. 135:** To date, DPA may not have been successful in removing all of the malicious commands or code and consequently DPA's web site remains potentially vulnerable to renewed "backdoor" attacks by defendant presently and in the future. (*See*, Caplinger Decl., ¶ 49).

**DPA Contention No. 136:** On November 9, 2013, DPA published in its publicly accessible Facebook and Twitter accounts a message stating, "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice …" (*See*, Caplinger Decl., ¶ 50).

**DPA Contention No. 137:** On or about November 13, 2013, Melvin sent an email to ALPA using the email address of "rcmelvin@mac.com" that attached a digital, unsigned letter. (*See*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8); (*See also*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4).

**DPA Contention No. 138:** Melvin's letter to ALPA disclosed that in the time frame of the hacking he owned a trial account at Squarespace and had shut it down. (*See*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8); (*See also*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4).

**DPA Contention No. 139:** Melvin's letter to ALPA also contained details about the disruption to DPA's web site that were not then publicly known. (*See*, Granath Decl., Exhibit 1 at DPA 47-51; Exhibit 15 at DPA 243-244 and 248-252; and Exhibit 36 at p. 7-8); (*See also*, Doc. 15-3 at ¶¶ 3, 4, 5; Doc. 13-4).

**DPA Contention No. 140:** On November 14, 2013, DPA published in its email newsletter entitled "DPA Status Report" an article that stated in part, "Hacking Update … our investigation has led us to a point we did not want to arrive at, filing a lawsuit …" (*See*, Caplinger Decl., ¶ 51).

**DPA Contention No. 141:** The very next day, November 15, 2013, Tim Caplinger received three phone calls at his residence from a male person who refused to identify himself but who claimed he was responsible for interfering with DPA's web site. (*See*, Caplinger Decl., ¶ 52).

**DPA Contention No. 142:** The caller was Melvin, as was later determined on August 14, 2014, after the Court granted DPA's then motion to compel compliance with a subpoena *duces tecum* served on ALPA (consequently disclosing Melvin as the author of the letter sent to ALPA by email on November 13, 2013). (*See*, Granath Decl., Exhibit 36 at p. 7-8).

**DPA Contention No. 143:** The originating phone number used to call Caplinger on November 15 was 901 871-7877. (*See*, Granath Decl., Exhibit 1 at DPA 53).

**DPA Contention No. 144:** The 901 871-7877 phone number was then billed by AT&T to an account at Melvin's property of 7050 Corsica Drive, Germantown, Tennessee, 38138. (*See*, Granath Decl., Exhibit 1 at DPA 55).

**DPA Contention No. 145:** In addition, Melvin's correspondence to ALPA admitted he called Caplinger. (*See*, Granath Decl., Exhibit 15, DPA 250 – "I contacted Tim Caplinger and discussed the matter …" ).

**DPA Contention No. 146:** In this call to Caplinger, Melvin attempted unsuccessfully to negotiate with Caplinger to avoid being "pursued." (*See*, Caplinger Decl., ¶ 53).

**DPA Contention No. 147:** After the call on November 15, 2013, Caplinger knew that there was a hacker, that he refused to identify himself, that the website was still dysfunctional but for reasons not then known, and he concluded that the website either remained under ongoing attack or was vulnerable to a new attack until the identity of the hacker/caller could be learned (*See*, Caplinger Decl., ¶ 73).

**DPA Contention No. 148:** Later that same day Caplinger made a criminal complaint based on the hacking of DPA's web site. (*See*, Caplinger Decl., ¶ 54).

**DPA Contention No. 149:** Caplinger also determined that the caller either continued to attack DPA's website or would in the future until their identity was exposed and for these reasons, in part, made a criminal complaint and then engaged the law firm of Seham, Seham, Meltz & Petersen LLP to resort to the courts to find and enjoin the hacker/caller(s) to end the ongoing threat to DPA. (*See*, Caplinger Decl., ¶ 64).

**DPA Contention No. 150:** At no time did Matthew Hobbs have authorized access to the DPA administrative account. (*See*, Caplinger Decl., ¶ 65).

**DPA Contention No. 151:** At no time did Mark McClain have authorized access to the DPA administrative account. (*See*, Caplinger Decl., ¶ 65).

**DPA Contention No. 152:** At no time did Don Harte have authorized access to the DPA administrative account. (*See*, Caplinger Decl., ¶ 65).

Dated: June 15, 2018                    Respectfully submitted,

Nicholas Granath, Esq. (*pro hac vice*)
ngranath@ssmplaw.com
Lee Seham, Esq. (*pro hac vice*)
lseham@ssmplaw.com
Lucas Middlebrook, Esq. (*pro hac vice*)
lmiddlerook@ssmplaw.com

**SEHAM, SEHAM, MELTZ & PETERSEN, LLP**
199 Main Street, Seventh Floor
White Plains, NY 10601
Tel.: 914 997-1346
Fax: 914 997-7125

*Attorneys For Plaintiff, the Delta Pilots Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 15, 2018, I electronically filed the following documents and their attachments, if any:

Plaintiff's Local Rule 56.1 Statement Of Material Facts Opposing Motion For Summary Judgment

I further hereby certify that the above listed documents were filed with the Clerk of this Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Dana Lossia, Esq.
dlossia@levyratner.com
LEVY RATNER, P.C.
80 Eighth Avenue Floor 8
New York, New York 10011
Tel. 212 627-8100; Fax. 212 627-8122

On this day of June 15, 2018

Nicholas Paul Granath, Esq.