# Exhibit 21

To Declaration Of Nicholas Paul Granath
In Support Of
"Plaintiff's Memorandum Of Law Opposing Defendant's Motion For Summary Judgment."



AIR LINE PILOTS ASSOCIATION INTERNATIONAL
alpa

THE WORLD'S LARGEST PILOTS UNION • WWW.ALPA.ORG

535 Herndon Parkway • PO Box 1169 • Herndon, VA 20172-1169 • 703-689-2270 • 888-FLY-ALPA

June 11, 2014

**VIA ELECTRONIC AND FIRST-CLASS MAIL**

Stanley Silverstone, Esq.
Seham, Seham, Meltz & Petersen, LLP
445 Hamilton Ave.
White Plains, NY 10601

**Re: Subpoenas Duces Tecum Issued to Air Line Pilots Association, Int'l and the Delta MEC in Litigation of Delta Pilots Association v. John Doe (No. 1:14-cv-00225-AKH) (S.D.N.Y.)**

Dear Mr. Silverstone:

On behalf of the Air Line Pilots Association, International ("ALPA") (which includes the Delta Master Executive Council), and pursuant to Federal Rule of Civil Procedure 45, I write in response to the above-referenced subpoenas duces tecum.

ALPA objects to the subpoenas to the extent that they seek disclosure of material protected by the attorney-client privilege, attorney work-product privilege, and any other applicable privileges.

ALPA also objects that the subpoenas fail to allow sufficient time for ALPA to respond. DPA has known since November 2013 of ALPA's investigation and of ALPA's belief that network traffic "was briefly mixed with a private individual's account maintained with the same hosting provider as the DPA, in this case Squarespace." *See* Subpoenas Attachment B at 2. Moreover, immediately following the alleged "hacking" in November 2013, DPA publicly accused ALPA of being responsible, while simultaneously seeking to use the allegation of "hacking" for its own political purposes. *See* Attachment 1. DPA then waited seven months to subpoena *any* documents from ALPA, yet it now expects ALPA to search in less than one-half month for responsive electronic records from many representatives, attorneys, and employees. In this circumstance, and given the command that a "party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid undue burden or expense on a person subject to the subpoena" (Fed. R. Civ. P. 45(d)(1)), two weeks is insufficient. In separate correspondence with you of June 3, 2014, ALPA requested an extension to June 27,

2014, but DPA denied that request and only offered to allow ALPA until June 17 (the second due date in the subpoena to the Delta MEC) to respond. Accordingly, despite ALPA's efforts and due diligence, ALPA cannot be certain that it is at this time providing all responsive non-privileged documents or listing all such documents on a privilege log.

ALPA further objects to producing all documents that identify the same "individual" (Request No. 2) and the same "third party" (Request No. 3). The production of all such material (or the listing on a privilege log of all privileged and responsive documents) identifying the *same* individual or the *same* third party is unnecessary and unduly burdensome in light of the Court's order permitting DPA to "serve immediate discovery upon third-parties in order to identify defendant John Doe" and, further, does not comply with the command in Rule 45 to "avoid imposing undue burden or expense on a person subject to the subpoena." If a responsive document identifies a different individual or third party, this objection does not apply.

Subject to and without waiver of these objections, ALPA responds to the subpoenas as follows.

**Document Request No. 1.** In this Request, DPA seeks production of documents that "contain, describe, or reference any 'facts' learned or 'information generated' in any 'investigation' by ALPA or the Delta MEC" as stated in the November 21, 2013 True Headings. On June 3, 2013, I spoke and wrote to you and explained that this Request appeared to exceed the license granted by the Court to DPA to conduct "immediate discovery upon third-parties in order to identify defendant John Doe." Your response to that email made clear that Request No. 1 is confined to documents that would identify John Doe. If you did not intend to limit the request to documents needed "in order to identify defendant John Doe[,]" then ALPA objects to the Request because it exceeds the authority granted by the Court.

ALPA's investigation did not show that any "hacking" of the DPA's website occurred and likewise did not reveal the identity of any such supposed "hacker." *See* DPA Subpoenas Attachments B and C. Accordingly, ALPA's investigation produced no documents that would identify John Doe.

