UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELTA PILOTS ASSOCIATION,<br>    a labor organization<br>    incorporated in Florida<br>                      Plaintiff<br><br>v.<br><br>JOHN DOE,<br>    an individual<br>                      Defendant. | Civil Action No.: 1:14-cv-00225-AKH<br><br>**DECLARATION OF<br>TIM CAPLINGER** |

I, Tim Caplinger, do declare as follows:

1. I make this Declaration of my own free will, based on my personal, first-hand knowledge, unless otherwise specifically indicated, and would so testify under oath.

2. This Declaration is submitted in support of "Plaintiff's Memorandum Of Law Opposing Defendant's Motion For Summary Judgment."

3. I reside in Tampa, Florida. I am employed by Delta Air Lines, as a pilot.

## Main Averments

4. I am Interim President of Plaintiff, the Delta Pilots Association ("DPA"), a position I have held since 2010.

5. DPA is an association recognized by the IRS as a 501(c)(5) labor organization, which is incorporated in the State of Florida.

6. DPA seeks to organize and exclusively represent the craft and class of pilots at Delta Air Lines, Inc. ("Delta"). Currently, there is no representational election pending and the Delta pilots continue to be represented by the Air Line Pilots Association ("ALPA").

7. DPA maintains a home office in Tampa, Florida.

8. In May of 2010, DPA was founded out of dissatisfaction with ALPA's representation of Delta pilots and with the specific goal of replacing ALPA as the union representing Delta pilots.

9.  I am the founder of DPA, a member of its Board of Directors, as well as its Interim President.

10. In 2010, DPA began a campaign to collect authorization cards ("cards") signed by individual Delta pilots in order to demonstrate to the National Mediation Board ("NMB") that a majority of them desire to be represented by DPA.

11. At the time, this campaign was for the purpose of securing and winning a representational election conducted by NMB, pursuant to the Railway Labor Act ("RLA"), and ultimately to have DPA certified by the NMB as the new and exclusive representative of Delta pilots.

12. By early November 2013, DPA had collected cards from more than 50% of all Delta pilots (a statutory threshold) but had not yet filed an application for a representational dispute with the NMB (to obtain a representational election) due to several hundred of the previously collected cards having expired (greater than one year old per NMB requirement).

13. DPA's primary means of conducting its business, including communicating with Delta pilots, raising donations, and campaigning, was and is through its web site.

14. DPA's web site could then be located, or "surfed" to on the Internet, or "web," at the uniform resource locator ("URL"), or web address of, http://delta-pilots.org and several other domain names redirected to the primary domain http://delta-pilots.org including:
    www.deltapilotsassociation.org;
    www.deltapilotsassociation.net;
    www.deltapilotsassociation.com; and
    www.deltapilot.org.
    The above addresses could also be reached at times by adding ".squarespace.com" to the end of the address.

15. DPA's web site then contained publicly accessible web "pages" as well as private pages that required a login and password.

16. On the public portion of its website, DPA displayed a running count of the number of cards signed by Delta pilots in DPA's campaign to replace ALPA.

17. SquareSpace, Inc. is a New York company that in 2013 "hosted" DPA's web site.

18. Through SquareSpace, DPA also linked to various domain names or other URLs or web sites on other computers used in inter-state commerce, and maintained a web master account.

19. Critical files, code, and programs that constituted DPA's web site were then maintained on computers located in the state of New York.

20. I was authorized to and had personal access to DPA's SquareSpace account on behalf of DPA.

21. Richard Eagan, also a pilot employed by Delta, was DPA's Web Master. Eagan was then authorized by me to access DPA's SquareSpace account on behalf of DPA.

22. Russell C. Melvin ("Melvin") joined DPA on or about January 5, 2011, giving an address of 7050 Corsica Drive, Germantown, Tennessee, 38138.

23. At no time was Melvin ever authorized for administrative access to DPA's web site, computer files, or computers used by DPA for its web site.

