USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/15/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
                                                               :
DELTA PILOTS ASSOCIATION,                                      :
                                                               :   **ORDER DENYING MOTION**
                                        Plaintiff,             :   **FOR SUMMARY JUDGMENT**
                                                               :
        -against-                                              :   14 Civ. 225 (AKH)
                                                               :
RUSSELL C. MELVIN,                                             :
                                                               :
                                        Defendant.             :
                                                               :
-------------------------------------------------------------- X

ALVIN K. HELLERSTEIN, U.S.D.J.:

        This case concerns an alleged hacking of a labor union website during a contested campaign. Plaintiff Delta Pilots Association ("DPA" or "plaintiff"), a 501(c)(5) labor organization, filed this action on January 13, 2014, under the Computer Fraud and Abuse Act ("CFAA"), *see* 18 U.S.C. § 1030 *et seq.*[1] Broadly stated, the complaint alleges that Russell C. Melvin ("defendant") maliciously infiltrated DPA's website in an effort to undermine its campaign to unseat the Air Line Pilots Association ("ALPA") as the sole union representing Delta Airlines pilots. Plaintiff's second amended complaint asserted three causes of action, corresponding to violations of 18 U.S.C. § 1030(a)(5)(A)–(C). DPA moves for partial summary judgment. Plaintiff's motion is denied.

---

[1] DPA has filed two amended complaints in this case, the first of which was filed on October 26, 2016, to add Russell Melvin to the caption. *See* First Amended Complaint, ECF 51. In response to defendant's motion to dismiss, the Court granted DPA leave to file a second amended complaint on April 5, 2017. *See* Second Amended Complaint, ECF 85. As discussed *infra*, I denied plaintiff's motion to file a third amended complaint. ECF 125.

## Background

### A. Factual History

DPA is a registered 501(c)(5) labor organization. Defendant's Response to Plaintiff's Rule 56.1 Statement ("Def. 56.1 Resp."), ECF 115, ¶ 1.1. It claims that defendant maliciously infiltrated its website in an attempt to thwart DPA's campaign to become the sole representative for Delta Airlines pilots in collective bargaining, briefly disrupting is fundraising and messaging campaign and stalling momentum for its initiative.

At the time of the alleged disruption, DPA was working to unseat the Air Line Pilots Association ("ALPA"), the existing pilots' union. As part of its campaign, DPA operated a website to, among other things, communicate with Delta pilots, solicit donations, and disseminate information. Def. 56.1 Resp. ¶ 2.1. The site was hosted by Squarespace, Inc., a New York company. Def. 56.1 Resp. ¶ 2.4. As the campaign was allegedly gaining steam in late 2013, DPA's website began to malfunction.

Specifically, DPA claims that on November 8, 2013, the website at the URL www.deltapilotsassociation.org, and associated URLs, began redirecting users and potential donors to a hoax website that falsely claimed that DPA had abandoned its campaign and would instead support ALPA. ECF 116-1, at 3. DPA claims that just as this issue was resolved, the website began redirecting users to a webpage that disseminated false information about DPA and attempted to dissuade potential supporters from joining the campaign. ECF 118-1. In sum, DPA claims that it faced an ongoing attack on its computer systems orchestrated by the defendant.

Although DPA claims that it feared a subsequent attack or other disruption, DPA acknowledges that "much of the website was soon restored to functionality." Br., ECF 114, at 1. DPA claims that the disruption began between 7:00 p.m. and 8:00 p.m. on November 8, 2013.

Def. 56.1 Resp. ¶ 4.5. Defendant observed in his letter that various technical issues altogether appear to have occurred for approximately eighteen hours. Tim Caplinger, the interim president of DPA, estimated that control of the site was lost for 21 hours and 27 minutes. In any case, by November 9, 2013, DPA appears to have received new online-based "member donations," as distinguished from "check donations" and "cash donations." Lossia Decl., Ex. R., ECF 132-18, at 43.