**Document Request No. 2.** Attached hereto as Attachment 2 is a statement that was attached to an email of November 19, 2013, from a Delta pilot to ALPA attorney (and Assistant Director of the Representation Department) Arthur Luby. The email itself is subject to the attorney-client privilege and concerns the attached statement, DPA's allegations that someone hacked its website, and two other attached documents that are not responsive to this Request. ALPA has found no documents reflecting the identities of any other individual referenced in the November 21, 2013 True Headings. If ALPA finds any documents that identify any other individual referenced in that True Headings, it will produce them or list them on a privilege log, as appropriate.

As you can tell from the statement, the individual Delta pilot is not "John Doe" referred to in DPA's Complaint. ALPA objects to publicly identifying this individual because, as a Delta pilot within the bargaining unit, he is entitled to be protected against the risk that DPA will make untruthful public assertions about him. DPA has engaged in such conduct in the past. *See* Attachments 1, 3. However, if DPA is willing to agree to maintain the confidentiality of this individual's identity and to enter into an appropriate protective order, for the Court's approval, guaranteeing that confidentiality, ALPA will provide the name of the individual.

**Response to Request No. 3.** DPA's Subpoenas Attachment B identifies the "'third party' referenced in the" May 21, 2014 True Headings. *See* Subpoenas Attachment B (identifying "DPA's hosting provider [as] 'Squarespace.'"). ALPA has found no documents reflecting the identities of any other third parties as referenced in the May 21, 2014 True Headings.

Thank you for your attention to this matter.

Sincerely,

James K. Lobsenz
Senior Attorney, Legal Department

Attachments

REDACTED

**From:** Delta Pilots Association <dpa@delta pilots org>
**Date:** November 9 2013 2:00:20 PM EST
**To:** REDACTED
**Subject: DPA ALERT! ALPA Hacks DPA!**
**Reply To:** dpa@delta pilots org

QUICK LINKS

authorization card

register online

donate

facebook

twitter

text updates

email us

home page

DPA CHECKLIST

1. Always carry the Authorization Card.

2. Recommend the online registration.

3. To renew, simply mail in a new card.

REDACTED

**ALERT! ALPA has hacked part of the DPA website.**

When users search for Delta Pilots Association and try to go to the link provided, you are redirected to an ALPA produced page that indicates DPA has quit our campaign (not true, of course). The content of our site has not been hacked, only where the address takes you.

DPA recommends that you do not attempt to visit the DPA site until we let you know it is restored. ALPA has cloned the site and is operating what appears to be the DPA site at deltapilot.org. This site could be harmful!

DPA will work hard to restore our site, but do we really need it? DPA is not just a website, it is 5675 Delta Pilots! ALPA cannot "hack" your mind nor "hijack" your determination. Help them see that they have made a grave error in judgment. The ALPA "Special Committee" is clearly responsible for this so reward them appropriately.

Perhaps now is the time to consider removing yourself from ALPA dues check-off. Contact DAL

4. Mail new cards and renewals to:

DPA
P.O. Box 17025
Tampa, FL 33682

Pilot Payroll to revoke automatic dues withdrawal.

In contrast to ALPA's pressure tactics in layover hotels and dirty maneuvers like hacking our website, the DPA *GO TEAM* just had a fantastic first event in MSP! Watch the one minute video recap hosted on our YouTube site to see how effective the *GO TEAM* is! DAL Flight Operations vetted our actions throughout the day and we have their full approval.

Click image above to watch.

With our website down, word-of-mouth, and therefore the *GO TEAM*, just got more important. Let ALPA's actions motivate you to join the *GO TEAM* and let's swamp the bases with Delta Pilots who will no longer tolerate ALPA.

**CLICK HERE** to join the *GO TEAM.*

Carry **AUTHORIZATION CARDS** with you right now and have a fellow Delta Pilot join us or renew their Card right now.

If you would like to donate to DPA, **please do not donate via the web** until we straighten this out.

Mail checks to:

DPA
P.O. Box 17025
Tampa, FL 33682

We are resolved to complete our campaign with dignity, respect and hard work. Please do not attack ALPA Reps over this incident. Most are good individuals with good intents. ALPA National and a few individuals here at Delta are responsible. Give them what they are asking for, your undivided attention in this representation

battle.

STAY THE COURSE!

---

Thank you for your support!
Tell another Delta Pilot about our drive for exclusive representation today!