24. Melvin withdrew from DPA in 2012.

25. Starting on or about November 8, 2013, and continuing thereafter, the integrity of DPA's web site was dramatically and visibly disrupted when it was "hacked" into likely by unauthorized use of the DPA administrative login and password and thereafter the hacker caused damage by the transmission of code or commands to cause DPA's web site to cease functioning and instead to serve the hacker's unauthorized use.

26. On November 8, 2013, at approximately 7:18 p.m. EST, the hacker transmitted commands or code to the "master files" of Squarespace computer and files hosting DPA's web site and opened a trial account called "Tim-Caplinger.squarespace.com" for the purpose of creating a hoax or fake website on that trial account in order to redirect the DPA website to the trial account website using DPA domain administrative credentials.

27. To accomplish this unauthorized act the hacker impersonated "Tim-Caplinger" and used an email address of amp.chumbawamba@ausi.com, as Squarespace computer records show.

28. At approximately 7:18 p.m. EST using the DPA domain administrative credentials the hacker transmitted commands or code to redirect the primary domain "delta-pilots.org" to the domain name of "deltapilot.org" which was then redirected to "Tim-Caplinger.squarespace.com".

29. The site "deltapilot.org" was a domain listed in the DPA Administrative account but was not being used by DPA, nor was DPA aware the domain was present in the account at the time of the attack. The domain was apparently created, without authorization from DPA in April of 2012 by the registered owner "hobbsmsb@aol.com". DPA is presently unaware of what mechanism was used to add the domain to its account.

30. The hacker transmitted commands or code to the Squarespace computer and other domain files hosting DPA's web site that caused the "deltapilot.org" site to 'point to' files existing in the Tim-Caplinger.squarespace.com trial account. The "deltapilot.org" site owner was concealed by "ContactPrivacy.com" – a domain privacy service which was located in Canada and which had been previously established by unknown parties who, apparently, conspired with the hacker.

31. As a direct and immediate consequence of this attack, DPA's web site ceased to function as intended and web pages containing data and information in the public portion of the web site were made inaccessible to visitors to the website.

32. The ability of DPA's web site to accept monetary donations from member and/or supporters ceased to function properly when software links to a secure third-party credit card web site were severed.

33. The ability of the web site to display video messages and important updates was also severely disrupted.

34. The private portion of the web site also became inaccessible.

35. Visitors to DPA's web site were involuntarily redirected away from it to sites not of DPA's making, nor owned, nor controlled by DPA.

36. In the early stages of the attack, viewers attempting to access DPA's web site were involuntarily redirected to a web page that falsely claimed DPA had abandoned its card collection campaign and instead now urged support for ALPA (i.e. the "work together" message). This false page also contained a link to an ALPA web site.

37. In the later stages of the attack viewers were redirected back to the unused DPA web site, "deltapilot.org," which was then apparently configured to mimic DPA's primary web site, potentially a malicious "clone" of it.

38. The false web page and the clone site were calculated or intended to dissuade any further Delta pilots from signing cards in DPA's campaign or to otherwise abandon DPA and its campaign, by knowingly and intentionally making false statements of material fact about DPA and its campaign.

39. The computer attack disrupted DPA's web site and effectively "hijacked" it to another site, one intended to appear as part of DPA's web site in order to deceive viewers of it and to inhibit or cut-off donations to DPA.

40. The attack further severed software links to other computers used and relied upon by DPA's web site both for receiving monetary donations and for displaying videos.