On November 15, 2013, defendant telephoned Caplinger. Caplinger Decl., ECF 118, at 1; Def. 56.1 Resp. ¶ 4.2. While the call was at the time anonymous, defendant subsequently admitted to making the call. *Id.* The contents of the call are disputed: Caplinger claims that defendant acknowledged responsibility for the disruption and revealed various technical details corroborating his involvement. Caplinger has stated that defendant provided details of the disruption of DPA's website, including the time, his location, his use of an AT&T WiFi network, his IP address, his browser, his creation of a trial Squarespace account with the username "Tim-Caplinger," and that he in fact created a "harmful web page." Caplinger Decl. ¶ 21. Defendant denies making these admissions, and he generally disputes Caplinger's account of the call. *See, e.g.*, Def. 56.1 Resp. ¶ 4.15. On the call, defendant admits stating that he was present in the downtown Atlanta Hilton, along with many other Delta pilots, on November 8, 2013, and defendant subsequently admitted that he did in fact stay there on November 8, 2013. Def. 56.1 Resp. ¶¶ 4.7–.8.

Defendant also admits to having sent a letter that contains some details of the disruption. Def. 56.1 Resp. ¶ 4.22. Defendant expressed his "regret that the mapping problem interfered with the operation of his website." ECF 13-4. In the letter, defendant denies that he attempted to access DPA's domain name management account, but he acknowledges that "his

3

personal, unpublished website was mapping to a domain name owned by and controlled by DPA" and that "my private writings and thoughts of a personal nature were briefly accessible to those visiting a DPA owned domain name." ECF 13-4. Defendant also acknowledges having a Squarespace trial account at that time. Def. 56.1 Resp. ¶ 4.16. Squarespace records appear to show that a user with the IP address 64.134.191.62 accessed the "deltapilotsassociation" site, though the nature of the engagement, if any, is unclear. ECF 127.

DPA has presented several theories of damages: (1) the 72 hours of labor, undertaken by volunteer pilots, apparently necessary to repair DPA's computer system following the attack, which DPA values at $12,496, (2) attorneys' fees it claims were necessary to respond to the ongoing threat to its website, and (3) other consequential damages resulting from lost donations and the loss of good will among potential donors and supporters.

DPA did not pay any information technology professionals to remediate the disruption. Rather, it relied on the volunteer labor of Caplinger and Rick Eagan ("Eagan"), who also volunteered as DPA's webmaster. Neither Caplinger nor Eagan were scheduled to fly on November 9 through November 15, 2013, and neither pilot opted not to fly or otherwise forfeit any flying opportunities in 2013 because of the website disruption. Pl. 56.1 Resp., ECF 135, ¶ 80. Plaintiff's hours of labor are self-reported, and it measures its per-hour costs based upon Caplinger and Eagan's respective $150 and $203 per hour pilot wages. Pl. 56.1 Resp. ¶ 75. Caplinger testified that he resolved the issue by, among other steps, submitting technical support tickets to websites' technical support staffs. Pl. 56.1 Resp. ¶ 76; Deposition of Tim Caplinger, ECF 128, Tr. 49:14–50:6. After following the instructions of technical support personnel, the redirection issue was successfully resolved. The United States Bureau of Labor Statistics has reported that individuals in the "computer and mathematical occupations" involved in time-based

pay earn between $34.87 and $48.23 per hour in the Tampa—St. Petersburg—Clearwater Area. Pl. 56.1 Resp. ¶ 77.

In 2012 and 2013, DPA has never received more than $5,000 donations in a single week, and it received more than $3,000 in a single week only four times, one of which occurred in November 2013, after the alleged disruption. Pl. 56.1 Resp. ¶¶ 88–89.

### B. Procedural History

DPA originally filed this case on January 13, 2014, against John Doe, a purported member of the ALPA. DPA immediately filed a motion for leave to take immediate discovery to identify the actual perpetrator behind the attack. The Court granted DPA's request on January 29, 2014, *see* Order, ECF 5, and third-party discovery commenced. Having unmasked the alleged culprit, DPA then moved to amend the complaint to add the defendant to the caption. The Court granted DPA's motion on October 20, 2016, and plaintiff amended on October 26, 2016. *See* First Amended Complaint, ECF 51. The Court thereafter granted plaintiff's request to file a second amended complaint on April 5, 2017. *See* Order, ECF 84.