SafeUnsubscribe

Trusted Email from Constant Contact
Try it FREE today

This email was sent to REDACTED by dpa@delta-pilots.org
Update Profile/Email Address Instant removal with SafeUnsubscribe™ Privacy Policy.

Delta Pilots Association P.O. Box 17025 Tampa FL 33682-7025

Colleagues,

I am writing to address the issue of DPA's most recent claim that their website was in some way redirected.

I have two website accounts. One is personal. One is for a business with which I am affiliated. Until recently, I had a third personal website account.

This third website account was in Trial Mode while I was choosing templates related to the subject matter and evaluating the product's ability to accept imported data from a similar product. The product has millions of account holders PRECISELY because of its ease of point-and-click use by non-savvy website builders. On this third website's platform, accounts must be purchased to go live and to be published. Because this third account had not been paid for, it *was* in Trial Mode and I had taken *no* action to publish it. This third web site account contained my private writings and thoughts of a personal nature—none of which were intended to be seen by anyone other than my family and myself using a password protected web page. Based on the product's explicit assurance, I had every reason to believe ALL user-generated content was private, invisible to anyone but the account owner and, in fact, digitally sealed off from the world while in trial mode. See the screen capture below:

Squarespace Trial

Squarespace trial accounts are not visible to the public. When you are ready to publish your website, upgrading your trial will make your site active to the world.

While at home preparing for vacation, I learned the DPA website was alleged to have been "hacked." Subsequent to learning this, and in the normal course of my vacation time, I learned from a fellow pilot that *my* personal, unpublished website was mapping to a domain name owned and controlled by DPA. My private writings and thoughts of a personal nature were briefly accessible to those visiting a DPA owned domain

name, and who chose to enter a password on the web page presented to them. Once public, my data was subject to manipulation. I did not provide a password to *anyone*, including my family. My private thoughts were supposed to be completely sealed off from the world while in trial mode—and they weren't. My account was supposed to be secure and accessible only by me--but it wasn't. It is therefore unclear to me whether or not information in my account was added, changed, deleted, or downloaded by someone else. I don't know what other private data is in the public domain, and how or if it will be used. The lies—there's no other way to put it—lies being told by Tim Caplinger and the DPA are so far out of bounds it's difficult to put them in context as a person with a rational perspective. Caplinger is lying, and he KNOWS he is lying, because I told him the truth in good faith. These lies are intentionally inflicting tremendous emotional distress on my wife and me and, in my opinion, he's doing it to achieve a political objective.

Upon learning of the issue, I took immediate steps to protect the interests of all parties. I prevented further unauthorized access to my account or further publication of my private information by immediately shutting down the account. I did so within moments after I received the phone call. I reasoned that doing so would also stop visitors seeking DPA's website from finding mine. This was accomplished by early afternoon on Saturday, November 9. From what I can gather this mapping issue lasted for approximately 18 hours. It is now my understanding the domain name owner could have immediately altered the DPA domain name settings in order to stop the errant mapping. Why they chose not to take that action is a question that has not been answered to my satisfaction.

I opened the trial web-based personal journal account using a personally owned and properly registered laptop computer. The decision to open the account was mine, and mine alone. I neither solicited nor was offered any assistance or encouragement from any person or organization in opening in the account. There is a witness available to corroborate the facts surrounding the opening of this account. At no time did I rely on any person or organization for the creation, operation, or deletion of the account. During account creation, I logged on to the internet using my own properly registered subscription-based mobile WiFi service. The trial account contact email

provided was a personal address in routine use for over seven years. It would have been very easy to determine who opened the trial account, and that of course is inconsistent with the M.O. of a trained hacker or someone with malevolent intent. Others would describe my computer skill as "slightly above average" and "competent with package-based software like Microsoft Office." I have no knowledge of how to "hack" or how to unlawfully redirect a domain name. I use an Apple computer and have never had or been concerned about computer viruses. To be unequivocally clear, ALPA was not involved in any manner in the setting up or operation of my account, nor was it aware of any aspect of this incident until I transmitted this statement to their counsel.