41. Some severed links were not discovered or repaired until January 2014.

42. In attempting to assess damage and to restore the integrity of DPA's web site and restore availability of data and severed linked programs, I initially expended approximately 40 man-hours and Eagan 32 hours between discovering the damage and about December 3, 2013. The time I and Eagan took to work on responding to the hacking was time lost from DPA's campaign. A great deal of time (more than 12 hours) was spent initially trying to regain control of the website during the 21 hours and 27 minutes the hacker had control of the DPA website. This is evidenced by the extensive chat logs between myself and Squarespace and between Eagan (media@delta-pilots.org) and Squarespace as well as phone calls to GoDaddy and chat support. After the DPA website was recovered from the control of the hacker, many more hours were spent going page by page through the hundreds of DPA web pages looking for broken links and malicious code wherever possible. By the third day after the attack, only occasional repair efforts (one to two hours in duration each approximately three times a week) were made as DPA members brought new broken links to our attention or we found additional damage on our own. This occasional effort lasted until January 2014 when the last known broken link was found. Additional communications via email, Twitter and text messaging had to be drafted and sent out to our members explaining what we thought was happening to us at the time and asking for their help. These explanatory communications cost us a great deal of extra time and effort to accomplish that would have been spent on campaign communications, organizing, video production and meeting preparation otherwise. All of this time spent on damage control detracted from critical campaign efforts.

43. At the time, as pilots, I earned about $150 an hour and Eagan $203.

44. DPA sustained loss through donations not received during that portion of time that the DPA web site's contribution page and other links to that page were rendered inoperable.

45. As a direct consequence of the severed links to the donation pages, an unknown amount of donations were lost during November and December 2013, while the site was being repaired. Based on July 2013 total donations of over $11,000 for that month, November and December 2013 were only $10,641 combined, implying a loss of approximately $11,000 for the November and December 2013 period.

46. DPA suffered loss by incurring costs and expenditures to identify and pursue the offender(s) in order to ensure the future security and integrity of the DPA web site.

47. DPA also suffered the consequence of lost good will with the Delta pilots when the hacking and redirection to web sites falsely claiming DPA had ceased its organizing campaign, interfered with or frustrated DPA members and supporting pilots' lawful exercise of rights under the RLA to choose their own representative, which DPA sought to facilitate.

48. Despite my and Eagan's immediate efforts to mitigate damage to DPA's web site and to restore control over it, the hacker apparently succeeded in continuing to insert commands or code into accounts on computers relied upon by DPA that are necessary to the proper and safe function of DPA's web site, for a period of time after the initial attack on November 8th, 2013.

49. At the time neither I or Eagan appeared to have been successful in removing all of the malicious commands or code and consequently DPA's web site remained potentially vulnerable to renewed "backdoor" attacks by defendant.

50. On November 9, 2013, DPA published in its publicly accessible Facebook and Twitter accounts a message stating, "ALPA has hijacked and cloned the DPA website! DO NOT go to our site until further notice …"

51. On November 14, 2013, DPA published in its email newsletter entitled "DPA Status Report" an article that stated in part, "Hacking Update … our investigation has led us to a point we did not want to arrive at, filing a lawsuit …"

52. The very next day, November 15, 2013, I received at my home three phone calls from a male person who refused to identify himself but who admitted he was responsible for interfering with DPA's web site.

53. In this call, the caller attempted unsuccessfully to negotiate with me to avoid being identified or pursued.

54. Later that same day I made a criminal a complaint based on the hacking of DPA's web site.

**Additional Averments**

55. DPA began requesting assistance from Squarespace on the morning of November 9, 2013.

56. I used the Squarespace account, tim-caplinger.squarespace.com, only in the month of September 2012 for the purpose of setting up my neighborhood (Faircloth Estates) Home Owners Association's website in trial mode using my personal email address redrudder@verizon.net to initiate the trial account. Once the trial account was ready for publishing, I migrated the website to www.fairclothestates.org and deleted the trial account tim-caplinger.squarespace.com. I have not used or reactivated the tim-caplinger.squarespace.com trial account since September 2012. The trial Squarespace account tim-caplinger.squarespace.com was re-opened by the attacker in 2013 using a personal email address of amp.chumbawamba@ausi.com (*see* DPA 149-168). It is my belief that Russell Melvin stated he owned a trial account that contained his "private writings and thoughts of a personal nature" that was the false website including the pro-ALPA "Work Together" message in a letter he sent to ALPA shown in DPA 47-51 and 293-97.