On July 10, 2018, I denied defendant's motion for summary judgment with leave to renew at the end of discovery, concluding that further discovery was appropriate on the issue of damages, among other issues. ECF 104. The parties conducted fact discovery, which closed January 31, 2019. ECF 108. Subsequently, plaintiff withdrew its second claim, corresponding to a violation of 18 U.S.C. § 1030(a)(5)(B) of the CFAA. ECF 126. I denied plaintiff's motion to amend its second amended complaint. ECF 125.

## Discussion

### C. Legal Framework

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, a Court must "view the evidence in the light most favorable to the party opposing summary judgment, . . . draw all reasonable inferences in favor of that party, and . . . eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

A hack of DPA's website is actionable under the CFAA. As relevant here, Section 1030(a)(5) of the CFAA creates a private federal cause of action against any person who: (1) "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer," § 1030(a)(5)(A); or (3) "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss," § 1030(a)(5)(C).[2] Section 1030(g) of the CFAA provides: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this

---

[2] The CFAA also prohibits a broad range of conduct not relevant to this case. *See generally* 18 U.S.C. § 1030(a).

6

section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)." 18 U.S.C. § 1030(g); *see also Ramirez v. SupportBuddy Inc.*, No. 17-cv-5781 (VB), 2018 WL 2089362, at *4 (S.D.N.Y. May 4, 2018).

To maintain a cause of action under Section 1030(c)(4)(A)(i)(I), a plaintiff must show "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." Section 1030(g)(11) defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

**D. Application**

1. Access to the Website and Causation of a Transmission

Although plaintiff argues that defendant's statements and the surrounding circumstances establish defendant's liability, the factual record is not conclusive. Plaintiff's technical evidence, though potentially corroborative of defendant's liability, does not categorically establish that defendant was responsible for the website's disruption. It is undisputed that the DPA site(s) were disrupted for some period of time. Nevertheless, despite additional factual discovery, the exact nature and methods of the alleged disruption remain speculative and indefinite. Plaintiff relies primarily on Caplinger and Eagan, pilots admittedly lacking in specialized or expert knowledge for technical descriptions of the website's function. Other technical evidence, including of access to the Squarespace site at a particular IP address and the purported links between an email address "amp.chumbawamba@ausi.com," forum username "amp.chumbawamba," and web forum posts concerning "Major Russell Melvin" also

7

corroborate plaintiff's theory but do not conclusively prove defendant's responsibility for the disruption. ECF 118-2, at 48.

Plaintiff makes much of defendant's statements on his call to Caplinger and in his subsequent written statement. The statements, while potentially incriminating and supportive of an inference of liability, do not in themselves constitute admissions of fault. Moreover, there is no recording of the call with Caplinger, and any reliance on contents of the conversation requires weighing Caplinger's credibility, an issue not suitable for disposition on summary judgment. Inferring the requisite intent of defendant from these statements and from the technical evidence is a factual issue properly before a jury.

2. Damages

In assessing and rejecting defendant's motion for summary judgment, I concluded that plaintiff's damages theory "calls for a nuanced review of the ongoing nature of the website's malfunction that should be explored in discovery." Nevertheless, the factual record has remained largely unchanged since that time; DPA merely cites its earlier brief in opposition to defendant's motion for summary judgment for narrative "in greater detail." Br. at 15.

There is no dispute that labor performed to repair a website can qualify as a "cost of responding to an offense." See 18 U.S.C. § 1030(g)(11). The only dispute is the value of DPA's labor. Of the seventy-two hours of labor that DPA claims were necessary to respond to the attack, 40 were performed by Caplinger, a Delta pilot and then-president of DPA, and thirty-two were performed by Eagan, also a Delta pilot and then-webmaster of DPA. Defendant claims that, because Caplinger and Eagan were working as volunteers for the union, the seventy-two man-hours spent repairing the computer system are valueless. In contrast, DPA claims that their

8

time should be valued at $150 per hour and $203 per hour, respectively, or the hourly wages that Caplinger and Eagan received as pilots for Delta.[3]

Alternatively, the value of the labor could be set at the amount plaintiff "would have had to pay . . . had it hired an outside contractor to repair the damage," or some other number entirely. *United States v. Middleton*, 231 F.3d 1207, 1214 (9th Cir. 2000). Indeed, as the Ninth Circuit has explained:

> There is no basis to believe that Congress intended the element of "damage" to depend on a victim's choice whether to use hourly employees, outside contractors, or salaried employees to repair the same level of harm to a protected computer. Rather, whether the amount of time spent by the employees and their imputed hourly rates were reasonable for the repair tasks that they performed are questions to be answered by the trier of fact.