At no time did I attempt to access DPA's domain name management account or their web site account, nor did I make any effort to knowingly interfere with their ability to run their website. I do not have nor have I ever possessed any knowledge of any computer credentials which would give me the ability to access accounts other than my own or those belonging to my family. When DPA was in its infancy, I was asked to submit an authorization card and I did so. Shortly thereafter I officially revoked the card using the NLRB proscribed format. For a short time I had DPA membership credentials to access the DPA website as an authorized end-user—but never as an administrator of any sort. When I revoked my membership, the DPA newsletter stopped arriving in my email inbox, I discarded those credentials, and I have no idea what they were. My last access or attempt to access the DPA website as an authorized end-user—and therefore in any capacity—was several years ago

In an effort to resolve this issue and make sure all facts were on the table for everyone, I contacted Tim Caplinger personally and discussed the matter. I made this contact even before I contacted ALPA to make it aware of this mapping issue. I had hoped that our discussion would lead to a man to man resolution of this issue. It did not. Instead, he threatened me with civil and criminal charges and attempted to say I was "confessing" something to him when, in fact, all I was doing was informing him of what I knew and expressing my regret that the mapping problem interfered with the operation of his website. He instructed me to write a confession letter with all technical details, to

post it online, and to mail him a certified copy. I told him that was not going to happen, because I didn't have anything to "confess" to, and I told him that meeting this demand would be akin to "professional suicide." During brief conversations on that Friday morning, I was so confident that I had not made any attempt to access the resources required to redirect a DPA domain name, I offered to cover any expenses incurred by him or his organization should I be found negligent in any way. I did NOT offer to "bribe" him in order to stop pursuing answers. In fact, I ended the conversation by giving him my solemn promise that we would be able to work together to ensure a full, complete, and amicable resolution to this issue. I told him I'd speak to my attorney and get back to him. I asked for patience as we worked through the issue.

So we are clear, I do not claim that either Caplinger or anyone associated with DPA intentionally compromised my website. By the same token, I never had access to the DPA domain name or website accounts and therefore could not have unilaterally redirected traffic from their website to my account, or otherwise interfered with operation of their website. Obviously I would have nothing to gain by mapping my personal website to DPA's domain name and compromising the privacy of my own data. Moreover, I would not know how to accomplish the result even if I wanted to, and further, I don't believe it can even be accomplished without administrative access to the DPA domain names and website. Finally, if I was interested in interfering with the DPA website, why would I shut down my site as soon as I became aware of the mapping problem? .

I regret this whole incident, but I particularly regret that for reasons that were not my fault, strangers may well have viewed my private thoughts. My recent journaling includes my personal thoughts on the unexpected death of both parents, concerns about my special needs child, and the stresses of working two jobs to provide for my family. ALPA, of course, had nothing whatsoever to do with any of this and I find it absurd that this problem has been converted into a political issue.

All data at my disposal suggests this was purely a technical issue—most likely an unforeseen confluence of otherwise innocuous technical

factors--between two sites hosted on the same software platform.  It was resolved immediately upon discovery.  I don't believe there is any fault to assign, however, the method by which my account was accessed without my knowledge or consent remains a mystery.  To my understanding, neither party had the required access to unilaterally redirect a domain name to my private journal.  I can say with confidence that I took NO action to damage the DPA domain name or website.  I want to consider the matter closed and I am thankful that my confidentiality has so far been respected.

Respectfully submitted,

Delta Pilots
Association
... Delta Pilots taking back control of their representation

© 2013 • Delta Pilots Association • P.O. Box 17025 • Tampa, FL 33682-7025

dpa@delta-pilots.org

CLICK ON CHART to see more statistics

PROGRESS CHART

6500

| | |
|---|---|
| 6000 | |
| 5000 | |
| 4000 | GOAL |
| 3000 | MEMBERS |
| 2000 | |
| 1000 | 5400 Minimum to file |
| 0 | |

5800

YES DPA

CLICK IMAGE

Twitter

@DeltaPilots The DPA GO TEAM rocked ATL and DTW yesterday! Great job to all who participated! Sign up for the GO TEAM! about 6

ATTACHMENT 3

DPA 298

months ago

Older

Follow @DeltaPilots

Search

DPA Links

- DPA Text Messages
- Membership Registration
- DPA Authorization Card
- DPA Introduction
- DPA Mission
- About Becoming a Member

Other DPA Links

- DPA Constitution
- Email Us

DPA CHANNEL










Monday Oct212013

October 21, 2013

Delta ALPA MEC Recalls Chairman - Line Pilots Question Why?