---

Declaration of Tim Caplinger                                                                 Page 6 of 8

57. On November 13, 2013, DPA did not know the extent of the broken donation and video links at that time. Some had been repaired, but others were not found until as late as January 2014.

58. During the month of November 2013 following the hack, DPA was locked out of its ability to configure its domain settings. During the initial attack, I did not know how or why the website was redirecting to the "tim-caplinger.squarespace.com" account. It took myself and Eagan hours of research and contact with customer service at Squarespace and GoDaddy to even begin understanding what was happening. During the hours that the hacker's trial account was displaying on the DPA website, DPA had no ability to modify or configure the DPA website because the website was displaying the trial account "tim-caplinger.squarespace.com" via the "deltapilot.org" domain. The hacker had control of the content of his trial account "tim-caplinger.squarespace.com" that was displaying on the DPA website until he chose to return control back to DPA by turning off and deleting the trial account "tim-caplinger.squarespace.com". At no time in 2013 did DPA have control of or access to the "tim-caplinger.squarespace.com" trial account.

59. Once the domain began pointing correctly, the problem of broken donation and video links became the focus of our recovery efforts.

60. The unused DPA domain "deltapilot.org" was initiated in 2012 by an unauthorized entry into the DPA Administrative account. It was apparently a free domain name provided and hosted by Squarespace. The exact mechanism or unauthorized entry is unknown at this time. Neither Richard Eagan or myself were aware of the presence of "deltapilot.org" in the DPA Administrative account until after the attack occurred.

61. In the days and weeks following the hacking and disruption to the DPA website, Delta pilots who then supported DPA informed me that they were frustrated in attempting to make donations to DPA by DPA's malfunctioning website.

62. In the month of November, 2013, following the hacking, as I and Mr. Eagan discovered broken links and repaired them, DPA belatedly received some online donations.

63. In the month of November, 2013, immediately following the hacking, I observed on the Delta pilot web forum http://thehangar.forumchitchat.com many chats and postings by Delta pilots critical of DPA and our apparent inability to provide a secure website for our members. Several statements were made concluding that we could not hope to represent Delta Pilots when we could not keep even our own website secure. Those comments were posted in the Delta Pilot forum, available to any Delta pilot, and caused DPA continued damage to its goodwill. In addition, at the time, my belief was that ALPA was receiving approximately $70 Million in annual dues from Delta Pilots at 1.9% dues rate. Delaying a vote that could have led to DPA's certification as the Delta pilots' representative delayed DPA's dues structure of 1% annual rate from commencing, potentially costing us over $30 Million a year in dues.

64. Following my discovery of the hacking on November 9, 2013, and in the weeks following, I determined from the extent of the dysfunctionality, the apparent theft of passwords or login information, and the fact that the responsible parties were unknown, that there then remained the possibility that someone installed some sort of spyware or keylogger on the website or even on my own computer – and so there remained an ongoing threat.  Following the call to my house from the hacker only a few days later on November 15, 2013, whom I now believe was the Defendant in this matter where he admitted responsibility for disrupting DPA's website but refused to reveal himself – I further determined that the caller, and perhaps other persons working with him, either continued to attack DPA's website or would in the future – until their identity was exposed.  For these reasons, and others, I made a criminal complaint and then I engaged the law firm of Seham, Seham, Meltz & Petersen LLP to use the courts to find and enjoin the hacker/caller(s) to end the ongoing threat to DPA.

65. At no time did Delta Pilots Matthew Hobbs (hobbsmsb@aol.com), Mark McClain (mark_mcclain@cox.net), or Donald Harte (daharte@bellsouth.net) have authorized access to the DPA administrative account.

66. After November 15, 203, DPA received donations in the form of cash and checks.

67. In my experience as a pilot represented by labor unions such as ALPA, it is common that union officers are compensated for working on the union's behalf by paying them the value of the wages or flight time that they might or do earn as pilots.

Pursuant to 29 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on:  June 14, 2018        By:  _____
                                         Tim Caplinger