*Id.*

In denying defendant's motion for summary judgment, I concluded that "the value of DPA's time cannot, as defendant suggests, be zero. Were defendant correct, the CFAA would have no application to volunteer organizations or any number of nonprofit entities." Nevertheless, plaintiff's repair theory raises multiple issues for a finder of fact, such as whether the time reports of Caplinger and Eagon were accurate and whether their time spent, and their imputed hourly rates, were reasonable for the repair they conducted. These issues cannot be decided at summary judgment.

---

[3] To support this approach, DPA has submitted a declaration from an industry participant claiming that, in his experience, "pilots who provided services to the union during their free time, such as vacation time, would be permitted to identify a trip in their future schedule from which they would be removed and yet receive full pay for the trip from the union." Decl. of Howard Hollander, ECF 99, at ¶ 4.

### 3. Attorney Fees as a Subset of Losses

As to the value of the attorneys' fees spent responding to the alleged attack, it is well settled that, although "[l]itigation costs" associated with prosecuting a CFAA violation "are not recoverable, . . . legal expenses associated with remediating any damage, including any necessary preceding investigation, are recoverable." *Obeid on behalf of Gemini Real Estate Advisors LLC v. La Mack*, No. 14-cv-6498 (LTS) (HBP), 2018 WL 2059653, at *30 (S.D.N.Y. May 1, 2018).

DPA's damages theory categorizes at least some legal expenses as a response to an ongoing attack on its computer system. In effect, DPA argues that identifying the wrongdoer was not a typical litigation expense, but was the only way to eliminate or deter an ongoing threat.

Nevertheless, in spite of my observation that DPA's theory requires a nuanced analysis of the nature of the attack, DPA has done little to disambiguate legal expenses connected to remediating damage from normal litigation expenses. There is no suggestion that DPA's legal expenditures were necessary to remediate the damage to the website; in fact, the record suggests that, by their own admission, Caplinger and Eagan, two volunteers with no advanced technical skills, had largely completed their work by December 2013, before the great majority of the litigation work took place. Moreover, DPA's assertion of a continuing threat of attack is in tension with its own characterization of the November 15, 2013 call by defendant, who allegedly sought "to resolve any issue over the disruption concerning the caller's personal involvement," and "suggested he could pay expenses or write a letter of apology." Br. at 2.

I conclude that, given the transient duration of the disruption and the modest complexity of the repairs, the subsequent litigation to prosecute defendant under the CFAA does not constitute a "loss" within the meaning of the CFAA. *See Turner W. Branch, P.A. v. Osborn*,

No. 13-cv-00110 (MV) (WPL), 2014 WL 12593991, at *18 (D.N.M. Mar. 26, 2014). Plaintiff cannot invoke DPA's interest in general deterrence to place litigation expenses connected with any CFAA prosecution within the scope of its damages.

Similarly, at the time of defendant's motion for summary judgment, I observed that both parties relied on DPA's donation history from the months preceding and following the website malfunction. Despite intervening discovery, the purported decline in donations is speculative at best. Defendant notes that DPA leveraged the disruption to galvanize support and increase the number donations, and that November represented one of DPA's highest-earning months. This question is properly before a jury, and it is not appropriate to determine whether those damages exceed the jurisdictional threshold at this juncture.

Accordingly, factual issues also preclude granting summary judgment to plaintiff on the issue of damages.

## Conclusion

For the reasons stated, plaintiff's motion for partial summary judgment is denied. There exist material issues of fact in dispute. For the same reasons, any motion for summary judgment by defendant would be futile, and leave to renew such a motion is denied. *See* ECF 129. The parties shall appear for a status conference on September 20, 2019 to chart further progress in the case, and to set a date for trial. The clerk shall terminate the motion (ECF 113).

SO ORDERED.

Dated: July 15, 2019
New York, New York

_____
ALVIN K. HELLERSTEIN
United States District Judge