On October 17th and 18th, 2013, a Special MEC Meeting was convened to consider a recall of the following four MEC officers:

MEC Chairman: Captain Kingsley Roberts

MEC Vice Chairman: Captain Jim Van Sickle

MEC Secretary: First Officer Kevin Guilfoyle

MEC Treasurer: First Officer Bren Fries

The recall was precipitated by the sudden firing on October 7th, 2013 of the follow four positions appointed by the MEC Chairman:

Executive Administrator: Captain Rick Dominguez

Special Project Chairman: Captain Mike Pinho

Strategic Planning Chairman: Captain Mike Hanson

International Affairs Committee Chairman: First Officer Norman Abare

The meeting was attended by most DALPA representatives and staff and a few line pilots. The following notes were taken by a line pilot present on both days. The notes are by no means comprehensive and may contain errors in interpretation or identification of speakers. Every effort was made to accurately portray the events of the meeting as they happened, but some repetitive content was not included for the sake of brevity. Many of the facts relayed in these notes have been confirmed by active ALPA representatives in their own communications.

DPA has not inserted any comments in these notes. We are providing the notes as a starting point for discussion. Major highlights located throughout the notes include a discussion about paying an ALPA rep full Flight Pay Loss to work out of his home, MEC Chairman leadership, the establishment of a Special Committee to fight DPA, the wasting of $66,000 in dues by the Special Committee, the "Scourge Letter" originating from ALPA National, and other testimony pointing to a dysfunctional MEC.

Delta Pilots should be concerned that we have no control or direct input in this process.

**CLICK HERE** to read the MEC Recall Meeting Notes.

**Update** on November 18, 2013 by **Webmaster**

A great deal of information has surfaced since the MEC began to self-destruct several weeks ago. We learn from several Council updates that the MEC experienced a "coup" that has removed any hope of bottom-up representation from within DALPA. Details have emerged about a secret "Special Committee" whose sole purpose and function is to attack DPA and fellow Delta Pilots. Leaders of the Special Committee were fired by the MEC for unprofessional behavior such as insisting that an ALPA Rep be paid full time Flight Pay Loss to stay at home and write attack pieces against Delta Pilots. These very same leaders were immediately reinstated following the coup and restarted their attack. One of their very first moves was to head to layover hotel lobbies and bars and intercept Delta Pilots with their anti-DPA message. They aggressively pushed the attack packet shown below on Delta Pilots:

The centerpiece of the packet was an attack letter riddled with misinformation and twisting of the truth. DPA responded by providing a full rebuttal available below:

**CLICK HERE** to view and print out the rebuttal to carry with you. (Adobe Reader is required to view.)

When it comes to understanding the under-handed dealings of a rogue MEC, nothing beats hearing it from the horse's mouth. Below you will find a comprehensive collection of responses to the MEC Recall provided by various LEC's, both for and against the Recall of the MEC Chairman. Pay particular attention to the perspectives from several CVG pilots. They clearly reveal how low some will go to maintain power.

**CLICK HERE** for the C54 (SEA) Perspective.

**CLICK HERE** for the C108 (CVG) FO Perspective.

**CLICK HERE** for the C108 (CVG) CA Perspective.

**CLICK HERE** for the C66 (NYC) CA Perspective.

**CLICK HERE** for the C66 (NYC) CA/FO Update.

**CLICK HERE** for the C20 (DTW) Perspective.

**CLICK HERE** for the C44 (ATL) Perspective.

**CLICK HERE** for the C01 (MSP) Perspective.

**CLICK HERE** for the C16 (LAX) Perspective.

**Is change from within possible? Apparently not.**

Email Article | Print Article

**View Printer Friendly Version**

DPA 301

« ALPA Negotiates DAL Tentative Agreement Without Input From Pilots | Main | DPA Hits the BIG SCREEN! »

April 24, 2014

## ALPA Enlists Over 120 DAL Pilots to Spy on Fellow Pilots

ALPA leaders, in a desperate attempt to hold back the rising tide of DPA members, have lowered the bar in dirty tactics once again. An internal email from ALPA leadership has asked all Delta Pilot Network (DPN) and Pilot-to-Pilot (P2P) committee members to disguise themselves, spy on fellow Delta Pilots, eavesdrop on conversations, observe actions and report what is learned back to ALPA. Unknown amounts of dues dollars are being spent on this effort in the form of trip drops and Flight Pay Loss (FPL). See the email below to over 120 ALPA committee members:

***From:*** *"Caplan, Brad, DALMEC DPN Vice Chairman" <Brad.Caplan@alpa.org>*
***Sent:*** *Tuesday, April 22, 2014 12:45 PM*
***Subject:*** *DPA in the lounges / meeting rooms*

*DPN / P2P Volunteers -*

*It has come to our attention that the DPA has been frequenting lounges on a random basis, usually when there is no Flight Operations personnel on duty. We have received reports of this occurring most frequently in JFK and DTW pilot lounges.*

*In addition, today April 22nd, the DPA has rented out space in the ATL airport from 0830 to 1700. They are located in the Executive Board Room 9, OUTSIDE security on the third floor of the Atrium/food court.*

*For those volunteers that commute to any of these locations, please consider coming in a little earlier than normal or departing on a later flight, if DPA is in the lounge. For those of you that may be flying, or happen to be on a "productivity sit," please take the time to listen as well. We are interested in number of pilots that you may see talking with DPA, number of pilots that you actually see sign a card, along with any other prevalent information you may be able to provide. Please feel free to remove anything identifying you as a P2P / DPN Volunteer, and please provide any relevant information to me.*

*Thank you for your assistance.*

*Brad Caplan*

*Delta MEC DPN Chairman*

*Brad.caplan@alpa.org*

*cell: 678-612-5413*

It is apparent that ALPA is using these two committees for purposes other than they were designed. Fortunately, some members of the committees found this request distasteful, unprofessional and beneath Delta Pilots and chose to expose the actions of ALPA instead.

The act of spying on fellow Delta Pilots can only be the work of the "Special Committee" formed by ALPA leadership to attempt to defeat DPA. A few sketchy details of nature of the committee came out during the recall proceedings of the MEC Chairman in October 2013. The Council 20 report below reveals a committee of "lieutenants" tasked solely for the purpose of holding off DPA. While there was no official committee chairman designated, the report revealed that Captain Mike Pinho was the "senior lieutenant" and "defacto chairman" of the committee.

**CLICK HERE** to read the report describing the Special Committee.

Dig a little deeper and Delta Pilots discover that Captain Pinho is listed on the 4th Quarter 2013 Committee roster as a member of the Government Affairs Committee. The 4th Quarter FPL Report indicates that Captain Pinho, the "senior lieutenant" of the Special Committee was paid, not for Government Affairs work, but exclusively for Delta Pilot Network (DPN) work, a committee he wasn't even on.

**CLICK HERE** to search the 4th Quarter 2013 Committee roster.

**CLICK HERE** to search the 4th Quarter 2013 FPL Report.

**It is clear that the Special Committee has commandeered the P2P and DPN Committees**, if not others (Strategic Planning, Communications, Government Affairs and IAAC), for its own nefarious purposes. Committee members are being paid under the auspices of duties on one committee while, in reality, they are spending most, if not all, of their time working for the Special Committee. The MEC Chairman and Treasurer are authorizing and accounting for these activites.

The Council 20 report available above reveals that over $60,000 in dues disappeared into the Special Committee void in the fall of 2013. There is no accounting of how much has been spent in total by the Special Committee since that revalation.

It is time that Delta Pilots demand to know who is and has been on the Special Committee since its inception. Delta Pilots should demand to know how much money has been spent by the Special Committee, whether directly or through other committees, to conduct operations against fellow Delta Pilots. Delta Pilots should demand from their Reps a full accounting and shutdown of this unprofessional operation.

Again, the character of ALPA is revealed in its actions. Do we want a union that relies on thug tactics and shadow operations to represent us? Should our own union spy on us? The DPA Constitution guarantees full transparency and accountability so our

members will know, in the full light of day, what our union is doing and spending OUR money on. Pass this story along, wherever you are, and use it to help other Delta Pilots see that DPA is the clear choice.

Email Article | Print Article

View Printer Friendly Version

**© 2013 • Delta Pilots Association • P.O. Box 17025 • Tampa, FL 33682-7025**

**dpa@delta-pilots.org**